UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TANG CAPITAL PARTNERS, LP, | No. 22 Civ. 3476 (RWL) |
| Plaintiff, | **ORAL ARGUMENT REQUESTED** |
| -against- | |
| BRC INC., | |
| Defendant. | |

**PLAINTIFF TANG CAPITAL PARTNERS, LP'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT BRC INC.'S MOTION TO DISMISS**

GIBSON, DUNN & CRUTCHER LLP

Reed Brodsky
David Salant
Andrew Freire
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
rbrodsky@gibsondunn.com
dsalant@gibsondunn.com
afreire@gibsondunn.com

*Attorneys for Plaintiff Tang Capital
Partners, LP*

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ................................................................................ 1

**FACTUAL BACKGROUND** ................................................................................. 5

      A.   SPACs and de-SPAC Transactions. ....................................................... 5

      B.   SilverBox Issues Warrants Pursuant to the Warrant Agreement. ........... 6

      C.   SilverBox Combines with BRC, and the Business Combination is Registered with the SEC via the January Form S-4. ................................ 7

      D.   The January Form S-4 Paid a Registration Fee for the Shares of Common Stock Issuable Upon Exercise of the Warrants, Without Mention of any Further Registration Statement. ............................................................. 8

      E.   Transaction Documents and Contemporaneous Statements Reflect the January Form S-4 Registered Offers of Both the Warrants and Shares Issuable Upon Exercise of the Warrants. ............................................... 9

      F.   Tang Capital Purchases BRC Warrants. .............................................. 10

      G.   BRC Blocks Tang Capital's Attempts to Exercise its Warrants. .......... 10

      H.   During the Time Period Tang Capital Attempted to Exercise its Warrants, BRC's Public Stock Price Increased Sharply, and then Declined. ...................... 11

**LEGAL STANDARD** ......................................................................................... 11

**ARGUMENT** .................................................................................................... 12

   I.   Tang Capital States a Claim For Breach of Contract Because the January Form S-4 Registered the Warrants and Shares Issuable Upon Exercise of the Warrants. ................................................................................................ 12

      A.   BRC Misquotes the Warrant Agreement, Which Imposed No Requirement for the Filing of a Registration Statement on Form S-1. ....................... 12

      B.   Form S-4 Is Used to Register Warrants and Shares Issued Upon Exercise of the Warrants Offered in Connection with a Business Combination. ................. 14

      C.   The January Form S-4's Registration of the Offer of Shares Underlying the Warrants Required BRC to Accept the Exercise of the Warrants. ...................... 19

   II.   Tang Capital Has Sufficiently Pleaded Contractual Standing. ..................... 21

III.   The Court Should Not Rule on Tang Capital's Damages on this Motion to Dismiss. .................................................................................................................... 23

IV.   Tang Capital States a Claim for Declaratory Judgment. .............................................. 24

**CONCLUSION** .................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allan Applestein TTEE FBO D.C.A. Grantor Tr. v. Province of Buenos Aires*,
  415 F. 3d 242 (2d Cir. 2005) ................................................................................................ 22

*Arista Records LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ............................................................................................... 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................ 11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ................................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................ 11

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*,
  17 N.Y.3d 269 (2011) ......................................................................................................... 13

*Chechele v. Stand. Gen. L.P.*,
  2021 WL 2853438 (S.D.N.Y. July 8, 2021), *motion to certify appeal denied*,
  2022 WL 766244 (S.D.N.Y. Mar. 14, 2022) ...................................................................... 18

*Chiykowski v. Goldner*,
  2020 WL 2834225 (S.D.N.Y. May 31, 2020) .................................................................... 25

*Diamond Castle Partners IV PRC, L.P. v. IAC/InterActiveCorp.*,
  918 N.Y.S.2d 73 (1st Dep't 2011) ...................................................................................... 23

*Diverse Partners, LP v. AgriBank, FCB*,
  No. 16 Civ. 9526 (VEC), 2017 WL 4119649 (S.D.N.Y. Sept. 14, 2017) .......................... 22

*Dormitory Auth. v. Samson Constr. Co.*,
  94 N.E.3d 456 (N.Y. 2018) ................................................................................................. 23

*E. Materials Corp. v. Mitsubishi Plastics Composites Am., Inc.*,
  2017 WL 4162309 (E.D.N.Y. Sept. 19, 2017) ................................................................... 24

*Ely-Cruikshank Co. v. Bank of Montreal*,
  615 N.E.2d 985 (N.Y. 1993) ............................................................................................... 22

*Erickson v. Pardus*,
  551 U.S. 89 (2007) .............................................................................................................. 11

*Ezra v. Weitz & Luxenberg, P.C.*,
    794 F. App'x 27 (2d Cir. 2019) ...................................................................................22

*Fishman v. Bricker*,
    211 N.Y.S.2d 620 (1st Dep't 1961) ............................................................................22

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*,
    485 N.E.2d 208 (N.Y. 1985) ......................................................................................23

*India.Com, Inc. v. Dalal*,
    412 F.3d 315 (2d Cir. 2005) .......................................................................................23

*Johnson v. Roberts*,
    1992 WL 151820 (D.D.C. June 9, 1992) ....................................................................23

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
    507 U.S. 163 (1993) ...........................................................................................12, 21

*Lovati v. Petroleos de Venezuela, S.A.*,
    2021 WL 5908953 (S.D.N.Y. Dec. 14, 2021) ............................................................22

*Maracich v. Spears*,
    570 U.S. 48 (2013) .....................................................................................................17

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
    859 F.2d 242 (2d Cir. 1988) .......................................................................................23

*Myers Industries, Inc. v. Schoeller Arca Sys., Inc.*,
    171 F. Supp. 3d 107 (S.D.N.Y. 2016) ........................................................................25

*Olin Corp. v. Am. Home Assurance Co.*,
    704 F.3d 89 (2d Cir. 2012) .........................................................................................14

*Optanix, Inc. v. Alorica Inc.*,
    2021 WL 2810060 (S.D.N.Y. July 6, 2021) ...............................................................25

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998) .........................................................................................24

*Robin Bay Assocs., LLC v. Merrill Lynch & Co.*,
    2008 WL 2275902 (S.D.N.Y. June 3, 2008) ..............................................................24

*Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*,
    109 F. Supp. 3d 587 (S.D.N.Y. 2015) ........................................................................22

*SEC v. Longfin Corp.*,
    316 F. Supp. 3d 743 (S.D.N.Y. 2018) ........................................................................18

*SEC v. U.S. Envtl, Inc.*,
   2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) .......................................................15

*SEC v. Universal Express, Inc.*,
   475 F. Supp. 2d 412 (S.D.N.Y. 2007) ....................................................................15

*SEC v. Wyly*,
   788 F. Supp. 2d 92 (S.D.N.Y. 2011) ......................................................................17

*Sharkey v. Zimmer USA, Inc.*,
   2021 WL 3501160 (S.D.N.Y. Aug. 9, 2021) ..........................................................13

*Souratgar v. Lee Jen Fair*,
   818 F.3d 72 (2d Cir. 2016) .....................................................................................23

*Sudarsan v. Seventy Seven Energy Inc.*,
   2018 WL 1088004 (S.D.N.Y. Feb. 6, 2018) ...........................................................22

*Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*,
   404 U.S. 6 (1971) ...................................................................................................17

*U.S. v. Russell Elec. Co.*,
   250 F. Supp. 2 (S.D.N.Y. 1965) .......................................................................23, 24

*U.S. West Fin. Servs., Inc. v. Marine Midland Realty Credit Corp.*,
   810 F. Supp. 1393 (S.D.N.Y. 1993) .......................................................................24

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) .................................................................................15

*United States v. Newman*,
   664 F.2d 12 (2d Cir. 1981) .....................................................................................17

*United States v. Teicher*,
   987 F.2d 112 (2d Cir.) ............................................................................................17

*Van Syckle v. C.L. King & Assocs., Inc.*,
   822 F. Supp. 98 (N.D.N.Y. 1993) ..........................................................................24

*Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA) Inc.*,
   341 F. Supp. 2d 258 (S.D.N.Y. 2004) ....................................................................24

**Regulations**

17 C.F.R. § 230.145(a)(2) ...........................................................................................15

17 C.F.R. § 230.401(g)(1) ...........................................................................................20

17 C.F.R. § 230.415(a)(1)(viii) ...................................................................................16

17 C.F.R. § 239.25 ....................................................................................................................15

Plaintiff Tang Capital Partners, LP ("Tang Capital") respectfully submits this memorandum of law in opposition to Defendant BRC Inc.'s ("BRC") motion to dismiss.

## PRELIMINARY STATEMENT

BRC's motion to dismiss advances a revisionist narrative untethered from basic securities law reality. In January 2022, BRC registered with the SEC on Form S-4 an offering of warrant securities (the "Warrants") and stock issuable upon exercise of the warrants. BRC paid the SEC a registration fee for this offering; disclosed that the Warrants could be exercised at a particular time; offered and sold the Warrants to the investing public; and listed the Warrants for trading on the New York Stock Exchange ("NYSE"). Notwithstanding these undisputable steps, BRC claims the offering somehow remained unregistered and thus it had a right to block exercise of the Warrants. BRC's position is wrong. It ignores decades of SEC regulations and practice, contradicts BRC's prior securities filings and statements to the investing public, and amounts to a puzzling admission that it conducted an illegal offering of unregistered securities. BRC's newfound narrative should be rejected, and its motion to dismiss should be denied.

Tang Capital purchased BRC's Warrants in the open market, after they were registered on an SEC Form S-4 registration statement (the "January Form S-4") and approved for trading by the NYSE. The Warrants entitled holders to exercise a right to buy BRC's common stock at $11.50 per share. In March and April 2022, when BRC's stock price exceeded $11.50 per share, Tang Capital attempted to exercise its Warrants, a transaction that would have yielded a substantial profit. By then, the two key contractual conditions to the Warrants' exercise were satisfied: 30 days had passed since the closure of BRC's business combination on February 9, 2022, and the issuance of the shares underlying the Warrants was registered via an effective registration statement—the January Form S-4. But BRC refused to honor the terms of the Warrants, claiming the Warrants' exercise by Warrant holders was unregistered with the SEC, and that a further

registration statement on Form S-1 would be necessary before BRC could allow such exercise, a registration BRC would take months to complete.  Tang Capital attempted to exercise, sought unsuccessfully to engage with BRC's counsel on the adequacy of the January Form S-4, and then brought this action.

As a matter of basic securities law and practice, BRC can, and did, use the January Form S-4 to cover the offer, sale, and exercise of the Warrants.  In order to register the offering and sale of warrants exercisable within 12 months of a given offering date, the issuer must register not only the offer and sale of the *warrants*, but also the offer and sale of *stock issuable upon exercise of the warrants*.  For warrants offered as merger consideration, as occurred here, such registrations are regularly achieved using a single registration statement on Form S-4, in compliance with SEC Rule 415 for "delayed or continuous offerings" made "in connection with" business combinations.

BRC did just this on the January Form S-4.  In connection with its early 2022 "de-SPAC" business combination, BRC registered the offering and sale of Warrants being assumed from the predecessor SPAC, exercisable within 30 days of the closure of the business combination.  The Warrants and shares of BRC common stock issuable upon exercise of the Warrants were listed in bolded, capitalized font on the face of the January Form S-4.  The terms and conditions of Warrant exercise were described in detail in the January Form S-4.  BRC even paid the SEC a $18,940.15 registration fee specifically to register the offer and sale of shares "issuable upon exercise of the warrants."  The SEC Staff, after reviewing the filing and issuing comments to BRC, declared the January Form S-4 effective on January 13, 2022.  Shareholders approved the business combination on February 3, 2022, BRC's business combination closed on February 9, 2022, and the Warrants began trading publicly on the NYSE.  In sum, there can be no serious doubt the Form S-4 could, and did, register the offer, sale, and exercise of the Warrants.

Indeed, Tang Capital respectfully submits the expert report of John J. Huber ("Huber Rep."), the former Director of the SEC's Division of Corporation Finance, who supervised the proposal and adoption of the SEC's Form S-4 in 1984 and 1985, and also oversaw the adoption of Rule 415 for delayed and continuous offerings, the key form and rule governing this dispute.  A leading authority on U.S. securities registration rules and practices, Mr. Huber concludes, among other things:

- As a matter of longstanding SEC practice, Form S-4 may be used to register all of the "offer and sale," "resale," and "exercise" of warrants, and the resulting issuance of common stock upon exercise of the warrants, whenever such warrants are "publicly offered in connection with a merger."  Huber Rep. ¶ 12(A).

- BRC's January Form S-4 registered all aspects of the Warrants, including their exercise, upon the January Form S-4's being declared effective on January 13, 2022. Huber Rep. ¶ 12(B).  BRC listed the shares underlying the Warrants on the face of the January Form S-4; paid the SEC a registration fee for these shares; and caused the Warrants to be publicly listed on the New York Stock Exchange in reliance on the January Form S-4.  *Id.* ¶ 2.

- BRC's later-filed Form S-1 "was unnecessary and had no operative effect as to the offer and sale of" BRC's common stock issuable upon exercise of the Warrants "because the offer and sale of such shares had already been registered on the January Form S-4." Huber Rep. ¶ 12(D).

BRC's defense is that the January Form S-4 did not mean what it said.  BRC now claims to have registered on the January Form S-4 a so-called "Merger-Exchange Transaction," by which it supposedly *issued* the Warrants, but *not* the so-called "Warrant-Exercise Transaction" permitting Warrant holders to *exercise* them.  This position contradicts the January Form S-4, which stated it registered both the Warrants and the offering and sale of the shares of BRC common stock issuable upon exercise of the Warrants, and runs afoul of basic registration rules and practices.

BRC's position is problematic for additional reasons.  For one, in disclosing to investors the terms under which the Warrants could be exercised, the January Form S-4 made no mention of any requirement for a further registration of the exercise of the Warrants, a material omission if

such a requirement existed, which it does not.  Indeed, if BRC's litigation position were accepted, BRC violated Section 5 of the Securities Act by issuing and listing Warrants exercisable in 30 days, but whose exercise was unregistered with the SEC.  And BRC has no answer for why it paid the SEC a $18,940.15 registration fee to register the offer and sale of shares "issuable upon exercise of the warrants," if not for the obvious: to cover such issuance upon exercise as permitted by Rule 415 and Form S-4.  What is more, in correspondence between its own Investor Relations department and the investing public, BRC stated that the Warrants *were* exercisable starting 30 days after the de-SPAC merger closed, without reference to any need to file a new registration statement on Form S-1: yet another set of material omissions if BRC's present position is to be believed.  The investing public had a right to rely on what BRC said in its SEC filings and public communications, and BRC's contradiction of those statements now is troubling.

BRC's second-string arguments for dismissal fare no better.  BRC reads non-existent conditions into the text of the Warrants' governing warrant agreement, which, in any event, cannot override the securities law consequences of BRC's registration statement on Form S-4.

Nor are Tang Capital's allegations that it was the "Registered Holder" of the Warrants deficient in any way.  As BRC surely knows, Tang Capital attempted to exercise its Warrants *both* as a beneficial holder (*i.e.*, held with a broker as the intermediary) and a record holder (with no intermediary), and this change in form of ownership had no effect on BRC's willingness to respond to a proper and valid exercise notice.  In all events, contractual standing is evaluated as a threshold matter as of the time of the complaint, not at the time of the breaches of contract.  And plaintiff securities holders routinely prove their "Registered Holder" status later in an action, including by obtaining after-the-fact authorization from the broker who held the securities for their benefit, a perfunctory step for which courts of this Circuit do not hold up cases.

Finally, BRC's affirmative defense that Tang Capital allegedly should have mitigated its damages after March 11, 2022, is not only wrong on the law—BRC may not use the mitigation doctrine to shield its own illegal conduct—but also fact intensive and inappropriate to resolve at the motion to dismiss phase.  Tang Capital's repeated efforts on and after March 11 to convince BRC that it had breached its contract is a matter for discovery and summary judgment.

BRC should not be permitted to escape the consequences of its own securities filings and willful breaches of contract.  Its motion to dismiss should be denied.

## FACTUAL BACKGROUND

### A.    SPACs and de-SPAC Transactions.

The disputed Warrants in this action were issued in connection with BRC's early 2022 "de-SPAC" transaction.  Compl. ¶¶ 13, 22.  Special purpose acquisition companies, or SPACs, are publicly traded companies that raise capital through an initial public offering ("IPO") for the purpose of acquiring an existing operating company.  *See* Compl. Ex. B at 141, 252, 253 (ECF No. 1-2, Form S-4 Filed Jan. 11, 2022) ("January Form S-4").  To finance themselves, SPACs issue "units" comprised of shares of the SPAC's common stock and warrants to purchase further shares of the SPAC's common stock.  *Id.*  After a SPAC identifies and combines with a target private company, the combined company operates the target business as a publicly traded company, in lieu of the target company having to execute its own IPO.  *Id.*  The business combination between the SPAC and the target company is known as a de-SPAC transaction.

Notably, de-SPAC transactions can take different forms, with differing tax and securities law consequences.  *See* January Form S-4 at 26–27, 52.  Sometimes a SPAC will simply acquire the target private company.  *See id.* at 108.  Alternatively, a wholly new company (a "PubCo") may be formed, and then a number of mergers conducted among the SPAC, the target operating company, and PubCo leads to a new public holding company.  *See id.* at 41–42.  In this latter form

of business combination, the SPAC will merge with PubCo, and PubCo will continue as the publicly traded entity. *Id.* Accordingly, in this form of de-SPAC transaction, an extra step must be taken to exchange the SPAC's previously outstanding shares and warrants for equivalent securities issued by PubCo. *Id.* That is the form of de-SPAC transaction selected in this case, and why BRC (the PubCo here) needed to register the offer and sale of the Warrants and the offer and sale of shares of BRC common stock issuable upon exercise of the Warrants in connection with the de-SPAC transaction. *Id.*

## B. SilverBox Issues Warrants Pursuant to the Warrant Agreement.

The disputed Warrants in this case were exchanged for warrants issued by a SPAC called SilverBox Engaged Merger Corp I ("SilverBox"). Compl. ¶¶ 13, 24. Specifically, in connection with its March 2, 2021 initial public offering, SilverBox offered units comprised of one share of SilverBox Class A common stock and one-third of one warrant. *Id.* at ¶ 13.

The SilverBox warrants were governed by a Warrant Agreement dated February 25, 2021 and filed with the SEC. *See* Compl. Ex. A (ECF No. 1-1) ("Warrant Agreement"). Each Warrant entitled its holder to purchase one share of SilverBox's common stock at the price of $11.50 per share.[1] Warrant Agreement § 3.1. The Warrant Agreement set out two conditions that must be met before Warrant holders may exercise their right to buy shares of SilverBox for $11.50 per share. First, the Warrant holder had to wait thirty days after SilverBox completed its prospective merger with a target company. Warrant Agreement § 3.2. Second, the issuance of the common stock underlying the Warrants upon exercise had to be registered pursuant to the Securities Act of

---

[1] As noted below, in the business combination conducted by SilverBox and BRC, BRC, the "PubCo" in the transaction documents, expressly assumed the Warrant Agreement to govern the terms and conditions of its Warrants, including an obligation to satisfy the Warrants using shares of BRC. Therefore, while the terms of the Warrant Agreement reference shares of SilverBox's common stock, today that obligation relates to BRC's common stock. *See* January Form S-4 at 26.

1933 through an effective registration statement.  *Id.* § 3.3.2.

The Warrant Agreement expressly inured to the benefit of "Registered Holders" of the Warrants holders: "All covenants, conditions, stipulations, promises, and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns and of the Registered Holders of the Warrants."  Warrant Agreement § 9.5. "Registered Holders" are those (such as Tang Capital) "in whose name such Warrant is registered in the Warrant Register" maintained by a Warrant Agent.  *Id.* § 2.3.2; Compl. ¶ 17.

Finally, the Warrant Agreement contained provisions making its terms binding upon SilverBox's successors after SilverBox combined with a merger target.  Warrant Agreement §§ 4.4, 9.1; Compl. ¶ 18.

### C.   SilverBox Combines with BRC, and the Business Combination is Registered with the SEC via the January Form S-4.

In late 2021, SilverBox identified a merger target for its business combination: the Utah-based coffee company Black Rifle Coffee Company, LLC ("Black Rifle").  Compl. ¶ 19.  The parties selected a de-SPAC transaction structure involving the formation of new "PubCo"— BRC—which combined with SilverBox and Black Rifle and became the publicly traded holding company for Black Rifle, while succeeding to SilverBox's public listing and stockholder base on the NYSE.  *Id.*  In connection with this transaction, and as contemplated by the terms of the Warrant Agreement, the securities issued by SilverBox were exchanged for those issued by BRC, such that BRC exchanged SilverBox's outstanding warrants for its own Warrants, issued under the same terms and conditions of the Warrant Agreement, which BRC expressly adopted.  *Id.*

BRC registered with the SEC the securities offerings necessary to implement the business combination on the January Form S-4.  The January Form S-4 was initially filed on November 10, 2021 and amended on December 14, 2021, January 4, 2022, and January 11, 2022, in response to

7

comments from SEC Staff.  *See* Compl. ¶ 20 & Compl. Ex. B (final amended January Form S-4 dated January 11, 2022).  On January 13, 2022, the January Form S-4 registration was declared effective, permitting BRC to offer securities (including the Warrants and the shares underlying the Warrant) and to allow Silverbox to solicit proxies in connection with the business combination. Compl. ¶ 21 & Compl. Ex. C (ECF No. 1-3, SEC Notice of Effectiveness, filed January 13, 2022) ("Notice of Effectiveness").  Shareholders approved the business combination on February 3, 2022 and BRC's business combination closed on February 9, 2022.  Compl. ¶ 22; Salant Decl. Ex. B.[2]

### D. The January Form S-4 Paid a Registration Fee for the Shares of Common Stock Issuable Upon Exercise of the Warrants, Without Mention of any Further Registration Statement.

The January Form S-4 registered the offer and sale of three groups of securities: common stock, warrants, and common stock issuable upon exercise of the warrants.  These registrations were listed in bolded, capitalized font on the cover page of the Form January S-4:

> **PROSPECTUS FOR**
> **40,725,250 SHARES OF CLASS A COMMON STOCK**
> **17,766,667 WARRANTS TO PURCHASE SHARES OF CLASS A COMMON STOCK AND**
> **17,766,667 SHARES OF CLASS A COMMON STOCK UNDERLYING WARRANTS**
> **OF BRC INC.**

January Form S-4 at 3 (highlighting added).  These three tranches of securities were exchanged for securities previously issued by SilverBox, as BRC is the "PubCo" that succeeded SilverBox.[3] Compl. ¶¶ 23–25.  The January Form S-4 disclosed the characteristics of the Warrants being registered, including their terms of exercise for a right to by the underlying Warrant shares at

---

[2]   This Opposition references certain BRC SEC filings, which the Court may consider on a motion to dismiss.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). All such documents are attached as exhibits to the accompanying Declaration of David Salant in Support of Plaintiff's Opposition ("Salant Decl.").

[3]   Notably, the SEC objected to BRC's attempt to register on the same Form S-4 the offering of a *fourth* tranche of BRC securities, to be issued in a concurrent financing.  The SEC's objection forced BRC to amend the January Form S-4 to remove this tranche.  The SEC did not interfere with BRC's registration of the ongoing offering of the Warrants and shares issuable upon exercise of the Warrants.  Compl. ¶¶ 26–32.

$11.50 per share at any time after 30 days following the closing of the business combination:

> **Warrants**
>
>       Each outstanding PubCo Warrant will entitle the holder to purchase one share of PubCo Class A common stock at a price of $11.50 per share, subject to adjustment as discussed below, at any time 30 days after the completion of the Closing. A PubCo Warrant holder may exercise its warrants only for a whole number of shares of PubCo Class A common stock. The PubCo Warrants will expire five years after the Closing, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

January Form S-4 at 274.

       Consistent with these disclosures, BRC also paid an SEC Registration Fee of $18,940.15 in order to register the "shares of [BRC] Common Stock issuable upon exercise of warrants":

| CALCULATION OF REGISTRATION FEE | | | | |
|---|---|---|---|---|
| Title of Each Class of Security To Be Registered | Amount To Be Registered[1] | Proposed Maximum Offering Price Per Security | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
| Shares of Class A Common Stock, par value $0.0001 per share[2][7] | 41,883,750 | $ 10.44[5] | $ 437,266,250.00 | $ 40,534.59 |
| Warrants to purchase shares of Class A Common Stock[4] | 17,766,667 | $ 2.10[5] | $ 37,310,000.70 | —[5] |
| Shares of Class A Common Stock issuable upon exercise of warrants[6][8] | 17,766,667 | $ 11.50[7] | $ 204,316,670.00 | $ 18,940.15 |
| Total | | | $ 678,892,921.00 | $59,474.74[9] |

January Form S-4 at 2 (highlighting added).

       Across its 638-pages of disclosures and exhibits, the January Form S-4 made no note of a delay for registering the exercise of the warrants on a later Form S-1, or any caveat indicating to the investing public that the Warrants and shares underlying the Warrants were not in fact being fully registered.  Nor did SilverBox or BRC make any such public statement in any SEC filing.

### E.    Transaction Documents and Contemporaneous Statements Reflect the January Form S-4 Registered Offers of Both the Warrants and Shares Issuable Upon Exercise of the Warrants.

       Numerous further sources reflect that the January Form S-4 was intended to, and did in fact, register not only the offer and sale of the Warrants, but also the subsequent post-closing exercise of the Warrants.  For example, Paul Hastings LLP, which acted as counsel to BRC in preparing the January Form S-4, issued a legal opinion in connection with the January Form S-4, as required by the SEC in the context of a registration statement under the Securities Act.  Compl. ¶¶ 33–35.  Paul Hastings stated that once the January Form S-4 was declared effective (and other

conditions were met), the Warrants would be "valid and binding obligations of" BRC "enforceable

. . . in accordance with their terms," and the shares of common stock underlying the Warrants

would be "validly issued" and "fully paid" upon exercise of the Warrants.  January Form S-4 at

635–36 (Exhibit 5.1, Opinion of Paul Hastings, LLP).  The Paul Hastings opinion does not mention

any subsequent registration statement that would need to be filed as a condition to the warrants

becoming exercisable.

Additionally, BRC represented to investors that the January Form S-4 registered the offer

and sale of the shares issuable upon exercise of the warrants and that the warrants were exercisable.

*See* Compl. ¶¶ 37–38.  For example, on March 8, 2022, BRC's Vice President of Investor

Relations, Tanner Doss, wrote to a warrant holder that:

> After going back and forth with outside counsel, they confirmed a few things for
> me.  ***The public warrant holders**, which you are, **those underlying shares have
> already been registered through the SBEA [SilverBox] transaction and you
> should be able to exercise those warrants 30 days post-transaction***.

Compl. ¶ 37 (emphases added).[4]  This statement was correct as a matter of law and matches the

disclosures set forth in the January Form S-4.

### F.     Tang Capital Purchases BRC Warrants.

Relying on the January Form S-4, Tang Capital purchased 1,035,364 Warrants in open

market transactions between March 7 and April 6, 2022.  Compl. ¶ 39.

### G.     BRC Blocks Tang Capital's Attempts to Exercise its Warrants.

On March 11, 2022, thirty days after SilverBox's business combination with BRC, Tang

Capital submitted a notice to exercise its Warrants.  Compl. ¶¶ 40–41.  BRC then blocked Tang

---

[4]     Tang Capital has uncovered further statements by BRC to aggrieved Warrant holders, stating that the Warrants
were exercisable without the necessity of a further registration statement on Form S-1.  BRC's conflicting
statements regarding the registration of the Warrants, and its motivations for making them, are important matters
for discovery.

Capital's exercise of the Warrants.  *Id.*  Tang Capital sought an explanation from BRC that same day, and a telephone call was held between BRC's counsel and Tang Capital's counsel.  Compl. ¶¶ 42–43.  During the telephone call, and in email correspondence afterwards, Tang Capital supplied BRC with clear authority for the principle that a continuous offering under SEC Rule 415 can be registered on Form S-4 and that the registration requirement under the Warrant was already satisfied with the January Form S-4.  *Id.*  BRC never responded.  *Id.*  On April 13, 2022, Tang Capital submitted another notice to exercise its Warrants and again was inexplicably told that the Warrants were not yet exercisable.  Compl. ¶ 44.

### H.     During the Time Period Tang Capital Attempted to Exercise its Warrants, BRC's Public Stock Price Increased Sharply, and then Declined.

Between March 11, 2022, when Tang Capital first attempted to exercise its Warrants, and April 28, 2022, when Tang Capital filed its Complaint in this action, BRC stock rose to a high of $34.00 per share before falling back down to approximately $15.00 after BRC opted to redeem the Warrants.  Compl. ¶ 45.  If BRC had not refused to permit Tang Capital to exercise its Warrants when it sought to do so, Tang Capital could have acquired 1,035,364 shares at $11.50 per share and sold those shares in the following weeks at prices up to $34.00 per share.  Compl. ¶¶ 45–46.

### LEGAL STANDARD

When ruling on a motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  A plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, *i.e.*, sufficient "factual content," accepted as true and with all inferences drawn in the plaintiff's favor, to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This test does not impose any "heightened pleading

standard," *Arista Records LLC v. Doe 3*, 604 F.3d 110, 119–20 (2d Cir. 2010), and non-fraud

allegations may be pleaded generally, *Leatherman v. Tarrant Cty. Narcotics Intelligence &*

*Coordination Unit*, 507 U.S. 163, 168–69 (1993).

## ARGUMENT

**I.      Tang Capital States a Claim For Breach of Contract Because the January Form S-4
         Registered the Warrants and Shares Issuable Upon Exercise of the Warrants.**

Tang Capital states a claim that BRC breached the governing Warrant Agreement by

blocking Tang Capital from exercising its Warrants to buy shares on and after March 11, 2022, in

violation of the requirement that such exercise be honored once the issuance of the shares of

common stock underlying the Warrants was registered on an effective registration statement.  Each

of BRC's arguments that the January Form S-4 did not register the "exercise" of the Warrants is

wrong on the law, specious on the facts, or both, and none defeats Tang Capital's claim.

### A.      BRC Misquotes the Warrant Agreement, Which Imposed No Requirement
####         for the Filing of a Registration Statement on Form S-1.

BRC's invocation of the text of the Warrant Agreement, Br. 12–14,  may be quickly

rejected because BRC misquotes and misunderstands the cited contractual provisions.

*First*, it is false that "Section 3.3.2 requires that there be an effective Form S-1 registration

statement" in order to permit exercise of the Warrants.  Br. 13.  Neither Section 3.3.2 nor any other

part of the Warrant Agreement mentions a "Form S-1."  Br. 12.  Instead, Section 3.3.2 simply

reiterates BRC's obligation to issue BRC stock to Warrant holders "as soon as practicable after

the exercise of any Warrant" and that such obligation is in force once "a registration statement

under the Securities Act covering the issuance of the Common Stock underlying the Public

Warrants is then effective[.]"  Warrant Agreement § 3.3.2.  BRC's presumption that the Warrant

Agreement's reference to an "effective registration statement" means a registration *on Form S-1*,

rather than a registration *on Form S-4*, lacks any supporting contractual text and defies New York

law,[5] which is "extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Sharkey v. Zimmer USA, Inc.*, 2021 WL 3501160, at *6 (S.D.N.Y. Aug. 9, 2021) (*citing Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 277 (2011)).

*Second*, BRC misquotes Section 7.4.1 of the Warrant Agreement in claiming the Warrant Agreement "expressly contemplate[d]" that the Warrants must be registered "after the completion of the Merger", in other words, a purported "two-step approach" involving two registration statements: one on Form S-4, and another on Form S-1.  Br. 12, 14.  Section 7.4.1 says no such thing.  The quoted sentence states in full:

> ***The Company agrees that as soon as practicable, but in no event later than fifteen (15) Business Days after the closing of its initial Business Combination***, it shall use its reasonable best efforts to file with the Commission and registration statement for the registration, under the Securities Act of the shares of Common Stock issuable upon exercise of the Warrants.

Warrant Agreement § 7.4.1 (emphasis added).  Section 7.4.1 does not contemplate any particular sequence: it simply committed BRC to register the shares issuable upon exercise of the Warrants "as soon as practicable," and no later than 15 business days after the closure of the business combination.  The imposition of a 15-day outside deadline does nothing to prevent BRC from doing so sooner.   If anything, registration of the shares issuable upon exercise of the Warrants on the same Form S-4 used to register the business combination would be *more* faithful to Section 7.4.1, not less, because it required BRC's best efforts to register the issuance of these shares "as soon as practicable," and because preparation of a Form S-1 would take additional time.[6]

---

[5]    New York law governs the Warrant Agreement.  *See* Warrant Agreement § 9.3; Br. 11 n.4.

[6]    Accepting BRC's position means that BRC has breached this provision.  BRC did not file its Form S-1 until March 16, 2022, *35 days* after the February 9, 2022 closure of the business combination, well beyond the 15 days permitted.  *See* ECF No. 17-1 at 2 (the "Form S-1").  BRC's delay in filing its Form S-1 is a matter for discovery.

None of this renders any part of the Warrant Agreement "surplusage." Br. 13. The Warrant Agreement was dated 2021—long before SilverBox identified Black Rifle as its merger target, let alone selected the particular form of de-SPAC transaction it would execute in 2022—and governed the prior warrants initially offered by SilverBox in its IPO. Like any sophisticated contract, the Warrant Agreement addressed situations that might or might not materialize. *Cf.* Warrant Agreement §§ 9.9 (amendments clause), 9.10 (severability clause). Section 7.4.1 contemplated the possibility of a registration statement being filed "after the closing of" BRC's de-SPAC transaction in order to accommodate both the ordinary-course de-SPAC transaction structure (which was not used), in which the SPAC acquires another company and registers warrants and warrant shares in a later step, or (used here) a structure in which a new "PubCo" is formed, merges into the SPAC, and "rolls over" the SPAC's warrants and warrant shares by exchanging them for similar securities issued by PubCo, in a single business combination registered on Form S-4. That the Warrant Agreement gave BRC *up to* 15 days "after the closing of" its de-SPAC transaction to register the Warrants allowed for either path to be taken; it did not render anything in the clause "meaningless."[7] Br. 14. Even if it did, BRC never explains how or why the "meaninglessness" of a phrase in a contract could override the consequences of the effective registration statement that actually satisfied the condition to exercise.

B.      **Form S-4 Is Used to Register Warrants and Shares Issued Upon Exercise of the Warrants Offered in Connection with a Business Combination.**

Since the SEC's adoption of Form S-4 in 1985, offers of warrants issued in business combination transactions, and shares issuable upon exercise of the warrants, have been registered

---

[7]     *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (cited at Br. 13) is inapposite. Since this interpretation of the contract does not render any clause superfluous, it need not be avoided.

in a single registration statement on Form S-4 under SEC rules permitting such offerings on a "delayed or continuous basis" following the closure of the business combination.  BRC's denial of this everyday result, Br. 14–16, contradicts clear legal authority and longstanding SEC practice.[8]

The instructions to Form S-4, as well as the proposing and adopting releases promulgated by the SEC, confirm that Form S-4 may be used to register both the offer of warrants in connection with a business transaction, and the offer of stock issuable upon exercise of the warrants, all on a single Form S-4, as a continuation of the same business combination transaction.[9]  *See* Huber Rep. ¶¶ 12(A), 13–29.[10]

Applicable SEC regulations and Form S-4's instructions are clear that the offer and sale of warrants and shares issuable upon exercise of the warrants may both be registered on Form S-4. Form S-4 may be used for offerings of securities to be issued "in a transaction of the type specified in paragraph (a) of Rule 145."  17 C.F.R. § 239.25.  Paragraph (a) of Rule 145, in turn, covers an "offer, offer to sell, offer for sale, or sale" of securities related to a "merger or consolidation," 17 C.F.R. § 230.145(a)(2).  And Securities Act Rule 415 states that "securities which are to be issued in connection with business combination transactions" are among those permitted to be offered

---

[8]   BRC's *post-hoc* definition of "two distinct transactions," a so-called "Merger-Exchange Transaction" and "Warrant-Exercise Transaction," Br. 11-12, is baseless.  Such distinction contradicts SEC rules and practice requiring BRC to register both the offering and sale of the warrants, and the offering of stock issuable upon exercise of the warrants—that is, both "exchange" and "exercise" of the Warrants—at the same time, which is exactly what BRC did in the January Form S-4.  In a telling Freudian slip, BRC even admits that "the Form S-4 had already registered the Merger-*Exercise* Transaction."  Br. 8 (emphasis added).

[9]   *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (cited at Br. 17) is inapposite because it relates to the appropriate use of Form S-8 to issue securities in employee benefit plans.  In *Universal Express*, Judge Lynch held shares were not registered via Form S-8, when the number of shares issued exceeded the number listed on the face of the forms, and when the shares were issued to a business entity, in violation of Form S-8's requirement that shares be offered only to natural persons. 475 F. Supp. 2d at 435 n.15.

[10]   Second Circuit courts routinely accept expert testimony as helpful "in complex cases involving the securities industry." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *S.E.C. v. U.S. Envtl, Inc.*, 2002 WL 31323832, at *2 (S.D.N.Y. Oct. 16, 2002) (collecting cases where courts have admitted expert testimony in securities cases "to assist the trier of fact in understanding . . . securities industry regulations and complicated terms").

"on a continuous or delayed basis," that is, after the date of the merger itself.   17 C.F.R. §
230.415(a)(1)(viii); *see* Huber Rep. ¶ 22.  Form S-4's instructions reincorporate these rules, further
explaining that the Form may be used for registration of securities "to be issued *in connection with
a business combination*," including securities offered "on a continuous or delayed basis."  Huber
Rep. ¶¶ 20–22 (citing General Instructions A & H to Form S-4).

BRC is wrong that the offer of shares upon exercise of warrants issued in a business
combination has "no connection" to the business combination.  Br. 16.   Warrants issued in
connection with a business combination—including the Warrants here—are a part of the merger
consideration: in voting to approve a merger transaction, shareholders are voting to approve the
consideration they will receive in the merger, including the terms of warrant exchange and the
subsequent exercise, tethering the matter of the warrants' exercise to the merger itself.[11]   Huber
Rep. ¶ 24.  Here, for example, the details of the Warrants' offer and exercise were discussed in the
same January Form S-4 summarizing the business combination and served as an important source
of disclosure for SilverBox stockholders who were asked to vote on the de-SPAC merger with
BRC.[12]  *See* January Form S-4 at 274; Huber Rep. ¶ 24.  Nor is there anything abnormal about a
"delayed or continuous offering" under Rule 415(a)(1)(viii) occurring months after the business
combination closes and the delayed or continuous offering is registered, Br. 16—such a time delay
is the very purpose of the rule and, in fact, the January Form S-4 BRC filed contained
"undertakings" by BRC and required by the SEC for a Rule 415 continuous offering to file a post-
effective amendments to reflect, among other things, any facts or events after the effective date

---

[11]   As Mr. Huber explains, this was a driving purpose of the Form S-4: to permit shareholders reviewing a merger
transaction to use the same information to consider the offer of securities issued in connection with that
transaction.  Huber Rep. ¶ 18.

[12]   BRC's objection that "no stockholder vote is required for exercise of [the] BRC Warrants," Br. 16, is therefore
misplaced: the terms of the Warrants' exercise were indeed subjected to shareholder approval in the merger.

that represent a fundamental change in the information set forth in the registration statement.  *See* Huber Rep. ¶¶ 20, 22; January Form S-4 at 632.  These undertakings were required to be included in the January Form S-4 because the registrant was conducting an offering that was continuing into the future beyond the closing of the de-SPAC merger.

BRC acknowledges that the phrase "in connection with" "must be interpreted by reference to 'limiting principle[s] consistent with the same structure of the statute and its other provisions,'" Br. 15 (quoting *Maracich v. Spears*, 570, U.S. 48, 60 (2013)).  Analogous caselaw in the Rule 10b-5 context has long interpreted the clause "in connection with" flexibly to include transactions touching the sale of a security. *See, e.g.*, *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 (1971); *United States v. Newman*, 664 F.2d 12, 18 (2d Cir. 1981); *United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993); *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 120 (S.D.N.Y. 2011).[13]  And as Mr. Huber explains, in practice Rule 415(a)(1)(viii)'s phrase "in connection with" is interpreted broadly, and based on his 35 years' experience as a senior securities regulator and practitioner in the securities bar, this phase "clearly cover[s] the offer, sale, resale, and exercise of warrants issued as consideration in a business combination transaction."  Huber Rep. ¶¶ 20 23.

A simultaneous registration of warrants and the shares issuable upon exercise of the warrants is frequently required pursuant to SEC Staff's long-standing position that an issuer is deemed to be offering the securities underlying a derivative (such as stock underlying a warrant) if the derivative security (the warrant) is exercisable *within 12 months* of the offering and sale of the overlying derivative security.  SEC Division of Corporation Finance's Compliance and

---

[13]  Importantly, the expansive caselaw defining the scope of "in connection with" under Rule 10b-5 preceded the SEC's adoption of Form S-4 and Rule 415. As the principal draftsman of Rule 415 and Form S-4, Mr. Huber notes that the SEC Staff always assumed that "in connection with" in the Rule 415 context would have a similar scope, as interpreted by the Supreme Court in the 10b-5 context.

Disclosure Interpretation 139.01 states in this context that "the underlying securities **must be registered** at the time the offer and sale of the convertible securities are registered" (emphasis added), indicating that registration of warrants and underlying shares—or, using BRC's phraseology, the "exchange" and "exercise" aspects of the Warrants—can and must occur concurrently.[14]   BRC's response that C&DI 139.01 is a mere informational "disclosure requirement" to be followed rather than an interpretation of Section 5 of the Securities Act as to when an "offer and sale" of a security is required to be registered, Br. 16–17, flies in the face of the language of this interpretation, and if correct, would cause serious confusion for investors who would not know whether securities are listed in a registration statement for purposes of truly registering them or for purposes of mere "disclosure" but not registration, particularly when the January Form S-4 does not say one way or another.

In addition, Form S-4 is capable of registering the offer and sale of shares of common stock issuable upon exercise of warrants offered as merger consideration.  This result follows directly from the history and purpose of the Form S-4 itself.  Form S-4 implemented the SEC's decades-long effort to apply the key principle of "integration" to business combinations: to "modernize[] the process in which securities were offered and sold in public offerings . . . while reducing compliance burdens and costs" and, specifically, to avoid the necessity of filing separate registration statements for "offers and sales of securities related to the receipt of merger consideration[.]"  Huber Rep. ¶¶ 6, 13–19, 35.  Specifically, "Form S-4 was proposed and adopted to allow a registrant to include, 'on one registration statement,' all securities to be issued in a Rule

---

[14]   Courts in the Second Circuit have held that SEC Division of Corporation Finance's Compliance and Disclosure Interpretations, though "informal guidance," are "persuasive" authority, "particularly in light of the absence of any contrary precedent put forth."  *Chechele v. Stand. Gen. L.P.*, 2021 WL 2853438, at *7 (S.D.N.Y. July 8, 2021), *motion to certify appeal denied*, 2022 WL 766244 (S.D.N.Y. Mar. 14, 2022); *see also SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 762 (S.D.N.Y. 2018) (giving persuasive weight to C&DI).

145(a) transaction, merger, or exchange tender offer, any reoffers or sales of such securities, and any other transaction that would be required to be registered at the same time . . . such as exercises of warrants or conversions of convertible securities received in connection with a business combination transaction." *Id.* The full registration of securities publicly issued in connection with a merger is consistent with this driving integrative purpose.

### C.   The January Form S-4's Registration of the Offer of Shares Underlying the Warrants Required BRC to Accept the Exercise of the Warrants.

BRC's assertion that the January Form S-4 did not purport to register the Warrants' exercise here, Br. 16–18, conflicts with the plain language in the January Form S-4 and with BRC's actions and statements to investors. Because the January From S-4 plainly registered the offer and sale of shares issuable upon exercise of the Warrants, the January Form S-4 fully covered the "exercise" of the Warrants.

*First*, as the January Form S-4 made clear on its face, the securities BRC offered in the de-SPAC transaction included the securities issued at closing *as well as the ongoing offering of the exercise of the warrants*. The January Form S-4 registered BRC's offering of three groups of securities (common stock, warrants, and common stock underlying warrants) that BRC planned to issue in the de-SPAC merger. *See* January Form S-4 at 3. The January Form S-4 thus expressly described the Warrants and what BRC now calls the "Warrant-Exercise Transaction," explaining that the warrants could be exercised at any time after 30 days following the closing of the merger. January Form S-4 at 274. SilverBox unit holders voted for the merger based on this and the other disclosures in the January Form S-4. Huber Rep. ¶ 24. Moreover, on page II-3 of Amendment 3 to the January Form S-4, BRC included, in Item 22, the undertaking that is required to be made if "securities are registered pursuant to Rule 415 under the Securities Act," *i.e.*, on a delayed or continuous basis, acknowledging that BRC was conducting a delayed or continuous registration.

*See* Huber Rep. ¶ 36; January Form S-4 at 632.  And BRC's lengthy January Form S-4 made no mention of an additional delay for registering the exercise of the warrants on Form S-1, which would have a material omission if actually true.

*Second*, as the January Form S-4 disclosed, BRC paid a registration fee of $18,940.15 specifically to register the "shares of [BRC] Common Stock issuable *upon exercise of warrants*," thus expressly covering Warrant exercise following the closure of the de-SPAC merger.  January Form S-4 at 2 (emphasis added).  BRC fails to mention this fee in its briefing.

*Third,* Paul Hastings, which acted as counsel to BRC in connection with the preparation of the January Form S-4, issued a legal opinion stating that the Warrants would be a valid and binding obligation of BRC once the January Form S-4 became effective.  Paul Hastings stated that once the January Form S-4 was declared effective (and other conditions were met), the Warrants would be "valid and binding obligations of" BRCC "enforceable . . . in accordance with their terms," and the shares of common stock underlying the Warrants would be "validly issued" and "fully paid" upon exercise of the Warrants.  *See* January Form S-4 at 635–36 (Exhibit 5.1, Opinion of Paul Hastings, LLP); *see also* Huber Rep. ¶ 31.  Subsequently, BRC issued a Form 8-K expressly confirming that the items referenced in the Paul Hastings opinion letter were completed on February 9, 2022.  *See* Huber Rep. ¶ 33.

*Fourth*, Securities Act Rule 401(g), and the conduct of the SEC Staff in declaring the effectiveness of the January Form S-4, resolves any question as to whether the January Form S-4 was the proper form for the registration of the offering and sale of the shares issuable upon exercise of the Warrants.  Rule 401(g) provides that once a registration is declared effective by the SEC Staff, the securities purported to be registered on that form are deemed by rule to be registered on the proper form and are validly registered under the Securities Act.  17 C.F.R. § 230.401(g)(1).  In

the case of the January Form S-4, the SEC issued multiple rounds of comments to BRC, including objecting to the registration by BRC of an additional, unrelated tranche of securities, but permitted the registration of the Warrants and shares issuable upon exercise of the Warrants, before declared the effectiveness of the January Form S-4 on January 13, 2022.  Compl. ¶¶ 26–32; *see* Huber Rep. ¶ 32.  Upon declaring the registration statement effective with a registration on its face covering the issuance of the common stock underlying the Warrants, Rule 401(g) eviscerates any claim by BRC that Form S-4 was not the proper form for such registration (which it was, in any event).

*Fifth*, BRC's own statements demonstrate its understanding that the January Form S-4 registered the exercise of the warrants.  BRC's Vice President of Investor Relations wrote to a third-party warrant holder that the January Form S-4 registered the warrants and that they were exercisable.  Compl. ¶¶ 37–38.  Tang Capital has since uncovered evidence of similar statements by BRC to other aggrieved warrant holders, expressly stating that the January Form S-4 registered the warrants and that the warrants were exercisable.[15]

*Sixth*, the NYSE approved the listing of BRC's common shares and Warrants, which it described as "each whole warrant exercisable for one share of Class A common stock at an exercise price of $11.50."  Huber Rep. ¶ 34; *see* Salant Decl. Ex. D.  The Form 8-A Registration Statement on which NYSE relied required BRC to identify the registration statement to which such Form 8-A related, and BRC identified the January Form S-4, the only registration statement then in effect.  Huber Rep. ¶ 33; *see* Salant Decl. Ex. C.

## II.     Tang Capital Has Sufficiently Pleaded Contractual Standing.

Tang Capital's allegations that it was a Registered Holder of the Warrants pursuant to the

---

[15]   BRC is wrong that such statements are insufficiently specified in the Complaint and are irrelevant to the registration question.  Br. 18 n.7.  Notice pleading is sufficient in this context.  *See Leatherman*, 507 U.S. at 168–69.  And BRC's own statements that the January Form S-4 registered the exercise of the Warrants are material to show BRC's understanding of the applicable rules and law.

Warrant Agreement, Compl. ¶¶ 17, 52, are more than sufficient to overcome BRC's objection that Tang Capital needed to allege the precise dates on which it was a Registered Holder.   Br. 19–22. No such requirement exists.   Contractual standing is a simple threshold inquiry, which Tang Capital has satisfied.  Courts regularly determine standing at the time of the lawsuit, and even after a complaint has been filed, and do not require a showing regarding the timing of standing.  *See Lovati v. Petroleos de Venezuela, S.A.*, 2021 WL 5908953, at *2 (S.D.N.Y. Dec. 14, 2021) (analyzing whether noteholder plaintiffs had contractual standing "at the inception of the case").[16]

Even if the Court found that Tang Capital needed to clarify the dates on which it was a "Registered Holder," courts universally permit plaintiff securities owners the opportunity to supplement their "Registered Holder" allegations, including with an authorization post-dating the filing of the lawsuit, a perfunctory step for which courts do not hold up cases.  *See Allan Applestein TTEE FBO D.C.A. Grantor Tr. v. Province of Buenos Aires*, 415 F. 3d 242 (2d Cir. 2005); *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 607 (S.D.N.Y. 2015) ("A beneficial owner who lacks standing may receive authorization to sue from the registered Holder, and that authorization may be granted subsequent to the filing of the lawsuit."); *Lovati*, 2021 WL 5908953, at *2 (same).  For example, authorization may be obtained from brokerage firm who held the plaintiff's securities for the plaintiff's benefit "in street name," but has no economic interest in the action.  *See Diverse Partners, LP v. AgriBank, FCB*, No. 16 Civ. 9526 (VEC), 2017 WL 4119649, at *5 (S.D.N.Y. Sept. 14, 2017).[17]

---

[16]   BRC cites purported "black-letter law" on this subject, Br. 20, but its cited cases are inapposite to the question of contractual standing.   *See Ezra v. Weitz & Luxenberg, P.C.*, 794 F. App'x 27, 28-29 (2d Cir. 2019) (construing N.Y. C.P.L.R. § 213(2), an irrelevant statute of limitations); *Ely-Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 986 (N.Y. 1993) (construing a statute of limitations); *Fishman v. Bricker*, 211 N.Y.S.2d 620 (1st Dep't 1961) (analyzing if contract party relinquished right to specific performance).

[17]   *Sudarsan v. Seventy Seven Energy Inc.,* 2018 WL 1088004 (S.D.N.Y. Feb. 6, 2018) (cited at Br. 20), only proves this point. The Plaintiff in *Sudarsan* had failed to allege that he was a "Registered Holder" *at all* and

*Finally*, even if Tang Capital had not in fact been a Registered Holder (which it was), it may still enforce the Warrant Agreement under the legal doctrine permitting a third party to enforce a contract, notwithstanding a negating clause, "when the third party is the only one who could recover for the breach of contract or when it is otherwise clear from the language of the contract that there was 'an intent to permit enforcement by the third party.'" *Dormitory Auth. v. Samson Constr. Co.*, 94 N.E.3d 456, 459 (N.Y. 2018) (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*, 485 N.E.2d 208, 212 (N.Y. 1985)); *see also Diamond Castle Partners IV PRC, L.P. v. IAC/InterActiveCorp.*, 918 N.Y.S.2d 73, 75 (1st Dep't 2011) (rejecting negating clause when it would render contract meaningless and leave plaintiff without remedy).[18]

## III.    The Court Should Not Rule on Tang Capital's Damages on this Motion to Dismiss.

BRC's affirmative defense—that Tang Capital should have concluded that BRC was refusing to honor its Warrants upon its first refusal to allow their exercise on March 11, 2022, and should have mitigated all of its damages from that point, Br. 22–23—is wrong on the law and presumes facts not in the record.  No purported duty to mitigate can shield BRC from its continued breaches of contract because a party is not entitled to the benefit of equitable doctrines when it comes with "unclean hands."  *See Souratgar v. Lee Jen Fair*, 818 F.3d 72, 79 (2d Cir. 2016*)*.  Nor does any duty to mitigate arise "[i]f negotiations between the parties are pending, if assurances are made that performance will be forthcoming, or if other circumstances indicate that the breaching party intends to perform." *U.S. v. Russell Elec. Co.,* 250 F. Supp. 2, 20 (S.D.N.Y.

---

failed to obtain *any* authorization from a Registered Holder despite having eight months' opportunity to do so. 2018 WL 1088004 at *4, *5.  Here, Tang Capital sufficiently alleged it was a Registered Holder.

[18]    BRC cites inapposite cases on the import of a negating clause.  *See India.Com, Inc. v. Dalal*, 412 F.3d 315, 318 (2d Cir. 2005) (plaintiff not an intended beneficiary of the agreement, but a broker entitled to a commission); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 249 (2d Cir. 1988) (third-party plaintiff asserted negligence claim that was expressly prohibited in contract); *Johnson v. Roberts*, 1992 WL 151820, at *6 (D.D.C. June 9, 1992) (construing the Delaware Uniform Commercial Code).

1965).  Because BRC breached its contract, and because Tang Capital was making repeated efforts to cause BRC to change course, including an email containing legal authority to which BRC never responded, *see* Compl. ¶¶ 39–44, no mitigation duty arose as a matter of law.

In all events, whether a plaintiff mitigated its damages is "a question of fact and inappropriate to resolve at the motion to dismiss stage."  *E. Materials Corp. v. Mitsubishi Plastics Composites Am., Inc.*, 2017 WL 4162309, at *7 (E.D.N.Y. Sept. 19, 2017) (citations omitted); *see also Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, 2008 WL 2275902, at *8 (S.D.N.Y. June 3, 2008) (same).  And the "burden of proof on the issue of failure to mitigate damages is on the party asserting such failure."  *U.S. v. Russell Elec. Co.,* 250 F. Supp. 2, 20 (S.D.N.Y. 1965).[19]

Tang Capital disputes the factual allegations underlying BRC's mitigation defense.  For example, BRC made inconsistent statements to the investing public as to whether it would permit cash exercise of its warrants, and Tang Capital made phone calls to BRC and wrote an explanatory email to BRC's counsel, to which BRC's counsel never responded.  Compl. ¶¶ 33–38, 42–43. Tang Capital also tried again to exercise its warrants on April 13, 2022.  Compl. ¶ 44.  Tang Capital's efforts on and after March 11 to exercise its Warrants are strong factual evidence that BRC's proposed damages cut-off date of March 11 is flawed.  All of Tang Capital's damage allegations are well-pled and should proceed to discovery.  *See, e.g.*, *Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA) Inc.*, 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004).

## IV.    Tang Capital States a Claim for Declaratory Judgment.

Tang Capital's claim for declaratory judgment is not "duplicative."  Br. 18–19.  Tang

---

[19]    BRC's contrary citations, Br. 22–23, are either inapposite or contrary to BRC's proposition.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) (discussing irrelevant doctrine of official immunity); *Van Syckle v. C.L. King & Assocs., Inc.*, 822 F. Supp. 98, 102 (N.D.N.Y. 1993) (*denying* motion to dismiss on grounds of failure to mitigate damages given "questions of fact as to whether the plaintiffs acted reasonably"); *U.S. West Fin. Servs., Inc. v. Marine Midland Realty Credit Corp.*, 810 F. Supp. 1393, 1403 (S.D.N.Y. 1993) (*denying* summary judgment motion for failure to mitigate because issue "present[ed] a material question of fact" for trial).

Capital's breach of contract and declaratory judgment claims both center on the question of whether the January Form S-4 registered the exercise of the Warrants, i.e., the offer and sale of shares of common stock issuable upon exercise of the Warrants.  However, the issuance of a clear declaratory judgment on the matter would be independently helpful to resolve not only Tang Capital's claims, but also those of other Warrant holders who were also improperly precluded from exercising their Warrants, and doing so is squarely within the Court's discretion.

A district court possesses "broad discretion to exercise jurisdiction over the declaratory judgment action." *Myers Industries, Inc. v. Schoeller Arca Sys., Inc.*, 171 F. Supp. 3d 107, 121–22 (S.D.N.Y. 2016).  District courts consider: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Chiykowski v. Goldner*, 2020 WL 2834225, at *3 (S.D.N.Y. May 31, 2020) (citations omitted).  Where "a claim for declaratory judgment seeks distinct relief from a breach of contract claim, then notwithstanding some overlap between the two claims, it is not duplicative" and thus serves a "useful purpose." *Optanix, Inc. v. Alorica Inc.*, 2021 WL 2810060, at *3 (S.D.N.Y. July 6, 2021) (citations omitted); *see also Myers*, 171 F. Supp. 3d at 123 (S.D.N.Y. 2016).

Here, numerous Warrant holders, many without the ability to litigate the matter or located in other forums, were deprived the opportunity to exercise their Warrants for a substantial profit.  A narrow declaration on the matter of the Warrants' registration, independent from the facts of Tang Capital's trading and attempted exercises, would resolve any confusion over whether the January Form S-4 registered the exercise of the Warrants, promoting efficiency, uniformity, and clarity in the matter without any marginal harm or cost.

## CONCLUSION

For the foregoing reasons, the Court should deny BRC's motion to dismiss.

Dated:                                    New York, New York
August 30, 2022

                                                              GIBSON, DUNN & CRUTCHER LLP

                                                             By: */s/ Reed Brodsky*

                                                               Reed Brodsky
                                                               David Salant
                                                                Andrew Freire

                                                               200 Park Avenue
                                                               New York, NY 10166-0193
                                                               Telephone: (212) 351-4000
                                                               rbrodsky@gibsondunn.com
                                                               dsalant@gibsondunn.com
                                                               afreire@gibsondunn.com

                                                               *Attorneys for Plaintiff Tang Capital*
                                                               *Partners, LP*