# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TANG CAPITAL PARTNERS, LP, | Case No. 1:22-cv-3476 (RWL) |
| PLAINTIFF | |
| BRC INC., | |
| DEFENDANT. | |

EXPERT REPORT OF JOHN J. HUBER
AUGUST 30, 2022

**Table of Contents:**

I.    ASSIGNMENT AND ROLE.......................................................................... 1

II.   QUALIFICATIONS ...................................................................................... 2

III.  METHODOLOGY AND INFORMATION RELIED UPON................................ 5

IV.   SUMMARY OF OPINIONS .......................................................................... 7

V.    THE PROPOSAL AND ADOPTION OF FORM S-4 IN 1984-1985 DEMONSTRATES ITS BROAD FLEXIBILITY AND PURPOSE. .................................................... 9

VI.   FORM S-4'S INSTRUCTIONS CORROBORATE THAT FORM S-4 MAY BE USED TO REGISTER THE OFFER, SALE, RESALE, AND EXERCISE OF WARRANTS (I.E., THE OFFER AND SALE OF SHARES ISSUABLE UPON EXERCISE OF WARRANTS) ISSUED AS CONSIDERATION IN A BUSINESS COMBINATION..................................... 13

VII.  SECTION 5 OF THE SECURITIES ACT REQUIRED BRC TO REGISTER THE OFFER AND SALE OF BRC COMMON STOCK UNDERLYING THE BRC WARRANTS.............. 15

VIII. SECURITIES ACT RULE 401(g) RESOLVES ANY QUESTION ABOUT FORM ELIGIBILITY. ...................................................................................... 17

IX.   BRC'S JANUARY FORM S-4 REGISTERED THE OFFER, SALE AND EXERCISE OF THE BRC WARRANTS AND THE OFFER AND SALE OF SHARES OF BRC COMMON STOCK INTO WHICH THE BRC WARRANTS WERE EXERCISABLE.............................. 17

X.    CONCLUSION........................................................................................ 20

XI.   SIGNATURE.......................................................................................... 21

**Appendices:**

Appendix 1: CV of John Huber

Appendix 2: Listing of Publications and Testimony by John Huber

## I.     ASSIGNMENT AND ROLE

1.   This matter involves a lawsuit in the United States District Court for the Southern District of New York brought by Tang Capital Partners, LP ("Tang Capital") against BRC Inc. ("BRC"),[1] seeking, among other things, a declaration that the offer and sale of the BRC Warrants and the shares of BRC Common Stock (each as hereinafter defined) underlying the BRC Warrants were registered within the meaning of the Securities Act of 1933, as amended (the "Securities Act"),[2] on January 13, 2022.

2.   According to BRC's SEC filings, on February 9, 2022, SilverBox Engaged Merger Corp I ("SilverBox") and BRC completed a business combination (the "Merger") pursuant to which, among other things, each warrant of SilverBox outstanding immediately prior to the effectiveness of the Merger was converted into the right to receive one BRC Warrant, with BRC assuming SilverBox's obligations under the existing warrant agreement.[3] The BRC Warrants were approved for listing on the New York Stock Exchange ("NYSE") on February 9, 2022.[4] Tang Capital purchased 1,035,364 BRC Warrants between March 7, 2022 and April 6, 2022.[5] The Complaint alleges that BRC blocked Tang Capital from exercising the BRC Warrants to purchase shares of BRC Common Stock on the basis that "the Form S-4 did not register an ongoing offering covering the exercise of the Warrants

---

[1] *See* Complaint filed April 28, 2022 in *Tang Capital Partners, LP v. BRC Inc.* (SDNY, Case No. 1:22-cv-03476-RWL) by Tang Capital (the "Complaint").

[2] Complaint, ¶¶ 8 and 23. Section 5 of the Securities Act, Prohibitions Relating to Interstate Commerce and the Mails (15 U.S.C. §77e), requires registration of offers and sales of securities unless an exemption from registration is applicable. Section 6 of the Securities Act, Registration of Securities and Signing of Registration Statement (15 U.S.C. §77f), provides the method by which securities can be registered at the Securities and Exchange Commission (the "SEC" or the "Commission"). Section 6(b) requires the issuer (which is also referred to herein as the "company" or the "registrant") to pay a fee at the time of the filing of the registration statement, which fee is based on the maximum aggregate price at which such securities are proposed to be offered. Thus, the registration fee is based on the securities being registered, and not the transaction pursuant to which the securities being registered are to be issued by the registrant.

[3] BRC Form 8-K, filed on February 9, 2022.

[4] NYSE Certification of Approval for Listing and Registration under the Exchange Act, filed on February 9, 2022.

[5] Complaint, ¶ 39.

on the theory that a Form S-4 cannot be used for a 'continuous' offering under SEC Rule 415."[6]

3.  I have been retained by Gibson, Dunn & Crutcher LLP, counsel to Tang Capital ("Counsel"), as an expert witness in the custom, usage and practice with respect to registration statements filed with the SEC. Specifically, I was asked by Counsel to provide:

    a.  the background for the proposal of Form S-4 in 1984, its adoption in 1985 and interpretation by the SEC; and

    b.  my interpretation of two registration statements filed by BRC with the SEC:

        i.  the Form S-4, Registration No. 333-260942, filed on November 10, 2021 and amended on December 14, 2021, January 4, 2022 and January 11, 2022, which was declared effective by the SEC's Division of Corporation Finance (the "Division") pursuant to delegated authority[7] on January 13, 2022 (the "January Form S-4"); and

        ii. the Form S-1, Registration No. 333-263627, filed on March 16, 2022 and amended on April 19, 2022,[8] which was declared effective by the Division pursuant to delegated authority on May 4, 2022 (the "May Form S-1").

## II.   <u>QUALIFICATIONS</u>

4.  I have over 35 years' experience in matters involving custom, usage and practice with respect to registration statements filed with the SEC, including 11 years working on such matters at the SEC.

---

[6] Complaint, ¶ 7.

[7] 17 CFR § 200.30-1(a)(5)(i) (delegating authority to the Director of the Division of Corporation Finance to declare registration statements effective).

[8] Amendment No. 1 to Form S-1 states that it was filed with the SEC on April 18, 2022; however, the filing date on the SEC's Electronic Data Gathering, Analysis, and Retrieval system ("EDGAR") is April 19, 2022.

5.  I was on the Staff of the SEC from 1975 through 1986, serving in the Division from 1975 to 1978, the Office of General Counsel from 1978 to 1979, and in the Division from 1979 to 1986. I started as an examiner in a review branch of the Division; served as the chief and Deputy Associate Director (Legal) of the Division's rule writing office; and served as the Deputy Director and the Director of the Division during my last six years at the SEC. My work involved, among other things: reviewing public company filings; declaring registration statements effective; drafting and/or supervising rulemaking projects; deciding interpretive issues and drafting and/or supervising interpretive releases; consultations with and referrals to the Division of Enforcement; appearing before the Commissioners at open and closed Commission meetings; testifying in Congressional hearings on behalf of the SEC; and drafting and reviewing drafts of circuit court and Supreme Court amicus briefs.

6.  My rulemaking experience at the SEC included drafting and/or supervising the drafting, proposal, and adoption of the disclosure system that: integrated the disclosure requirements for periodic and current reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and registration statements under the Securities Act; and modernized the process in which securities were offered and sold in public offerings under the Securities Act, while reducing compliance burdens and costs (hereinafter referred to as "integration"). I drafted and/or supervised the drafting of the series of rulemaking projects in which the SEC proposed and adopted integration. I drafted and/or supervised the drafting of: the proposal of and adoption of: the shelf registration rule, Securities Act Rule 415,[9] in 1983; and the proposal of Form S-4 in 1984 and its adoption in 1985, which were part of the SEC's Proxy Review Program that applied integration to proxy solicitations, including mergers and exchange tender offers. As part of integration, I worked with the SEC's Office of the Chief Accountant on the proposal and adoption of rules under Regulation S-X, the repository of SEC accounting requirements. In addition, I drafted and/or supervised the drafting of Exchange Act Rule 13e-3 and Schedule 13E-3, the going private rule; Regulation D under the Securities Act, which modernized the

---

[9] 17 CFR §230.415.

private offering process; the application of integration to foreign private issuers; and the first permanent set of tender offer rules, including Rule 14e-3, under the Exchange Act. Finally, I supervised the design and implementation of the pilot for EDGAR, which went into operation in September 1984 and the rulemaking thereunder. EDGAR facilitated the usefulness of integration by making electronic SEC filings immediately publicly available.

7. My interpretive experience included drafting and supervising the drafting of a number of interpretive releases published by the SEC as well as Staff Accounting Bulletins, and working with the Division's Office of Chief Counsel and Office of Chief Accountant in interpreting integration after it was adopted. As the Deputy Director and Director of the Division from 1981 to 1986, I supervised the Division's interpretive process with respect to the availability of Form S-14, Form S-15 and Form S-4 and the operation of Securities Act Rule 415, as well as compliance by public companies with integration.

8. From 1986 to 2010, I was a partner, and from 2010 to 2011, I was Of Counsel, at Latham & Watkins LLP ("Latham"). As Latham's senior SEC partner, I advised public and private companies, commercial and investment banks, financial institutions, independent audit firms, and institutional and private equity investors on public and private securities offerings, mergers and acquisitions, tender offers, exchange tender offers and proxy contests, periodic and current reports and on securities regulatory issues. I frequently appeared before the SEC Staff in representing clients. I was consulted on a daily basis by other attorneys in Latham's Corporate Department and Litigation Department in the U.S. and internationally on registration, disclosure and interpretive issues under the federal securities laws. I also advised audit and compensation committees of boards of directors on a broad range of issues, including securities law, accounting issues, restatements of financial statements, Regulation FD, internal control over financial reporting ("ICFR"), disclosure controls and procedures ("DC&P"), and corporate governance.

9. I was an editor of *The Practitioner's Guide to the Sarbanes-Oxley Act*, published by the American Bar Association ("ABA") in 2004. I am the former chairman of the ABA's Subcommittee on Securities Registration. I was a member of numerous ABA drafting committees that submitted comment letters to the SEC concerning its rulemaking

proposals. I was a member of the National Association of Securities Dealers' Corporate Finance Committee. I have been a speaker at securities law and accounting conferences and have authored numerous articles on the securities laws, including with respect to disclosure, restatements of financial statements and Regulation FD, among other topics.

10. As a senior managing director from 2011 to 2013 and as an affiliate of FTI Consulting ("FTI") since 2013, I primarily provide consulting services and expert witness testimony in the areas of securities offerings, strategic transactions, corporate disclosure, restatements of financial statements, ICFR, DC&P and corporate governance. FTI is being compensated at a rate of $1,400 per hour in this matter for my time. As an independent contractor, I receive 80% of the fees FTI collects for my time and additional compensation for the other time FTI professionals bill and collect with respect to this matter. My compensation is not conditioned on the substance or outcome of the opinions I have issued in this report. My resume is attached hereto as **Appendix 1**. **Appendix 2** to this report lists my publications authored over the past 10 years, and my expert testimony in depositions and in trials during the last four years.

## III.   METHODOLOGY AND INFORMATION RELIED UPON

11. The methodology I followed in preparing this report informs the opinions set forth in Section IV of this report and includes the following:

   a.  I reviewed the following documents in whole or in part:[10]

   - Form S-14, 47 Fed. Reg. 34936 (Aug. 11, 1982);
   - Form S-15, 45 Fed. Reg. 63654 (Sept. 25, 1980);
   - *Business Combination Transactions – Proposed New Registration Form*, Release No. 33-6534 (May 9, 1984), [49 Fed. Reg. 20833 (May 17, 1984)] (the "Proposing Release");

---

[10] If additional materials relevant to this report are subsequently provided to me, I reserve the right to revise, supplement or amend my analysis and opinions.

Page 5

- *Business Combination Transactions – Adoption of Registration Form*, Release No. 33-6578 (Apr. 23, 1985) [50 Fed. Reg. 18990 (May 6, 1985)] (the "Adopting Release");

- The January Form S-4, filed on November 10, 2021 and amended on December 14, 2021, January 4, 2022 and January 11, 2022;[11]

- Notice of Effectiveness of the January Form S-4, filed on January 13, 2022;[12]

- SEC Staff and BRC correspondence relating to the January Form S-4, dated December 7, 2021, December 13, 2021, December 28, 2021, January 4, 2022, January 10, 2022 and January 11, 2022;[13]

- Item 5.07 - Submission of Matters to a Vote of Security Holders, Form 8-K, filed by SilverBox on February 4, 2022;[14]

- Form 8-K, filed by BRC on February 10, 2022 (the "February Form 8-K");[15]

- Item 8.01 - Other Events (Notice of Redemption Fair Market Value, dated April 19, 2022), Form 8-K, filed by BRC on April 19, 2022;[16]

- Form 8A-12B, filed by BRC on February 9, 2022;[17]

- New York Stock Exchange Certification letter, dated February 9, 2022;[18]

- NYSE Checklist for Supporting Documents Required for Original Listing Application (the "NYSE Checklist");[19]

- The May Form S-1, filed on March 16, 2022 and amended on April 19, 2022;[20]

---

[11] Publicly available in BRC's EDGAR file.

[12] Publicly available in BRC's EDGAR file.

[13] Publicly available in BRC's EDGAR file.

[14] Publicly available in SilverBox's EDGAR file.

[15] Publicly available in BRC's EDGAR file.

[16] Publicly available in BRC's EDGAR file.

[17] Publicly available in BRC's EDGAR file.

[18] Publicly available in BRC's EDGAR file.

[19] Publicly available at https://www.nyse.com/publicdocs/nyse/listing/Full_Application.pdf.

[20] Publicly available in BRC's EDGAR file.

- Notice of Effectiveness of the May Form S-1, filed on May 4, 2022;[21]
- SEC Staff and BRC correspondence relating to the May Form S-1, dated April 8, 2022, April 18, 2022 and May 2, 2022;[22]
- Complaint, filed on April 28, 2022 in *Tang Capital Partners, LP v. BRC Inc.* (SDNY, Case No. 1:22-cv-03476-RWL);
- Kirkland & Ellis LLP, June 10, 2022 pre-motion letter;
- Gibson, Dunn & Crutcher LLP, June 27, 2022 pre-motion letter; and
- Kirkland & Ellis LLP's Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's Complaint, dated July 29, 2022, filed in *Tang Capital Partners, LP v. BRC Inc.* (SDNY, Case No. 1:22-cv-03476-RWL) (the "Kirkland Memorandum").

b.  I reviewed and analyzed the documents referred to above in the context of the fact pattern described in the Complaint.

c.  My review and analysis included the application of my over 35 years of experience, both at the SEC and as the senior SEC partner at Latham, which experience included, but was not limited to, integration, the drafting of the proposal and the adoption of Form S-4 and Rule 415, advising clients engaging in business combinations, including mergers, tender offers and exchange tender offers and the custom, usage and practice concerning registration statements filed with the SEC.

## IV.    <u>SUMMARY OF OPINIONS</u>

12.  It is my opinion that:

A.    If warrants are publicly offered in connection with a merger (as was the case with the Merger involving SilverBox and BRC) or as part of a public exchange tender offer, Form S-4 can be used to register the offer and sale of the warrants,

---

[21] Publicly available in BRC's EDGAR file.

[22] Publicly available in BRC's EDGAR file.

the resale of the warrants, the exercise of the warrants for cash and the resulting issuance of the common stock upon exercise of the warrants, as well as the resale of such common stock.

B.  When the January Form S-4 was declared effective on January 13, 2022, the January Form S-4 registered: (1) the offer and sale of 41,883,750 shares of BRC Class A Common Stock (the "BRC Common Stock"); (2) the offer and sale of 17,766,667 warrants to purchase shares of BRC Common Stock for $11.50 per share (the "BRC Warrants"); and (3) the offer and sale of 17,766,667 shares of BRC Common Stock issuable upon exercise of the BRC Warrants. The securities listed on the cover page of the January Form S-4 and for which registration fees had been paid were on the proper form, including the offer and sale of shares of BRC Common Stock issuable upon exercise of the BRC Warrants. They were deemed to be registered on the proper registration statement form by operation of Rule 401(g) under the Securities Act,[23] as of the date of effectiveness of the January Form S-4.

C.  Because the BRC Warrants that were offered as part of the SilverBox/BRC merger consideration were exercisable "at any time 30 days after" the closing of the business combination,[24] which was February 9, 2022,[25] the offer and sale of shares of BRC Common Stock issuable upon exercise for cash of the BRC Warrants were required to be registered under Section 5 of the Securities Act at the same time as the offer and sale of the BRC Warrants.

D.  The May Form S-1 was unnecessary and had no operative effect as to the offer and sale of 17,766,667 shares of BRC Common Stock issuable upon exercise of

---

[23] 17 CFR §230.401(g).

[24] *See* Amendment No. 3 to the January Form S-4 at 3 ("'Closing' means the consummation of the Business Combination."); *id.* at 261 ("Each outstanding PubCo Warrant will entitle the holder to purchase one share of PubCo Class A common stock at a price of $11.50 per share, subject to adjustment as discussed below, at any time 30 days after the completion of the Closing.").

[25] *See* February Form 8-K.

the BRC Warrants because the offer and sale of such shares had already been registered on the January Form S-4.

E.    The BRC Warrants were listed on the NYSE in reliance on the January Form S-4. The January Form S-4 was the only effective registration statement relating to the BRC Warrants and the BRC Common Stock that could have been the basis for the Form 8-A Registration Statement under the Exchange Act, dated February 9, 2022, together with the NYSE Certification Letter,[26] dated February 9, 2022, pursuant to which the NYSE approved the listing on the NYSE of the BRC Warrants and the shares of BRC Common Stock into which the BRC Warrants were exercisable on February 9, 2022.

## V.    THE PROPOSAL AND ADOPTION OF FORM S-4 IN 1984-1985 DEMONSTRATES ITS BROAD FLEXIBILITY AND PURPOSE.

13.   The reasons that the January Form S-4 could, and did, register the offer and sale, resale, and exercise of the BRC Warrants follow from the purpose of the Form S-4: to apply the broad principles of integration to business combination transactions.

14.   The SEC adopted Form S-4 in 1985 as part of the Commission's Proxy Review Program, which applied the principles of integration to business combinations, including mergers under Securities Act Rule 145(a)[27] and exchange tender offers under the Williams Act.[28] I supervised the proposal and adoption of Form S-4. The primary reason for proposing and adopting new Form S-4 was to extend the principles of integration to all business combination registration statements. As the Proposing Release states:

> [The proposal of Form S-4] is the culmination of efforts extending over several years to improve disclosure to investors in business combinations and reflects the principles underlying the integrated disclosure system. This area has been the focus of attention because the documents delivered to security holders in the context of business combinations are frequently unwieldy (often 150 or more pages). Improvements to the business combination prospectus in certain

---

[26] *See also* NYSE Checklist.

[27] 17 CFR §230.145(a).

[28] Sections 13(d) through 14(f) of the Exchange Act and the rules adopted thereunder. 15 U.S.C. §§78m, 78n.

limited contexts were made in 1980 with the adoption, on an experimental basis, of Form S–15 as part of the first phase of the Commission's integrated disclosure system. Proposed Form S–4, which would replace Forms S–14 and S–15, expands upon the limited scope of Form S–15 by extending the principles of integration to all business combination registration statements.[29]

15. A secondary reason for proposing and adopting new Form S-4 was "to simplify the registration of securities issued in such transactions."[30] Form S-14, the predecessor to Form S-4, permitted the registration of two types of transactions: "securities to be issued in a transaction specified in paragraph (a) of § 230.145 [Securities Act Rule 145];"[31] and resales of securities acquired in a Rule 145(a) transaction "by persons and parties who may be deemed underwriters."[32] This latter aspect of Form S-14, for which the disclosure requirements were set forth in Item 6 of Form S-14, was of limited utility: an affiliate or a large security holder who received a large amount of securities in the merger could be deemed to be an underwriter if that person resold those securities promptly after the closing of the merger. At that time, any person who acquired 10% or more of an offering could be viewed as a "presumptive underwriter" under then-Securities Act Rule 145(c).[33] Therefore, such persons' resales of securities would need to be registered under the Securities Act as the Section 4(a)(1) exemption from registration would not be available for such persons. Form S-14 permitted the registration of those resales on the same form as securities to be issued in the Rule 145(a) transaction, and Item 6 of Form S-14 set forth the "[a]dditional [i]nformation [r]equired for [r]eoffering by [p]ersons and [p]arties [d]eemed to be [u]nderwriters."[34]

---

[29] Proposing Release at 20834.

[30] Adopting Release at 18998.

[31] Form S-14, General Instruction A, Rule as to Use of Form S-14.

[32] *Id.*

[33] The SEC did not abandon the presumptive underwriter doctrine until 2007, when the SEC amended Rule 145(c) to limit the presumptive underwriter doctrine to shell companies only. *See Revisions to Rules 144 and 145*, Release No. 33-8869 (Dec. 6, 2007).

[34] Form S-14, Item 6, Additional Information Required for Reoffering by Persons and Parties Deemed to be Underwriters.

16.   With respect to all other types of offers and sales of securities related to the receipt of merger consideration, the registrant would have to incur the time, effort and expense of filing a separate registration statement to register such offers and sales if an exemption from registration was not available. In response to the limited availability of Form S-14 for the resale of securities issued in a business combination, Form S-4 was intended to broaden the availability of the merger registration statement form to mergers and exchange tender offers, so that security holders who acquired securities, including warrants and convertible securities, in such mergers or exchange tender offers could exercise warrants, convert convertible securities, and resell the securities into which such warrants or convertible securities were exercisable or convertible, respectively, without any need for a subsequent registration statement.

17.   As proposed and adopted, Form S-4 permitted registration of a broader number of offers and sales of securities on one registration statement than either Form S-14 or Form S-15 had permitted.[35] As the Proposing Release explains, "In addition to Rule 145 transactions and exchange offers, the proposed Form also would be available for the registration, <u>on one registration statement, of securities to be issued in several such transactions and for reoffers or resales of the securities so registered</u>" (emphasis added).[36]

18.   Not only was this the result of the SEC's experience with Form S-14 and Form S-15, it also represented the application of integration and shelf registration to business combinations. Simply put, the same information that enabled shareholders or unit holders to make an informed investment decision with respect to the merger that was registered on Form S-4, could also serve as the corpus of disclosure that shareholders who acquired

---

[35] Adopted in 1980, Form S-15 was an "optional" form for registration of securities to be offered in certain business combination transactions. 17 CFR § 239.29 (1980). Form S-15 could be used to register securities issued in Rule 145(a) transactions, in a merger in which a vote of the security holders of the company being acquired is not required pursuant to applicable state law, or in an exchange offer for securities of another person if the securities sought to be acquired together with any securities owned by the issuer at the time of the filing of the registration statement will aggregate in excess of 50% of the class of securities which is the subject of the exchange. It could also be used by affiliates of the issuer or any other person who may be deemed underwriters of such securities, for reoffers or resales of securities acquired pursuant to Form S-15. General Instructions A and E, Form S-15.

[36] Proposing Release at 20835.

exercisable or convertible securities in a merger could use to exercise warrants or convert convertible securities and/or resell the securities into which such warrants or converts would be exercisable or convertible. While the Proposing Release stated that registering securities in these transactions on Form S-4 was optional, it was believed by the SEC Staff working on the proposal and adoption of Form S-4 that once the form was available for exercises of warrants and conversions of convertible securities as well as for reoffers and resales by non-affiliates (*i.e.*, non-presumptive underwriters), subsequent registration statements would be unnecessary[37] except in the limited situation where "registrants may prefer to register the securities on Form S-1 and to have the company being acquired prepare its own proxy statement so that the company being acquired would assume the liability for the information in its proxy statement."[38]

19.   In summary, Form S-4 was proposed and adopted to allow a registrant to include, "on one registration statement," all securities to be issued in a Rule 145(a) transaction, merger or exchange tender offer, any reoffers or resales of such securities, and any other transactions that would be required to be registered at the same time in order to comply with Section 5 of the Securities Act, such as exercises of warrants or conversions of convertible securities received in connection with a business combination transaction. Thus, the objective of Form S-4 was not to exclude transactions, or to require the filing of additional registration statements, but rather, to apply the broad principles of integration, expand availability and "to simplify the registration of securities issued in such transactions."[39]

---

[37] Rather than file a separate registration statement, if there was any need after the date of effectiveness to update the disclosure in the Form S-4, such as for a Securities Act Section 10(a)(3) update under Item 512 of Regulation S-K, a post-effective amendment to the Form S-4 would suffice.

[38] Proposing Release at 20835.

[39] Adopting Release at 18998.

**VI.     FORM S-4'S INSTRUCTIONS CORROBORATE THAT FORM S-4 MAY BE USED TO REGISTER THE OFFER, SALE, RESALE, AND EXERCISE OF WARRANTS (I.E., THE OFFER AND SALE OF SHARES ISSUABLE UPON EXERCISE OF WARRANTS) ISSUED AS CONSIDERATION IN A BUSINESS COMBINATION.**

20.     Form S-4's instructions make clear that the offer, sale, resale, and exercise of warrants issued as consideration in a business combination may all be registered on Form S-4. That is because they reference SEC rules that permit the registration of securities "offered on a delayed or continuous basis" [40] and "in connection with business combination transactions"[41] – broad terms that clearly cover the offer, sale, resale and exercise of warrants issued as consideration in a business combination transaction. Shares of common stock underlying warrants can be offered by a company on a delayed or continuous basis. Put differently, a company is offering the shares underlying warrants on a delayed basis if the warrants are not exercisable for 30 days after the merger and on a continuous basis thereafter so long as the warrants remain outstanding and exercisable.

21.     Clauses (1), (4) and (5) of General Instruction A, Rule as to Use of Form S-4, support this interpretation. General Instruction A reads as follows: "This Form may be used for registration under the Securities Act of 1933 ('Securities Act') of securities to be issued (1) in a transaction of the type specified in paragraph (a) of Rule 145 (§ 230.145 of this chapter); (2) in a merger in which the applicable state law would not require the solicitation of the votes or consents of all of the security holders of the company being acquired;[42] (3) in an exchange offer for securities of the issuer or another entity; (4) in a public reoffering or resale of any such securities acquired pursuant to this registration statement; or (5) in more than one of the kinds of transaction listed in (1) through (4) registered on one registration statement."

---

[40] Securities Act Rule 415(a).

[41] Securities Act Rule 415(a)(1)(viii).

[42] The Merger was voted on in a special meeting of SilverBox stockholders on February 3, 2022. *See* Form 8-K dated February 4, 2022 for results of the vote. Amendment No. 3 to the January Form S-4, was not only a prospectus but was a proxy statement for the special meeting of stockholders of SilverBox. *See e.g.,* Amendment No. 3 to the January Form S-4, pages 123-190.

22. General Instruction H of Form S-4 also supports this interpretation. General Instruction H, which is titled, "Registration Statements Subject to Rule 415(a)(1)(viii) (§230.415(a)(1)(viii) of this chapter)," provides in pertinent part: "If the registration statement relates to offerings of securities <u>pursuant to Rule 415(a)(1)(viii)</u>, required information about the type of contemplated transaction or the company to be acquired only need be furnished as of the date of initial effectiveness of the registration statement to the extent practicable" (emphasis added). Securities Act Rule 415(a)(1)(viii) provides that "[s]ecurities may be registered for an offering to be made <u>on a continuous or delayed basis in the future</u>, Provided, that the registration statement pertains only to….(viii) securities which are to be issued <u>in connection with business combination transactions</u>" (emphasis added). The offering of securities that can be registered on Form S-4 is not limited to the immediate merger transaction; it can also include securities that are offered on a continuous basis, such as immediately exercisable or convertible warrants and convertible securities, respectively, as well as securities that are offered on a delayed basis, such as warrants that are exercisable after 30 days. Thus, the registration statement can include all securities "which are to be issued in connection with business combination transactions."

23. The Kirkland Memorandum claims that issuance of shares underlying warrants issued as consideration in a business combination transaction is not "in connection with" the business combination transaction. I disagree with this claim. Both when I was on Staff at the SEC, supervising the Staff drafting the proposal and adoption of SEC Rule 415, and throughout my career at Latham, I interpreted Rule 415(a)(1)(viii)'s use of "in connection with" as encompassing any transaction that "touches" the business combination. The term "in connection with," which is also used in Section 10(b) of the Exchange Act,[43] has been interpreted by the Supreme Court and other federal courts as "touching"[44] a purchase or

---

[43] 15 U.S.C. §78j.

[44] Caselaw under Rule 10b-5 under the Exchange has interpreted the clause "in connection with" flexibly to include transactions touching the sale of a security. *See e.g., Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6 (1971), *United States v. Teicher*, 987 F.2d 112, 120 (2d Cir.) cert. denied, 510 U.S. 976 (1993) and *United States v. Newman*, 664 F.2d 12, 18 (2d Cir. 1981) cert. denied 464 U.S. 863 (1983). The Supreme Court's decision in *Superintendent of Ins. of State of N.Y.* pre-dated the proposal of Form S-4.

sale of securities. Based on my experience, Rule 415(a)(1)(viii)'s use of "in connection with" should be interpreted in the same manner as the caselaw's interpretation of Exchange Act Section 10(b) and Rule 10b-5 thereunder. Because the BRC Warrants constituted a part of the merger consideration, their subsequent exercise post-closing is "in connection with" a business combination transaction.

24. By operation of the Merger, the SilverBox warrants were converted into the right to receive BRC Warrants in a transaction specified in paragraph (a) of Securities Act Rule 145, which is included in General Instruction A.1.(1) of Form S-4. The exercisability of the BRC Warrants into shares of BRC Common Stock 30 days after Closing was disclosed in the January Form S-4. The Form S-4 did not contain any disclosure that a further registration statement was required for the exercise of the BRC Warrants or the offer and sale of shares of BRC Common Stock issuable upon exercise of the BRC Warrants. Therefore, SilverBox unit holders voting on the Merger received this disclosure, and such disclosure informed their investment decision to approve the Merger and accept the BRC Warrants as merger consideration. Indeed, the timing of the exercisability of the BRC Warrants (*i.e.*, only 30 days post-closing) may have impacted the valuation of the BRC Warrants and the willingness on the part of SilverBox unit holders to approve the receipt of BRC Warrants as part of merger consideration. Thus, the offer and sale of shares of BRC Common Stock underlying the BRC Warrants are "in connection with" the business combination transaction, thereby triggering the operation of Rule 415(a)(1)(viii).

## VII.   SECTION 5 OF THE SECURITIES ACT REQUIRED BRC TO REGISTER THE OFFER AND SALE OF BRC COMMON STOCK UNDERLYING THE BRC WARRANTS.

25. Question 139.01 of the Division's Compliance and Disclosure Interpretations ("C&DIs") for Securities Act Sections[45] provides the Division's longstanding interpretive position of

---

[45] "Question: Where the offer and sale of convertible securities or warrants are being registered under the Securities Act, and such securities are convertible or exercisable within one year, must the underlying securities be registered at that time?

Answer: Yes. Because the securities are convertible or exercisable within one year, an offering of both the overlying security and underlying security is deemed to be taking place. If such securities are not convertible or exercisable within one year, the issuer may choose not to register the underlying securities at the time of registering the convertible securities or warrants. However, the underlying securities must be registered no later than the date such

Section 5 of the Securities Act that an offer and sale of a warrant that is exercisable within one year constitutes a concurrent offering of both the overlying security (the warrant) and the underlying security (the common stock issuable upon exercise of the warrant).

26.  I disagree with the Kirkland Memorandum's assertion that C&DI 139.01 is merely a "disclosure requirement" to be complied with, and that the stock underlying the BRC Warrants was listed on the January Form S-4 "not to register them . . . but instead because doing so is required" as part of this "disclosure requirement." [46] The Securities Act requires the registration of offers and sales of securities unless an exemption from registration is available. C&DI 139.01 interprets Section 5 of the Securities Act and defines what constitutes an offer and sale of a security under the Securities Act. Once a registration statement is filed to register the offer and sale of securities, it must disclose information material to that offer and sale, which disclosures become subject to the liability provisions of the Securities Act and can be relied upon by investors, including those who are receiving the registration statement as well as the investing public which has access to the registration statement pursuant to EDGAR. Disclosure about the exercisability of the BRC Warrants at any time 30 days after the completion of the closing of the Merger is set forth in the January Form S-4. [47]

27.  As discussed in Section IX of this Report, *infra*, the January Form S-4, the Exhibit 5 legal opinion by Paul Hastings LLP, the Form 8-A, and the NYSE Certification Letter all proceed from the premise that the registration statement on Form S-4 must comply with interpretation established by C&DI 139.01 and therefore register the offer and sale of the BRC Common Stock issuable upon exercise of the BRC Warrants.

---

securities become convertible or exercisable by their terms, if no exemption for such conversion or exercise is available. Where securities are convertible only at the option of the issuer, the underlying securities must be registered at the time the offer and sale of the convertible securities are registered since the entire investment decision that investors will be making is at the time of purchasing the convertible securities. The security holder, by purchasing a convertible security that is convertible only at the option of the issuer, is in effect also deciding to accept the underlying security. [Aug. 14, 2009]" (Question 139.01 of the Division's Disclosure and Compliance Interpretations.)

[46] Kirkland Memorandum, pages 16-17.

[47] Amendment No. 3 to January Form S-4, page 261.

## VIII.   SECURITIES ACT RULE 401(g) RESOLVES ANY QUESTION ABOUT FORM ELIGIBILITY.

28.   To comply with Section 5(a) of the Securities Act, all offers and sales of securities must either be registered with the SEC or qualify for an exemption from registration. In order to register securities with the SEC, the registrant must pay a registration fee as required by Section 6(b) of the Securities Act. Once a registration statement has been declared effective by the Staff of the Division, pursuant to delegated authority from the SEC, any subsequent questions about form eligibility are moot by operation of law.

29.   Securities Act Rule 401(g), "Requirements as to Proper Form," which was adopted in 1982 as part of integration, provides that "a registration statement or any amendment thereto is deemed filed on the proper registration form unless the Commission objects to the registration form before the effective date." As it was proposed for comment, proposed Rule 401(g) would have provided that the SEC could notify a registrant that the effectiveness of a registration statement would provide no presumption as to the appropriateness of the registration form used by the registrant. Commentators on the proposed rule objected to this provision: "They contended that a good faith, but erroneous, determination as to the availability of a registration form should not result in contingent liability for the sale of unregistered securities." As a result, "[b]ased on these and related comments and the implementation of certification requirements in the signature provisions of the registration forms, the Commission has determined to delete the [provision]."[48] Thus, once a registration statement is declared effective, the securities on that form are deemed to be on the proper form and are registered.

## IX.   BRC'S JANUARY FORM S-4 REGISTERED THE OFFER, SALE AND EXERCISE OF THE BRC WARRANTS AND THE OFFER AND SALE OF SHARES OF BRC COMMON STOCK INTO WHICH THE BRC WARRANTS WERE EXERCISABLE.

30.   When the January Form S-4 was declared effective on January 13, 2022, BRC registered the securities listed on its cover page, including the offer and sale of 17,766,667 shares of BRC Common Stock issuable upon exercise of the 17,766,667 BRC Warrants to purchase

---

[48] *Adoption of Integrated Disclosure System*, Release No. 33-6383 [47 Fed. Reg. 11380, 11393 (Mar. 16, 1982)].

shares of BRC Common Stock for cash.[49] At the time of the initial filing of the January Form S-4 in December 2021, to comply with Section 6 of the Securities Act, BRC paid $18,940.15 to register the offer and sale of these shares issuable upon exercise of the BRC Warrants.[50]

31.  As required by Form S-4, Part II, Item 21(a) and Item 601(b)(5) of Regulation S-K,[51] the January Form S-4 contained an Exhibit 5 opinion of Paul Hastings LLP, dated January 11, 2022, that opined, without qualification, in relevant part: "the [BRC] Warrants and the Warrant Shares have been duly authorized by all necessary corporate action on the part of the Company," and "when (i) the Registration Statement has been declared effective…(ii) the Merger Certificates have been filed with and accepted by the Delaware Secretary of State, (iii) the PubCo Charter has been filed with and accepted by the Delaware Secretary of State, [and] (iv) the Warrants have been issued and paid for…," then the "[BRC] Warrants will be valid and binding obligations of the Company," and when the "[BRC] Warrants are duly exercised in accordance with the terms of the Warrant Agreement, the Warrant Shares will be validly issued, fully paid and non-assessable."[52]

---

[49] The January Form S-4 remained effective on May 4, 2022, the date on which the BRC Warrants were redeemed, and thereafter with respect to the BRC Common Stock. *See* BRC Form 8-K, filed on April 19, 2022: "On April 4, 2022, the Warrant Agent (as defined below) delivered a notice of redemption (the 'Redemption Notice') on the Company's behalf indicating that the Company is redeeming, at 5:00 p.m. New York City time on May 4, 2022 (the 'Redemption Date'), all of the Company's outstanding warrants (the 'Warrants') to purchase shares of the Company's Class A common stock, par value $0.0001 per share (the 'Class A Common Stock'), that were originally issued under the Warrant Agreement, dated as of February 25, 2021 (the 'Warrant Agreement'), by and between SilverBox Engaged Merger Corp I ('SilverBox') and Continental Stock Transfer & Trust Company, as warrant agent (the 'Warrant Agent'), and further assumed by the Company on February 9, 2022, as part of the units sold in SilverBox's initial public offering (the 'IPO') (such warrants, the 'Public Warrants') or in a private placement simultaneously with the IPO (such warrants, the 'Private Warrants' which, together with the Public Warrants, constitute the Warrants), as applicable, in each case for a redemption price of $0.10 per Warrant (the 'Redemption Price')."

[50] Based on my experience, if the registration fee is not paid with the initial filing of a registration statement, the registration statement is subject to being rejected by the SEC Staff.

[51] Item 601(b)(5) of Regulation S-K requires an opinion of counsel as to the legality of the securities being registered, indicating whether they will, when sold, be legally issued, fully paid and non-assessable. This is referred to as the "Exhibit 5" opinion, and such opinion, while filed prior to the effective date, relates to the date of effectiveness of the registration statement.

[52] Exhibit 5.1, Opinion of Paul Hastings LLP, Amendment No. 3 to the January Form S-4.

32. Since the January Form S-4 was an initial public offering of BRC, it was reviewed by the Staff of the Division. No comment appears in the comment letter file questioning BRC's registration of the BRC warrants or the BRC Common Stock into which the BRC Warrants are exercisable for cash. In contrast, the SEC Staff did object to the "concurrent" registration of offers and sales of BRC Common Stock to holders of SilverBox Class C Common Stock, which would be converted into the right to receive BRC Common Stock pursuant to the merger. Holders had purchased SilverBox Class C Common Stock in a private offering – this offering is commonly known as a PIPE, Private Investment in Public Equity. The SEC Staff took the position that "[w]e do not believe that attempting to register the offer and sale of securities that were issued privately is consistent with Section 5 of the Securities Act. Refer to Question 134.02 of our Securities Act Sections Compliance and Disclosure Interpretations."[53] BRC ultimately agreed to remove these securities from the January Form S-4.

33. Additionally, the February Form 8-K expressly confirmed that items (i) to (iv) referenced in Paragraph 31, *supra*, were completed on February 9, 2022. On February 9, 2022, BRC filed a Form 8-A to register BRC Common Stock and the BRC Warrants under Section 12(b) of the Exchange Act. In this Form 8-A, BRC was required to identify the Securities Act registration statement to which such Form 8-A relates: BRC identified the January Form S-4, Registration No. "333-260942."

34. Finally, on February 9, 2022, 35 days prior to the date the May Form S-1 was initially filed and 84 days prior to the May Form S-1 being declared effective, the NYSE certified its approval for listing BRC's Class A Common Shares and the BRC Warrants, which it described as "each whole warrant *exercisable* for one share of Class A common stock at an exercise price of $11.50."[54] As can be seen from these dates, the May Form S-1 was unnecessary and had no operative effect on: the registration of the BRC Warrants and the BRC Common Stock into which the BRC Warrants were exercisable; the delayed and

---

[53] Comment letter from SEC Staff, dated December 28, 2021, on Amendment No. 1 to January Form S-4.

[54] NYSE Certification, filed on February 9, 2022 (emphasis added).

continuous offering of such BRC Warrants and shares of BRC Common Stock after February 9, 2022; the BRC Form 8-A; and the NYSE Certification Letter. Each of these occurred as a result of the effectiveness of the January Form S-4 and preceded the filing of the May Form S-1.

35.     An argument that the January Form S-4 did not actually register the offer and sale of shares of BRC Common Stock issuable upon exercise of the BRC Warrants or that the Form S-4 was not capable of registering such offers and sales is not supported by the history of the proposal and adoption of Form S-4, as I discuss above; by the Division's administration and interpretation of Form S-4; by the Division's review of the January Form S-4; or by a review of the January Form S-4 itself, including the Exhibit 5 opinion by Paul Hastings LP, which opines on the issuance of BRC Common Stock upon issuance of the BRC Warrants; and the payment of the registration fee of $18,940.15 for the issuance of BRC Common Stock upon exercise of the BRC Warrants. Pursuant to Rule 401(g), both the BRC Warrants and the BRC Common Stock into which the BRC Warrants were exercisable, as set forth on the cover page of the January Form S-4, are deemed to be registered on the proper form, *i.e.*, the January Form S-4.

36.     The January Form S-4 acknowledges that it is registering a delayed or continuous offering of the BRC Warrants and the shares of BRC Common Stock into which the BRC Warrants were exercisable. On page II-3 of Amendment No. 3 to the January Form S-4, BRC included, in Item 22 of the January Form S-4, the undertaking that is required to be made if "securities are registered pursuant to Rule 415 under the Securities Act", *i.e.*, on a delayed or continuous basis. This is the undertaking that is required by Regulation S-K Item 512(a) for Securities Act Rule 415 offerings, and it is included in Item 22 of the January Form S-4.

## X.     <u>CONCLUSION</u>

37.     Based on my experience both at the SEC and in private practice over a 35-year period, the January Form S-4 did what the cover page and the disclosure in the January Form S-4 said it did and what BRC paid registration fees for it to do. On January 13, 2022, BRC registered: (1) the offer and sale of 41,883,750 shares of BRC Common Stock; (2) the

offer and sale of 17,766,667 BRC Warrants to purchase shares of BRC Common Stock for $11.50 per share; and (3) the offer and sale of 17,766,667 shares of BRC Common Stock issuable upon exercise of the BRC Warrants. Form S-4 was intended by the SEC and the SEC Staff whom I supervised through its proposal and adoption to be able to register all of these securities in one registration statement. Furthermore, by operation of Securities Act Rule 401(g), any questions of form eligibility are moot once a registration statement has been declared effective. The SEC Staff reviewed the January Form S-4 and issued three comment letters containing 24 individual comments on the January Form S-4; in none of these comment letters did the SEC Staff question the availability or eligibility of Form S-4 to register the offer and sale of shares of BRC Common Stock issuable upon exercise of the BRC Warrants received in the SilverBox/BRC business combination. The January Form S-4 was the only effective registration statement that the NYSE could use to approve the listing of the BRC Warrants and BRC Common Stock, for which the BRC Warrants were exercisable, for trading on February 9, 2022.

## XI.  <u>SIGNATURE</u>

John J. Huber

Executed August 30, 2022.

**Appendix 1**

# CV OF JOHN HUBER

**EXPERIENCE**

**Affiliate to FTI Consulting, Inc.**                                                              Apr. 2013-Present

Provides consulting services and expert witness testimony in the areas of securities offerings, strategic transactions, corporate disclosure, restatements, internal control over financial reporting and corporate governance. Assists companies facing SEC Staff comments, FCPA investigations and SEC enforcement actions, including deferred prosecution agreements and monitorships.

**FTI Consulting, Inc.; Senior Managing Director**                                      Feb. 2011-Mar. 2013

Provided consulting services and expert witness testimony in the areas of securities offerings, strategic transactions, corporate disclosure, restatements, internal control over financial reporting and corporate governance. Also provides assistance to companies facing FCPA violations and SEC enforcement actions, such as deferred and non-prosecution agreements as well as monitorships.

**Latham & Watkins LLP; Senior Partner and Of Counsel**                         Apr. 1986-Jan. 2011

Counseled clients, including companies and investment banking firms, on securities offerings, tender offers and mergers. Advised companies and audit committees on a broad range of securities regulation issues, including securities law, accounting, restatements, internal control over financial reporting and corporate governance. One of three members of Latham's National Office which advised over 400 corporate attorneys in 30 offices world-wide.

**Securities and Exchange Commission, Washington, D.C.**                               1975-1986

After starting in the Division of Corporation Finance at the entry level position of branch attorney in 1975, became the draftsman in 1976 of the first permanent tender offer and going private rules, served in the Office of General Counsel in 1978, became the supervisor for the Division's rulemaking program, including the integrated disclosure system in 1979, was named Deputy Director in 1981 and supervised the review function before being named Director in 1983 and supervised over 300 professionals and staff in administering the Securities Act of 1933, the reporting provisions of the Securities Exchange Act of 1934 and the Trust Indenture Act of 1939.

**Clerk to the Wisconsin Securities Commissioner**                                       1973-1974

**PUBLICATIONS, PROFESSIONAL RECOGNITION and TEACHING**

- Chairman of the ABA task force that submitted the ABA Task Force Report on Regulation FD to the SEC in August 2001.
- Editor of The Practitioner's Guide to the Sarbanes-Oxley Act, published by the American Bar Association.
- Former member of the NASD's Corporate Financing Committee and former Chairman of the ABA's Subcommittee on Securities Registration and Task Force on Regulation Financial Disclosure.
- Adjunct Professor at both Georgetown University Law Center and Washington School of Law of the American University in Washington, D.C. from 1978 to 1986 teaching courses in Mergers and Acquisitions, Business Associations and Securities Regulation.
- First recipient of the Manual F. Cohen Outstanding S.E.C. Young Lawyer award in 1978 conferred by the Securities Law Committee of the Federal Bar Association.

**EDUCATION**

LL.M. (Taxation), Georgetown University Law Center; Washington, DC                  1978

J.D. cum laude, University of Wisconsin Law School; Madison, Wisconsin              1974

Masters Program, University of Wisconsin Graduate School, Madison, Wisconsin
    (September, 1968 to January, 1969) (left to enter U.S. Army)

B.A., History, with honors, University of Wisconsin, Madison, Wisconsin              1968

**MILITARY SERVICE**

U.S. Army, 1st LT, MI                                                              1969-1972

**Appendix 2 - Listing of Publications and Testimony**

## <u>ARTICLES</u>

1. How Fait Plays a Role in the Materiality Analysis
   a. Date - 10/18/2012
   b. Publisher - FTI Consulting, Inc.
   c. Co-author(s) - Tim Hanson
2. Dealing With Increasing Cost of Compliance: Proposal for Disclosure Approach
   a. Date - 11/16/2012
   b. Publisher - Bloomberg BNA - Daily Reports for Executives
   c. Co-author(s) - Phil Nathan
3. Disclosure of Internal Control over Financial Reporting
   a. Date - Prior to 12/31/2012
   b. Publisher - N/A
   c. Co-author(s) - Joel H. Trotter
4. International Contract Manual (Chapter 33. The United States Sarbanes-Oxley Act of 2002: Overview for Non-U.S. Issuers)
   a. Date - Prior to 12/31/2012
   b. Publisher - West
   c. Co-author(s) - N/A
5. The SEC's Renewed Interest in Accounting Cases —A New Beginning or a Victim of Fait?
   a. Date – 9/16/2013
   b. Publisher – BNA
   c. Co-author(s) - Linda L. Griggs and Christian J. Mixter
6. *Omnicare* and GAAP-Based 'Numerical Opinions'
   a. Date – 6/29/2015
   b. Publisher – Securities Regulation & Law Reporter
   c. Co-author(s) – Linda L. Griggs and Christian J. Mixter.
7. Ten Strategic Building Blocks for Shareholder Activism
   a. Date – 12/20/2016
   b. Publisher  – FTI Consulting
   c. Co-author(s) – Jay Frankl, Steven Balet, Merritt Moran
8. Leidos and MD&A: Seeing MD&A Through the Eyes of the SEC
   a. Date - 8/10/2017
   b. Publisher – Social Science Research Network
   c. Co-author(s) – N/A
9. When Rules Collide – *Leidos*, the Supreme Court, and the Risk to MD&A – Part I
   a. Date - 9/25/2017
   b. Publisher – Bloomberg BNA - Securities Regulation & Law Report
   c. Co-author(s) – Linda L. Griggs and Christian J. Mixter

10. When Rules Collide – *Leidos*, the Supreme Court, and the Risk to MD&A – Parts II and III
    a. Date - 10/2/2017
    b. Publisher – Bloomberg BNA - Securities Regulation & Law Report
    c. Co-author(s) – Linda L. Griggs and Christian J. Mixter
11. Living with *Leidos*
    a. Date - 11/13/2017
    d. Publisher – Bloomberg BNA - Securities Regulation & Law Report
    c. Co-author(s) – Linda L. Griggs and Christian J. Mixter

## <u>LETTERS AND INTERVIEWS</u>

1. Big Legal Minds podcast
    a. Date – 2/11/2017
    b. Publisher – Big Legal Minds blog (http://www.biglegalminds.com/2017/02/life-as-a-corporate-lawyer-4/)
    c. Co-author(s) – Broc Romanek
2. Comment letter on Release No. 33-10750, 34-880093, RE: Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information
    a. Date – 6/5/2020
    b. Publisher – Federal Regulation of Securities Committee of the Business Law Section of the American Bar Association
    c. Co-author(s) – Robert E. Buckholz, Kimberley Drexler, Karen J. Garnett, Linda L. Griggs, Keith F. Higgins, Stanley Keller, Jay H. Knight
3. Comment letter on Release No. 33-11013, 34-93782, RE: Rule 10b5-1 and Insider Trading
    a. Date – 4/29/2022
    b. Publisher – Federal Regulation of Securities Committee of the Business Law Section of the American Bar Association
    c. Co-author(s) – Jay H. Knight, Kimberley Drexler, Quentin Wiest, Lillian Brown Robert Buckholz, Nicolas Grabar, Keith Higgins, Timothy Hoxie, Stanley Keller, Jay Knight, James Moloney, Lona Nallengara, Anna Pinedo

## <u>SPEAKING ENGAGEMENTS AND PRESENTATIONS</u>

1. Nuts and Bolts of the New Disclosure Regime: How to Write an MD&A
    a. Date - Prior to 12/31/2012
    b. Publisher - Latham & Watkins
    c. Co-author(s) - N/A

**Appendix 2 - Listing of Publications and Testimony**

2. How to Write an MD&A
   a. Date - Prior to 12/31/2012
   b. Publisher - Latham & Watkins
   c. Co-author(s) - N/A
3. Understanding and Mitigating Risk in the Current Environment
   a. Date - Prior to 12/31/2012
   b. Publisher - N/A
   c. Co-author(s) - Alexander F. Cohen, Andrew S. H. Ting
4. SOX 404 - Rules of the Road
   a. Date - Prior to 12/31/2012
   b. Publisher - Latham & Watkins
   c. Co-author(s) - N/A
5. Rules of the Road for Fair Value Disclosure
   a. Date - Prior to 12/31/2012
   b. Publisher - Latham & Watkins
   c. Co-author(s) - N/A
6. Securities: Tackling Future Issues Today
   a. Date – 6/15/2016
   b. Publisher - Securities Regulation Section of the State Bar of Arizona, 83rd Annual Convention, Chandler, AZ
   c. Co-author(s) – Jay Frankl
7. Leidos and MD&A: Seeing MD&A Through the Eyes of the SEC
   a. Date – 11/10/2017
   b. Publisher – Practicing Law Institute, 49th Annual Institute on Securities Regulation, New York, NY
   c. Co-author(s) – N/A

## **TESTIMONY**

1. *Mark Smilovits, et al.  v. First Solar, Inc. et al.*; United States District Court for the District of Arizona; Case No.: 2:12-CV-00555-DGC
   a.  Deposition Testimony – 1/17/2019
2. *In Re Domestic Airline Travel Antitrust Litigation;* United States District Court for the District of Columbia; Case No.: 1:15-mc-01404-CKK
   *a.* Deposition Testimony – 11/6/2020
3. *In Re Broiler Chicken Antitrust Litigation;* United States District Court for the Northern District of Illinois; Case No.: 1:16-cv-08637
   *a.* Deposition Testimony – 6/27/2022