UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/8/2023

--------------------------------------------------------------X

TANG CAPITAL PARTNERS, LP.,          :

                              Plaintiff,          :

                 - against -          :

BRC Inc.,          :

                              Defendant.          :

--------------------------------------------------------------X

22-CV-3476 (RWL)

**DECISION AND ORDER:**
**MOTION TO DISMISS**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Tang Capital Partners, LP ("Tang") purchased and attempted to exercise certain warrants to purchase shares in Defendant BRC Inc. ("BRC"). After being refused twice and only permitted to exercise its warrants after BRC's stock price had fallen, Tang commenced the instant action seeking damages for breach of contract. Tang also seeks a declaration that "the Warrants and the shares of common stock underlying the Warrants were registered within the meaning of the Securities Act of 1933 as of January 13, 2022, when [BRC's] Form S-4 was declared effective" by the Securities and Exchange Commission (the "SEC") and that, "therefore, the Warrants should have been exercisable on March 11, 2022." (Compl. ¶ 48.[1]) BRC moves to dismiss with prejudice both the breach of contract claim and the declaratory judgment claim under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). For the reasons that follow, the Court GRANTS the motion as to the declaratory judgment claim and DENIES the motion as to the breach of contract claim.

---

[1] "Compl." refers to Tang's Complaint at Dkt. 1.

## FACTUAL BACKGROUND

The following facts are drawn from the Complaint, exhibits attached thereto, and public filings with the SEC.  As required on a motion to dismiss, the Court accepts as true all well-pled allegations of the Complaint and draws all reasonable inferences in favor of Tang as the non-moving party.

The warrants at the heart of this dispute were first issued by SilverBox Engaged Merger Corp I ("SilverBox") pursuant to a February 25, 2021 warrant agreement (the "Warrant Agreement").[2]  (Compl. ¶ 2.)  SilverBox was a public special purpose acquisition company ("SPAC") formed to identify and combine with a merger target.  (Compl. ¶ 13.)  Ultimately, SilverBox combined with Black Rifle Coffee Company, LLC ("Black Rifle Coffee"), forming the new company BRC Inc.  (Compl. ¶ 19.)

## A.    The Warrant Agreement

Several key provisions of the Warrant Agreement are summarized below.

### 1.  Parties And Beneficiaries

Section 9.5 of the Warrant Agreement defines which parties have rights and obligations under the Agreement (and which do not) as follows:

> Nothing in this Agreement shall be construed to confer upon, or give to, any person or corporation other than the parties hereto and the Registered Holders of the Warrants any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof.  All covenants, conditions, stipulations, promises, and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns and of the Registered Holders of the Warrants.

---

[2] The Warrant Agreement is attached to Tang's Complaint as Exhibit A, at Dkt. 1-1.

Ownership of warrants is tracked by registration with the "Warrant Agent," identified in the Agreement as Continental Stock Transfer & Trust Company.  (Warrant Agreement at 1.)  Per the Warrant Agreement:

> The Warrant Agent shall maintain books (the "Warrant Register") for the registration of original issuance and the registration of transfer of the Warrants.  … Ownership of beneficial interests in the Public Warrants shall be shown on, and the transfer of such ownership shall be effected through, records maintained by (i) the Depositary or its nominee for each book-entry certificate or (ii) institutions that have accounts with The Depository Trust Company … .

(Warrant Agreement § 2.3.1).  "Registered Holder" is defined as "the person in whose name such Warrant is registered in the Warrant Register." (§ 2.3.2.)

The original signatories to the Warrant Agreement are SilverBox and Continental Stock Transfer & Trust Company.  (Warrant Agreement at 23.)  The Warrant Agreement explicitly binds and benefits successors.  (Warrant Agreement §§ 4.4, 9.1, 9.5.)

### 2.  Exercise Of Warrants

The Warrant Agreement provides that each warrant entitles the Registered Holder thereof to purchase a share of common stock for $11.50 per share (the "Warrant Price"), subject to provisions allowing adjustments.  (Warrant Agreement § 3.1.)

Section 3.2 establishes the duration of warrants and provides that warrants may only be exercised during the "Exercise Period" which begins on the later of "the date that is thirty (30) days after the first date on which the Company completes a merger, share exchange, asset acquisition, share purchase, reorganization or similar transaction, involving the Company and one or more businesses (a "Business Combination"), and … the date that is twelve (12) months from the date of the closing of the Offering" provided, however, "that the exercise of any Warrant shall be subject to the satisfaction of any

applicable conditions, as set forth in subsection 3.3.2 … with respect to an effective registration statement or a valid exemption therefrom being available."

Section 3.3 governs the exercise of warrants.  Under § 3.3.1, a Registered Holder may exercise a warrant by surrendering the warrant with an executed election to purchase form and payment in full.  Section 3.3.2 governs the issuance of shares of common stock once the warrant is exercised, including conditions precedent to issuance.

Section 7 sets forth other provisions relating to the rights of warrant holders. Section 7.4.1 concerns the registration of shares of common stock "issuable upon exercise of the Warrants."

## B.    SilverBox And Black Rifle Coffee Merge To Create BRC And File SEC Form S-4

In late 2021, SilverBox identified Black Rifle Coffee as a merger target and sought to merge and form BRC Inc.[3]  (Compl. ¶ 19.)  On November 10, 2021, BRC filedwith the

---

[3] The proxy statement sent to SilverBox shareholders and filed with the final Form S-4 explained the merger as follows:

On November 2, 2021, SilverBox Engaged Merger Corp I, a Delaware corporation ("SilverBox, "we," "our" or "us"), BRC Inc., a Delaware corporation and wholly owned subsidiary of SilverBox ("PubCo"), SBEA Merger Sub LLC, a Delaware limited liability company and wholly owned subsidiary of PubCo ("Merger Sub 1"), BRCC Blocker Merger Sub LLC, a Delaware limited liability company and wholly owned subsidiary of SilverBox ("Merger Sub 2," and together with Merger Sub 1, "Merger Subs"), Authentic Brands LLC, a Delaware limited liability company ("Authentic Brands") and the parent company of Black Rifle Coffee Company LLC, a Delaware limited liability company ("BRCC"), and Grand Opal Investment Holdings, Inc., a Delaware corporation and holder of equity interests in Authentic Brands ("Blocker"), entered into a business combination agreement (as it may be amended or restated from time to time, the "Business Combination Agreement"), pursuant to which SilverBox agreed to combine with Authentic Brands in a series of transactions that will result in PubCo becoming a publicly-traded company on the New York Stock Exchange ("NYSE") and controlling

SEC a Form S-4, which is used for "[r]egistration of securities issued in business combination transactions."[4]  BRC filed amended versions of the Form S-4 on December 14, 2021, January 4, 2022, and January 11, 2022, in response to comments from the SEC.  (Compl. ¶ 20.)

The January 11, 2022 Form S-4 lists three securities "to be registered" by the form and for which fees were calculated and paid: 1) 41,883,740 "Shares of Class A Common Stock, par value $.0001 per share"; 2) 17,766,667 "Warrants to purchase shares of Class A Common Stock" and 3) 17,766,667 "Shares of Class A Common Stock issuable upon exercise of warrants."  (Form S-4 at ECF 2.)  The Preliminary Proxy Statement and Prospectus provided to SilverBox stockholders and filed as part of the Form S-4 states in bold and capital letters that it is a "Prospectus for 40,725,250 shares of Class A common stock[;][5] 17,766,667 warrants to purchase shares of Class A Common Stock[;] and 17,766,667 shares of Class A common stock underlying warrants of BRC Inc.  (Form S-4 at ECF 3.)  The Prospectus further states that "[p]ursuant to the Business Combination [i.e., the Silverbox – Black Rifle Coffee merger], among other things ... each warrant of SilverBox outstanding immediately prior to the effectiveness of the SilverBox Merger [will be] converted into the right to receive one warrant of PubCo [i.e.,

---

Authentic Brands in an "Up-C" structure (collectively, the "Business Combination").

(Form S-4 (Compl. Ex. B at Dkt. 1-2) at ECF 3.)

[4] SECURITIES AND EXCHANGE COMMISSION, *Edgar Filer Manual (Volume II)*, 3-1, 3-42 (Dec. 2020) (accessible at https://www.sec.gov/info/edgar/forms/edgform.pdf).

[5] This number excludes the 1,158,500 shares the Sponsor agreed to forfeit after the consummation of the merger.  (*See*, *e.g.*, Form S-4 at ECF 35, 45.)

BRC], ...with PubCo assuming SilverBox's obligations under the existing warrant agreement."  (Form S-4 at ECF 3.)

The amended Form S-4 became effective on January 13, 2022 at 9:00 A.M. (Compl. Ex. C.)  SilverBox and Black Rifle Coffee completed their merger on February 9, 2022, creating BRC.  (Compl. ¶ 22.)  The same day, BRC registered "Class A common stock" and "Redeemable warrants, each whole warrant exercisable for one share of Class A common stock at an exercise price of $ 11.50" on the New York Stock Exchange (NYSE).  (BRC Form 8-A (Dkt. 34-3) at 1.)  BRC's Form 8-A regarding this registration on the NYSE incorporated by reference the Form S-4's "description of the shares of Class A common stock and warrants" to describe the securities to be registered.[6]  (BRC Form 8-A at 2.)

In response to an investor inquiry, Tanner Doss, BRC's Vice President of Investor Relations, stated on March 8, 2022 "[a]fter going back and forth with outside counsel" that, as to public warrant holders, "those underlying shares have already been registered through the [SilverBox] transaction and you should be able to exercise those warrants 30 days post-transaction."  (Compl. ¶ 37.)

## C.    Tang Purchases And Attempts To Exercise Its Warrants

Tang purchased 1,035,364 warrants in open market transactions between March 7, 2022 and April 6, 2022, relying on the Form S-4, BRC's other SEC filings, and BRC's public statements.  (Compl. ¶ 39.)  While the Complaint does not describe which warrants

---

[6] Form 8-A is the form "for the registration / listing of a class of securities on a national securities exchange pursuant to Section 12(b)."  SECURITIES AND EXCHANGE COMMISSION, *Edgar Filer Manual (Volume II)*, 3-1, 3-10 (Dec. 2020) (accessible at https://www.sec.gov/info/edgar/forms/edgform.pdf).

were purchased when, the gross cost of the purchases totaled more than $3.76 million. (Compl. ¶ 39.)

On March 11, 2022, thirty days after the February 9, 2022 merger, Tang submitted a notice to exercise its then-held warrants, but was told that the warrants were not exercisable.   (Compl. ¶ 41.)   Tang's counsel requested an explanation from BRC's counsel, who "asserted that the Form S-4 did not register an ongoing offering covering the exercise of the [w]arrants, on the theory that a Form S-4 cannot be used for a 'continuous' offering under SEC Rule 415."  (Compl. ¶ 42.)  Tang's counsel responded that the instructions for Form S-4 and the SEC's adopting release indicate that a continuous offering under Rule 415 can be registered using Form S-4.  (Compl. ¶ 42.) Neither BRC nor its counsel responded to Tang's explanation.  (Compl. ¶ 42.)

**D.    BRC's Form S-1 And Tang's Additional Exercise Attempts**

On March 16, 2022, BRC filed with the SEC a Form S-1, which is the "[g]eneral form of registration statement for all companies including face amount certificate companies."[7] The Form S-1 contemplated a primary offering of "17,766,641 Shares of Class A Common Stock Issuable Upon the Exercise of Warrants" and a secondary offering of 203,821,303 Shares of Class A Common Stock [and] 6,266,667 Warrants to

---

[7] SECURITIES AND EXCHANGE COMMISSION, *Edgar Filer Manual (Volume II)*, 3-1, 3-42 (Dec. 2020) (accessible at https://www.sec.gov/info /edgar/forms/edgform.pdf).

Purchase Class A Common Stock.",[8]  On April 8, 2022, the SEC provided comments and requested revisions.[9]

Tang again sought to exercise its warrants on April 13, 2022, but was again told the warrants were not exercisable.  (Compl. ¶ 44.)  On April 18, 2022, BRC responded to the SEC's comments and filed an amended Form S-1. (*See* Dkts. 31-1, 31-2.) BRC finally allowed Tang to exercise its warrants on April 20, 2022.[10]  (Compl. ¶¶ 45, 55.)

On May 2, 2022, BRC filed a letter with the SEC requesting that the effective date of the amended Form S-1 be accelerated "to 4:00pm Washington D.C. time on May 4, 2022, or as soon as practicable thereafter."[11]  On May 4, 2022, the Form S-1 became effective.  (Dkt. 31-3.)

## PROCEDURAL BACKGROUND

Tang filed its Complaint on April 28, 2022.  (Dkt. 1.)  On June 10, 2022, BRC sought a conference or briefing schedule for an anticipated motion to dismiss; Tang opposed. (Dkts. 17-18.)  On June 28, 2022, the parties consented to my jurisdiction for all purposes. (Dkt. 22.)

---

[8] BRC Inc., Registration Statement (Form S-1) (March 16, 2022), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001891101/000110465922034586/brrc-20220314xs1.htm.

[9] Comment Letter from the SEC to BRC Inc. (April 8, 2022), https://www.sec.gov/Archives/edgar/data/1891101/000000000022003795/filename1.pdf

[10] The parties represented at oral argument that Tang exercised its warrants on a "cashless basis" under provisions of the Warrant Agreement not at issue in this opinion.

[11] BRC Inc, Acceleration Request (May 2, 2022), https://www.sec.gov/Archives/edgar/data/1891101/000110465922054683/filename1.htm.

BRC filed its motion to dismiss on July 29, 2022.  (Dkts. 30-32.)  Tang filed its opposing brief and supporting declaration on August 30, 2022.  (Dkts. 33-34.)  Tang's filing included the Expert Report of John J. Huber, who addressed the background of the proposal, adoption, and subsequent interpretation of Form S-4 by the SEC, as well as the interpretation of BRC's Form S-4 and Form S-1.  ("Huber Report," Dkt. 34-1.)  BRC filed its reply in support of the motion to dismiss on September 13, 2022, at which point the motion to dismiss was fully briefed.  (Dkt. 35.)

The same day it filed its reply, BRC filed a letter motion for a conference or briefing schedule to move to strike the Huber Report and portions of Tang's opposition brief referencing the report or otherwise containing unpled factual assertions.  (Dkts. 36.)  Tang filed a letter in opposition on September 16, 2022.  (Dkt. 37.)  On September 22, 2022, the Court ordered that the extent to which the Huber Report will be considered would be decided in connection with the motion to dismiss without further briefing.  (Dkt. 38.)  The Court heard oral argument on the motion to dismiss on March 7, 2023.

## LEGAL STANDARD FOR MOTION TO DISMISS

Under Rule 12(b)(6), a pleading may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007).  A claim is facially plausible when the factual content pled allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility

and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966).

In considering a motion to dismiss, a district court "accept[s] all factual claims in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor."  *Lotes Co., Ltd. V. Hon Hai Precision Industry Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (internal quotation marks omitted).   However, this tenet is "inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.  "[R]ather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level … *i.e.*, enough to make the claim plausible."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and brackets omitted). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558, 127 S. Ct at 1966.

For the purposes of considering a motion to dismiss pursuant to Rule 12(b)(6), a court generally is confined to the facts alleged in the complaint.  *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  A court may, however, consider additional materials, including documents attached to the complaint, documents incorporated into the complaint by reference, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit.  *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (quoting *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).  If "a document relied on in the complaint contradicts allegations in the complaint, the document, not the

allegations, control, and the court need not accept the allegations in the complaint as true." *Poindexter v. EMI Record Group Inc.*, No. 11-CV-559, 2012 WL 1027639, at *2 (S.D.N.Y. March 27, 2012) (quoting *Barnum v. Millbrook Care Ltd. Partnership*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y.1994)).

Of particular relevance to this motion, "[t]he Second Circuit has consistently held that in the securities context, courts may consider 'public disclosure documents required by law to be, and that have been, filed with the SEC.'" *Donoghue v. Gad*, No. 21-CV-7182, 2022 WL 3156181, at *4 (S.D.N.Y. Aug. 8, 2022) (quoting *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) and collecting cases); *accord Ashland Inc. v. Morgan Stanley & Co.*, *Inc.*, 700 F. Supp.2d 453, 461 n.4 (S.D.N.Y. 2010), *aff'd*, 652 F.3d 333 (2d Cir. 2011) ("Where … public documents filed with the SEC are attached to a defendant's motion to dismiss, the Court may consider them without converting a motion to dismiss into a summary judgment motion").  The parties have referenced, and the Court has relied on, certain such public disclosure documents, as referenced above and below.

## DISCUSSION

BRC raises several grounds for dismissal under Rule 12(b)(6).  First, BRC asserts that denying Tang's attempt to exercise its warrants was consistent with the Warrant Agreement, which contemplated two separate transactions:  the merger and exchange of SilverBox securities for BRC securities (the "Merger-Exchange Transaction"), which was the subject of the Form S-4 filing, and exercise of the warrants (the "Warrant-Exercise Transaction"), which required an effective Form S-1 to be filed after the Form S-4.  BRC

argues that, as a matter of law, a Form S-4 cannot register the Warrant-Exercise Transaction and that BRC's Form S-4 did not purport to do so.

Second, BRC argues that Tang lacks contractual standing because it failed to plead it was a Registered Holder when it attempted to exercise the warrants.  Third, BRC moves to dismiss Tang's declaratory judgment claim for the same reasons it argues for dismissal of the breach of contract claim, and because the declaratory judgment claim is duplicative of the breach of contract claim.  In the alternative, BRC seeks dismissal of Tang's claims as to warrants purchased after March 11, 2022, when BRC stated its intent not to allow exercise until a Form S-1 was effective.  Finally, in addition to its arguments for dismissal, BRC asks the Court to strike the Huber Report and strike from Tang's opposition brief any references thereto, as well as any discussion of facts not pled in the Complaint.

In the following sections, the Court first explains why it does not consider the Huber Report, references thereto, or unpled facts from Tang's brief in deciding the motion to dismiss, but does not deem it necessary to strike those materials from the record.  The Court next considers each of BRC's arguments for dismissal, and rejects all as to the breach of contract claim.  The Court, however, agrees that the declaratory judgment claim should be dismissed as duplicative.

## A.   The Court Has Not Considered The Huber Report Or Unpled Facts In Deciding The Motion To Dismiss

In opposing BRC's motion, Tang has offered the expert opinion of Mr. Huber.  Tang identifies Mr. Huber as "a leading authority on United States securities registration rules and practices, the former Director of the SEC's Division of Corporate Finance, and the person who supervised the SEC's original proposal and adoption of its Form S-4 and its

adoption of Rule 415." (Dkt. 37.)  BRC seeks to strike the Huber Report as well as several portions of Tang's brief in which Tang relies on, cites, and/or quotes the Huber Report. (*See* Dkt. 36-1.)

BRC also identifies two instances in Tang's brief discussing facts not pled in the Complaint.  First, Tang's brief states, "[a]s BRC surely knows, Tang Capital attempted to exercise its Warrants **both** as a beneficial holder (*i.e.*, held with a broker as the intermediary) and a record holder (with no intermediary), and this change in form of ownership had no effect on BRC's willingness to respond to a proper and valid exercise notice." (Pl. Mem. at 4 (emphasis in original); Dkt. 36-1 at 4.[12])  Second, Tang states that it "has uncovered further statements by BRC to aggrieved Warrant holders, stating that the Warrants were exercisable without the necessity of a further registration statement on Form S-1." (Pl. Mem. at 10 n.4; Dkt. 36-1 at 10 n.4.)

The law is clear: the Court may not consider materials outside the complaint on a motion to dismiss, except for "written instrument[s] attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Communications, Inc.*, 493 F.3d at 98.  The Huber Report is not such material.  The Court therefore has not considered the Huber Report to decide this motion.  *See Pyatt v. Raymond*, 462 F. App'x 22, 24 (2d Cir. 2012), *as amended* (Feb. 9, 2012) (summary order) ("[t]he district court did not err by declining to examine" documents not attached, incorporated, or integrated

---

[12] "Pl. Mem." refers to Plaintiff Tang Capital Partners, LP's Memorandum Of Law In Opposition To Defendant BRC Inc.'s Motion To Dismiss at Dkt. 33.

into the complaint, including expert reports, attached to plaintiff's opposition to a motion to dismiss); *accord Jordache Enterprises, Inc. v. Affiliated FM Insurance Co.*, No. 21-CV-5433, 2022 WL 986109, at *6 n.8 (S.D.N.Y. March 31, 2022) (declining to consider expert reports submitted with plaintiff's opposition to a motion to dismiss because they were not "written instruments" attached to the complaint as exhibits, incorporated into it by reference, or integral to the complaint).

As to the "unpled facts," BRC is correct that, although Tang pled that it is a "Registered Holder" under the Warrant Agreement (Compl. ¶¶ 17, 52), the additional details of Tang's ownership status when it attempted to exercise the warrants do not appear in the Complaint.  The Court therefore has not taken those unpled facts into account in deciding the motion to dismiss.  Statements to other warrant holders that have been "uncovered" after the filing of the Complaint are also obviously not pled in the Complaint.  The Court therefore has not considered them in deciding the motion.  In sum, any assertions in Tang's brief not otherwise supported by the Complaint or documents properly before the Court (such as the Warrant Agreement or BRC's SEC filings) were not considered by the Court in deciding this motion.  *See Holmes v. YMCA of Yonkers, Inc.*, No. 19-CV-620, 2020 WL 85389, at *2 n. 4 (S.D.N.Y. Jan. 7, 2020) ("Except for those matters of which the Court may take judicial notice, the Court does not consider any … alleged facts" which were "asserted in [the parties'] unsworn briefs" in deciding a motion to dismiss).

While the Court did not consider those materials in deciding the motion, it does not find it necessary to strike them.  *See Lfoundry Rousset SAS v. Atmel Corp.*, No. 14-CV-1476, 2015 WL 4461617, at *7 (S.D.N.Y. July 21, 2015) (denying as moot motion to strike

because it was "unnecessary for the Court to rely on Plaintiffs' … expert report" to decide the motion), *aff'd sub nom. Guerrini v. Atmel Corp.*, 667 F. App'x 308 (2d Cir. 2016); *Degrosiellier v. Solomon & Solomon, P.C.*, No. 00-CV-1065, 2001 WL 1217181, at *2 (N.D.N.Y. Sept. 27, 2001) ("Because the Court declines to consider any factual averments contained in defense counsel's supporting affidavit in connection with the present application, it is not necessary to either strike portions of the affidavit and/or convert defendant's motion to one for summary judgment").  Accordingly, the Court will deny BRC's letter motion to strike.

## B.   The Warrant Agreement Is Ambiguous, Precluding Dismissal

The first merits issue to decide is one of contract interpretation.  BRC argues that refusing to permit Tang to exercise its warrants 30 days after the merger did not breach the Warrant Agreement because §§ 3.3.2 and 7.4.1 require an effective Form S-1 to be filed after the merger is consummated.  Tang argues for a contrary interpretation.  Both interpretations are reasonable, thereby establishing ambiguity that may not be resolved on this motion.

### 1.  Legal Standards For Breach Of Contract And Contract Interpretation

The Warrant Agreement is governed by New York law.  (Warrant Agreement § 9.3; Def. Mem. at 11 n.4; Pl. Mem. at 13 n.5.[13])  "To prevail on a breach of contract claim under New York law, a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000) (internal quotation marks omitted).  "Plaintiffs bear the burden of proof as to all elements of a breach of contract claim."  *Choquette v. Motor*

---

[13] "Def. Mem." refers to BRC's Memorandum Of Law In Support Of Defendant's Motion To Dismiss Plaintiff's Complaint at Dkt. 32.

*Information Systems, Inc.*, No. 15-CV-9338, 2017 WL 3309730, at *3 (S.D.N.Y. Aug. 2, 2017).

Under New York law, "the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Judd Burstein, P.C. v. Long*, 180 F. Supp.3d 308, 311-12 (S.D.N.Y. 2016) (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)). The parties' intentions are typically "discerned from the four corners of the document itself." *Judd Burstein, P.C.*, 180 F. Supp.3d at 312 (citing *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645, 884 N.Y.S.2d 211, 215 (2009)). When determining the intent of the parties, "the words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks and brackets omitted). Therefore, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, No. 13-CV-1582, 2015 WL 4191419, at *11 (S.D.N.Y. July 10, 2015) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 569 (2002)). Only where a contract's terms are ambiguous can extrinsic evidence be used to aid interpretation. *See Brad H. v. City of New York*, 17 N.Y.3d 180, 186, 928 N.Y.S.2d 221, 224 (2011) (collecting cases).

A contract is unambiguous if its language has "a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Greenfield*, 98 N.Y.2d at 569, 750 N.Y.S. at 569-70 (internal quotation marks, citations, and brackets

16

omitted).  In contrast, contract terms are ambiguous if they "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business*." Law Debenture Trust Company of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted).  "Evidence as to such custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized … the court must be informed of the meaning of the language as generally understood in that business, in the light of the customs and practices of the business." *Id.* (internal quotation marks and citations omitted).

"On a motion to dismiss, 'a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous.'" *Novartis Pharma AG v. Incyte Corp.*, 520 F. Supp.3d 514, 525 (S.D.N.Y. 2021) (quoting *Orchard Hill Master Fund Ltd. v. SBA Communications Corp.*, 830 F.3d 152, 156 (2d Cir. 2016)); *accord Maniolos v. United States*, 741 F. Supp.2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) ("when the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal on a Rule 12(b)(6) motion") (internal quotation marks omitted).  Put another way, while the court is not "obliged to accept the allegations of the complaint as to how to construe a contract," it nonetheless "should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss."

*Maniolos*, 741 F. Supp.2d at 567 (internal quotation marks omitted).

### 2. Analysis Of The Warrant Agreement

Analysis of the four corners of the Warrant Agreement reveals ambiguity as to the number and type of SEC filings contractually required before BRC must issue stock upon exercise of a warrant.

Section 3.3.2 governs the issuance of common stock once the warrant is exercised, including conditions precedent to issuance.  Section 3.3.2 reads, in relevant part:

> As soon as practicable after the exercise of any Warrant and the clearance of the funds in payment of the Warrant Price … the Company shall issue to the Registered Holder of such Warrant a book-entry position or certificate, as applicable, for the number of full shares of Common Stock to which he, she or it is entitled … Notwithstanding the foregoing, the Company shall not be obligated to deliver any shares of Common Stock pursuant to the exercise of a Warrant and shall have no obligation to settle such Warrant exercise unless (a) a registration statement under the Securities Act covering the issuance of the Common Stock underlying the Public Warrants is then effective and (b) a prospectus relating thereto is current, subject to the Company's satisfying its obligations under Section 7.4 or a valid exemption from registration is available.

Section 7 sets forth other provisions relating to the rights of warrant holders.

Section 7.4.1 concerns the registration of shares of common stock, and reads in part:

> The Company agrees that as soon as practicable, but in no event later than fifteen (15) Business Days after the closing of its initial Business Combination, it shall use its reasonable best efforts to file with the Commission a registration statement for the registration, under the Securities Act of the shares of Common Stock issuable upon exercise of the Warrants.  The Company shall use its reasonable best efforts to cause the same to become effective within sixty (60) Business Days following the closing of the initial Business Combination and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration or redemption of the Warrants in accordance with the provisions of this Agreement.

BRC contends that these two provisions, read together, unequivocally require the

effective registration of two transactions with the SEC before BRC is obligated to issue stock upon exercise of a warrant.  According to BRC, § 3.3.2 requires registration "covering the issuance of the Common Stock underlying the Public Warrants," that is, the Merger-Exchange Transaction, accomplished through a Form S-4.  Section 7.4.1's requirement to "file with the Commission a registration statement for the registration, under the Securities Act of the shares of Common Stock issuable upon exercise of the Warrants" contemplates a separate registration, presumably through a Form S-1, to register the Warrant-Exercise Transaction, that can only occur *after* the closing of the merger.  (Def. Mem. at 11-13; *see* Warrant Agreement § 7.4.1 (registration should occur "in no event later than fifteen (15) Business Days after the closing of its initial Business Combination.").)  According to BRC, any other reading would render § 7.4.1's requirement to register the Warrant-Exercise Transaction meaningless.

Tang, however, contends that references to an "effective registration statement" are general, and can include a Form S-4.  (Pl. Mem. at 11-13.)  Further, § 7.4.1 "does not contemplate any particular sequence" but merely requires registration by any means "'as soon as practicable' and no later than 15 business days" after the merger closes.  (Pl. Mem. at 13.)  In other words, the Warrant Agreement does not require, but merely allows for, the shares issuable upon exercise of the warrants to be registered in a second registration after the merger closes.

A reasonable reading of the two provisions could support either construction.  In BRC's favor, the language regarding the registration of stocks in the two sections is slightly different – § 3.3.2 describes an effective registration "covering the issuance of Common Stock underlying the Public Warrants," while § 7.4.1 describes a registration "of

19

the shares of Common Stock issuable upon exercise of the Warrants."  BRC seizes on this difference in language to bifurcate into separate transactions what BRC dubs the "Merger-Exchange Transaction" and the "Warrant-Exercise Transaction."   In Tang's favor, the plain language of § 7.4.1 nowhere mandates that the registration referred to in that section occur after the merger, and neither section at issue specifies the form an "effective registration statement" must take.

Contrary to BRC's contention, Tang's interpretation does not necessarily render § 7.4.1 "meaningless."  Section 3.3.2, in describing the conditions that must be met before BRC is obligated to issue stocks upon a warrant holder's exercise of a warrant, cautions that shares cannot be issued without an effective registration.  Section 7.4.1, under the general heading "Other Provisions Relating to **Rights of Holders of Warrants**," ensures for the benefit of warrant holders that the registration of the "the shares of Common Stock issuable upon exercise of the Warrants" is completed as soon as practicable and in a timely manner, that is, filed **no later** than 15 days after the merger closes, with an effective date **no later** than 60 days after the merger closes. (Warrant Agreement §§ 7, 7.4.1 (emphasis added).)  Section 7.4.1 thus can be reasonably read as a backstop to protect the interests of warrant holders; it does not necessarily require that registration of stock to be issued to warrant holders be filed after the merger closes, but instead allows for a subsequent registration to accommodate the (at the time) unknown details of the future business combination contemplated by the Warrant Agreement.

Because the provisions at issue are subject to two reasonable interpretations, it will be necessary to consider extrinsic evidence to resolve the ambiguity.  Tang includes some extrinsic evidence within or attached to its Complaint that supports its interpretation

of the Warrant Agreement.  For example, Tang quotes an opinion letter, included in the January 11, 2022 Form S-4, in which BRC's outside counsel indicates that when the "[r]egistration [s]tatement has been declared effective," the necessary steps to complete the merger occur, the warrants are issued and paid for, and the warrants "are duly exercised in accordance with the terms of the Warrant Agreement, the Warrant Shares will be validly issued, fully paid and non-assessable."  (Form S-4 at ECF 636.)  That language reasonably can be read to mean that the S-4 registration includes registration of the shares of stock to be issued upon exercise of the warrants.

Tang also reproduces a communication by BRC's Vice President of Investor Relations to a shareholder made on March 8, 2022, indicating that the executive (via discussion with BRC's outside counsel) understood that the "underlying shares" for the "public warrant holders … have already been registered through the [SilverBox] transaction and you should be able to exercise those warrants 30 days post-transaction." (Compl. ¶¶ 37-38.)  BRC also registered "Class A common stock" and "Redeemable warrants, each whole warrant exercisable for one share of Class A common stock at an exercise price of $ 11.50" on the NYSE on February 9, 2022 and incorporated by reference the Form S-4's "description of Class A common stock and warrants" to describe the securities to be registered. (BRC Form 8-A at 1-2.)  Even the face of the Form S-4 is supports Tang's interpretation, insofar as it purports to register 17,766,667 "Shares of Class A Common Stock issuable upon exercise of warrants."  (Form S-4 at ECF 2.)

These facts plausibly support Tang's understanding of the Warrant Agreement and suggest that BRC's understanding was at some point the same.  BRC, of course, disputes the meaning and relevance of these statements.  (Def. Mem. at 17-18; Def. Reply at 6-

7.[14])

Accordingly, Tang has sufficiently pled a plausible interpretation of the Warrant Agreement to establish BRC's breach of contract.  Of course, through discovery, the parties will have the opportunity to unearth more extrinsic evidence that may support their respective interpretations.  Such evidence would include not only the statements and actions of the parties, but also, potentially, evidence of custom and practice, expert testimony, and other material.  In light of the present contractual ambiguity, the Court denies BRC's motion to dismiss.[15]

The Court now turns to discussing BRC's arguments that Tang's interpretation is contrary to law.

**C.    Whether The January Form S-4 Could And Did Register The Shares Underlying The Warrants**

To bolster support for its reading of the Warrant Agreement, BRC contends that as a matter of law the Form S-4, which registered the so-called Merger-Exchange Transaction, could not and did not also register the so-called Warrant-Exercise Transaction; that is, the Form S-4 did not register the issuance of stocks underlying the warrants for the purpose of actual exercise of the warrants.  Because the Warrant-Exercise Transaction could **only** be registered by the Form S-1, BRC's argument goes, its refusal to allow Tang to exercise its warrants before the Form S-1 became effective

---

[14] "Def. Reply" refers to BRC's Reply Memorandum Of Law In Further Support Of Defendant's Motion To Dismiss Plaintiff's Complaint at Dkt. 35.

[15] Adopting BRC's interpretation would also not warrant dismissal.  BRC did not file the Form S-1 until March 16, 2022, 35 days after the merger was complete.  The S-1 did not become effective until May 4, 2022, 84 days after the merger.  Even if BRC's contract interpretation prevails, Tang may nonetheless be able to state a claim for breach of § 7.4.1's obligation that BRC use "best efforts" to file a registration within 15 days of the merger and ensure that such registration is effective within 60 days of the merger.

did not breach the Warrant Agreement.  (*See* Def. Mem. at 14-16.)  BRC also disputes that the Form S-4 can be read as registering the stocks issuable upon exercise of the warrants.  (Def. Mem. at 16-18.)

BRC's arguments do not stand up to scrutiny, at least not on the current record.

### 1. BRC Has Not Demonstrated That Form S-4 Cannot Register The Stocks Issuable Upon Exercise Of The Warrants

BRC claims that the issuance of stock upon exercise of the warrants is an entirely distinct transaction from the SilverBox-BRC merger (which included the exchange of SilverBox warrants for BRC warrants).  Because the Warrant-Exercise Transaction is not within the scope of transactions that can be registered on a Form S-4, BRC claims, the Form S-4 becoming effective could not have satisfied the registration requirements at § 7.4.1 of the Warrant Agreement.  Tang, on the other hand, contends that the shares to be issued upon exercise of the BRC warrants are properly understood as securities issued in connection with the merger and so could have been, and were, registered through the Form S-4.  In other words, the Merger-Exchange Transaction and Warrant-Exercise Transaction are both part of one single merger transaction, and the shares to be issued upon exercise of the warrants could be, and were, registered in connection with the merger.

In support of their arguments with respect to what is legally permissible, the parties rely on regulatory text and history as well as SEC guidance.  Those sources do not alone conclusively establish as a matter of law that the Warrant-Exercise Transaction is a separate transaction from the Merger-Exchange Transaction requiring a separate registration, nor that the shares issued upon exercise of the warrants could not have been issued in connection with the merger, such that the Form S-4 could not have registered

the shares issuable upon exercise of the warrants.

### a. SEC Regulatory Text

SEC regulations specify that a Form S-4 can be used to register securities issued

in "business combination transactions," specifically:

> securities to be issued (a) in a transaction of the type specified in paragraph (a) of Rule 145 (§ 230.145 of this chapter); (b) in a merger in which the applicable state law would not require the solicitation of the votes or consents of all of the security holders of the company being acquired; (c) in an exchange offer for securities of the issuer or another entity; (d) in a public reoffering or resale of any such securities acquired pursuant to this registration statement; or (e) in more than one of the kinds of transactions listed in paragraphs (a) through (d) registered on one registration statement.

17 C.F.R. § 239.25.  Tang contends that the shares issuable upon exercise of warrants

were issued in connection with the SilverBox – Black Rifle Coffee merger, and so were

issued within one of the transactions specified in Rule 145 at 17 C.F.R. § 230.145(a)(2).

The relevant portion of Rule 145 provides:

> (a) Transactions within this section. An offer, offer to sell, offer for sale, or sale shall be deemed to be involved, within the meaning of section 2(3) of the Act, so far as the security holders of a corporation or other person are concerned where, pursuant to statutory provisions of the jurisdiction under which such corporation or other person is organized, or pursuant to provisions contained in its certificate of incorporation or similar controlling instruments, or otherwise, there is submitted for the vote or consent of such security holders a plan or agreement for:
> …
>> (2) Mergers of consolidations. ***A statutory merger or consolidation or similar plan or acquisition in which securities of such corporation or other person held by such security holders will become or be exchanged for securities of any person***, unless the sole purpose of the transaction is to change an issuer's domicile solely within the United States.

17 C.F.R. § 230.145(a)(2) (emphasis added).

Another rule, SEC Rule 415, specifies that "Securities may be registered for an

offering to be made on a continuous or delayed basis in the future, [p]rovided, [t]hat: …

The registration statement pertains only to … Securities which are to be issued *in connection with* business combination transactions."   17 C.F.R. § 230.415(a)(1)(viii) (emphasis added).  Tang asserts that this regulation allows for the shares to be issued upon exercise of the warrants to be registered by the Form S-4, and demonstrates that the SEC intended for the registration of shares to be issued upon exercise of warrants issued as part of a merger to be within the scope of Rule 145 and Form S-4.  (Pl. Mem. at 15-16.)

BRC counters that "[t]he phrase 'in connection with' is not so broad as to sweep in transactions that occur many months after a merger has closed" and urges the Court to interpret the phrase by reference to "limiting principle[s] consistent with the structure of the statute and its other provisions."  (Def. Mem. at 15 (quoting *Maracich v. Spears*, 570 U.S. 48, 60, 133 S. Ct. 2191, 2200 (2013) (interpreting 18 U.S.C. § 2721(b), which allows a state department of motor vehicles to disclose personal information "[f]or use in connection with" certain matters).)  To that end, BRC highlights the preliminary note to Rule 145, which states that "[t]he thrust of the rule is that an offer, offer to sell, offer for sale, or sale occurs when there is submitted to security holders a plan or agreement pursuant to which such holders are required to elect, on the basis of what is in substance a new investment decision, whether to accept a new or different security in exchange for their existing security."  17 C.F.R. § 230.145.  Because "no stockholder vote is required for exercise of BRC Warrants," the "Warrant-Exercise Transaction was … temporally separate" from the merger, the Registered Holders were not necessarily the same investors who approved the merger, and the Warrant-Exercise Transaction was not required by or a condition of the merger, BRC contends that the Warrant-Exercise

Transaction was not an issuance of securities "in connection with" the business combination.  (Def. Mem. at 15-16.)

In opposition, Tang asserts that the Form S-4 contained certain "undertakings" by BRC required for a Rule 415 continuous offering, and points out that "in voting to approve a merger transaction, shareholders are voting to approve the consideration they will receive in the merger, including the terms of warrant exchange and the subsequent exercise, tethering the matter of the warrants' exercise to the merger itself."  (Pl. Mem. at 16; *see also* Form S-4 at ECF 274 ("Each outstanding PubCo Warrant will entitle the holder to purchase one share of PubCo Class A common stock at a price of $11.50 per share … at any time 30 days after completion of the Closing").)  Tang also asserts that the phrase "in connection with" has been interpreted broadly in the context of SEC Rule 10b-5 to include all transactions "touching" the sale of a security.  (Pl. Mem. at 17 (collecting cases).)

BRC argues in reply that it "makes no sense" to apply interpretations of the "catchall" provision in Rule 10b-5 to Form S-4, which is "expressly limited to only certain specified transaction types," but does not provide any support for its competing interpretation other than to reiterate its own interpretation that the Warrant-Exercise Transaction is in fact a distinct transaction that must be registered separately.  (Def. Reply at 4-5.)

The Court is not convinced by BRC's interpretation that the shares to be issued upon exercise of the BRC warrants (BRC warrants which were themselves issued as part of the merger) are not to be treated as securities issued in connection with the merger. While faulting Tang for resorting to cases interpreting other security law statutes and SEC

regulations, BRC bases its proposition that the phrase "in connection with" must be interpreted narrowly on a case interpreting a statute entirely unconnected to the registration and sale of securities.  BRC has not provided any legal authority, other than its own recitation and interpretation of the text of the regulations, that supports its contention that the Form S-4 could not have registered the stocks to be issued upon exercise of the warrants.  As summarized above, Tang's interpretation is at the very least plausible in light of the interlocking provisions of the Form S-4 instructions, Rule 145, and Rule 415; the fact that the Warrant-Exercise Transaction was contemplated by shareholders approving the merger; and court interpretations of the same phrase as it appears in another SEC regulation, notwithstanding the fact that neither party provides precisely on-point legal support for their position.  BRC has not provided the Court with sufficient reason at this juncture to adopt its interpretation of the regulations over Tang's.

### b.  SEC Guidance

In further support of its position, Tang highlights the SEC Division of Corporation Finance's Compliance and Disclosure Interpretation 139.01 ("C&DI 139.01"),[16] which states "the underlying securities must be registered at the time the offer and sale of the convertible securities are registered."  (Pl. Mem. at 18 (quoting C&DI 139.01) (original emphasis omitted).)   While SEC guidance documents are not binding, they are "persuasive, particularly in light of the absence of any contrary precedent put forth by Defendants" to the Court when interpreting the meaning of the Securities Act and SEC regulations promulgated thereunder.  *Chechele v. Standard General L.P.*, No. 20-CV-

---

[16] SEC Division of Corporate Finance, *Compliance and Disclosure Interpretations*, Section 139. Securities Act Section 5, Q. 139.01 (Aug. 14, 2009).

3177, 2021 WL 2853438, at *7 (S.D.N.Y. July 8, 2021), *motion to certify appeal denied*, 2022 WL 766244 (S.D.N.Y. March 14, 2022); *accord Chechele v. Elstain*, No. 11-CV-3320, 2012 WL 607448, at *3, 7 (S.D.N.Y. Feb. 24, 2012) (giving persuasive weight to SEC guidance); *In re SunEdison, Inc. Securities Litigation*, 300 F. Supp.3d 444, 485 n. 6 (S.D.N.Y. 2018) ("Informal agency guidance is … afforded deference according to its persuasiveness … based on the agency's expertise, the longevity of its statements and registrants' need for clear guidance as to their filing obligations").

C&DI 139.01 reads:

**Question**: Where the offer and sale of convertible securities or warrants are being registered under the Securities Act, and such securities are convertible or exercisable within one year, must the underlying securities be registered at that time?

**Answer**: Yes. Because the securities are convertible or exercisable within one year, an offering of both the overlying security and underlying security is deemed to be taking place. If such securities are not convertible or exercisable within one year, the issuer may choose not to register the underlying securities at the time of registering the convertible securities or warrants. However, the underlying securities must be registered no later than the date such securities become convertible or exercisable by their terms, if no exemption for such conversion or exercise is available.  Where securities are convertible only at the option of the issuer, the underlying securities must be registered at the time the offer and sale of the convertible securities are registered since the entire investment decision that investors will be making is at the time of purchasing the convertible securities. The security holder, by purchasing a convertible security that is convertible only at the option of the issuer, is in effect also deciding to accept the underlying security.

*Id.*

C&DI 139.01 provides reason to conclude that the shares to be issued when warrants are exercised could be, should have been, and in fact were registered by Form S-4.  BRC does not dispute that the Form S-4 registered the exchange of SilverBox Warrants for BRC Warrants and that those warrants were exercisable within one year.

28

From a plain reading of the SEC's guidance, the shares underlying the warrants are those that are issued when the warrant is exercised, and those must have been registered when the warrants were registered to comply with the SEC's interpretation of the Securities Act. While BRC is correct that the guidance does not specify for what purposes the shares must be registered, one would imagine that if a separate registration were required in order for warrants such as those at issue here to actually be exercised that the SEC would have explained so in this guidance.

BRC argues that the SEC guidance relates only to "the information that needs to be disclosed in an SEC filing," because it is a Compliance and **Disclosure** Interpretation, and "do[es] not purport to alter the Securities Act or the regulations promulgated thereunder as to what forms can be used to register what securities." (Def. Mem. at 17.) BRC asserts that it complied with this disclosure requirement by listing the underlying shares on the Form S-4 for purposes of the Merger-Exchange Transaction only. (Def. Mem. at 17, Def. Reply at 6 n.4.)

BRC's position is not supported by any authority cited in BRC's brief and ignores the "Compliance and" portion of "Compliance and Disclosure Interpretation." Further, while the SEC notes that CD&Is are "not rules, regulations, or statements of the Commission," it describes them as "interpretive positions," invites "requests for interpretive advice and other assistance relating to the areas of the federal securities laws that the Division [of Corporation Finance] administers and interprets," and presents CD&Is organized by the statute or regulation that they interpret.[17] These interpretations thus

---

[17] *See* United States Security and Exchange Commission, *Compliance and Disclosure Interpretations*, https://www.sec.gov/divisions/corpfin/cfguidance (last visited March 7, 2023).

apply to far more than only disclosure requirements.

BRC also argues that even if the shares were registered by the Form S-4, because registrations are "transaction-specific," any registration for purposes of the Merger-Exchange Transaction cannot register the shares for purposes of the Warrant-Exercise Transaction. (Def. Mem. at 17.) Again, BRC's division of events into two separate transactions is suspect. The Court strains to understand for what purpose the shares underlying the warrants could be registered except to issue when warrants are exercised. Tang's point that BRC's interpretation "would cause serious confusion for investors who would not know whether securities are listed in a registration statement for purposes of truly registering them or for purposes of mere 'disclosure'" is well-taken, particularly in light of a Form S-4 like BRC's which can be reasonably read as registering the shares for purposes of issuing them upon exercise of warrants. (Pl. Mem. at 18.)

### c. Regulatory History

The parties also offer competing interpretations of the history and purpose of Form S-4 to support their positions. Tang, however, relies chiefly on the Huber Report, which the Court may not and does not consider in deciding this motion. BRC argues that the proposing and adopting releases published in the Federal Register merely state that Form S-4 can be used for "Rule 145 transactions and exchange offers" as well as "other mergers, exchange offers and reoffers or resales of securities registered on the Form," with no reference to the exercise of warrants. (Def. Reply at 5 (internal quotation marks omitted).) However, BRC's argument again rests on the assumption that the exercise of BRC warrants that were issued in connection with the merger is to be treated as a distinct transaction from the merger itself (and therefore outside the scope of Rule 145

transactions), which the Court does not accept as a matter of law.  If the shares issued upon exercise of the warrants are considered issued in connection with the merger, the lack of mention of a separate "warrant exercise" transaction in Rule 145's regulatory history is of no moment.

### 2. It Is Plausible That Form S-4 Did Register The Stocks Issuable Upon Exercise Of The Warrants

In addition to disputing whether, as a matter of law, the Form S-4 could register shares issuable upon exercise of the warrants for the purpose of the "Warrant-Exercise Transaction," BRC argues that the Form S-4 on its face cannot be read to register the shares for this purpose.  (Def. Mem. at 16-17.)  BRC contrasts the language in the Form S-1 ("registering 17,766,641 Shares of Class A Common Stock *Issuable Upon the Exercise of Warrants*") with that in the Form S-4 ("registering 17,766,667 SHARES OF CLASS A COMMON STOCK *UNDERLYING WARRANTS* OF BRC INC.") to argue that the Form S-4 purports to register the shares only for the Merger-Exchange Transaction and not the Warrant-Exercise Transaction.  (Def. Mem. at 17 (emphasis in original).)  Again, the Court cannot rule as a matter of law at this juncture about the significance, if any, of the difference in phrasing of "stock issuable upon the exercise of warrants" versus "stock underlying warrants," or that there are two such distinct transactions as BRC contends.

Indeed, there is much in the Form S-4 that makes it plausible that BRC registered the shares at that time for purposes of exercise of the warrants.[18]  The very first page of

---

[18] BRC characterizes the provisions cited by Tang as "cherry-pick[ing]" (Def. Reply at 6), but the Court does not agree.  Moreover, BRC engages in some "cherry-picking" of its own.  BRC contends that the Form S-4 "makes clear" that BRC would file an additional registration statement "covering the shares of Class A common stock issuable upon

the final Form S-4 contains a Calculation of Registration Fee table describing the securities to be registered by the form and indicating the fee paid by BRC.  (Form S-4 at ECF 2.)  As seen above, that table includes 17,766,667 "Warrants to purchase shares of Class A Common Stock," which the form specifies "[c]onsists of warrants of the Registrant [BRC] that will be issued in exchange for the outstanding warrants of SilverBox" *and* "17,766,667 Shares of Class A Common Stock issuable upon exercise of warrants" which "[c]onsists of shares of PubCo [BRC Inc.] Class A Common Stock issuable upon exercise of the warrants."  (Form S-4 at ECF 2 (emphasis added).)  As further stated, "[e]ach whole warrant will entitle the warrant holder to purchase one share of PubCo [BRC] Class A Common Stock at a price of $11.50 per share (subject to adjustment)."  (Form S-4 at ECF 2.)  Even accepting BRC's position that "stocks underlying warrants" and "stocks issuable upon exercise of warrants" are meaningfully distinct, the face of the Form S-4 explicitly purports to register "17,766,667 Shares of Class A Common Stock *issuable upon exercise of warrants*."  (Form S-4 at ECF 2 (emphasis added).)  BRC argues that the Form S-4 fee chart "simply describes the ultimate purpose of the underlying shares; it does not state that the Form S-4 is registering the *transaction* whereby those securities will later be issued" (Def. Reply at 7 (emphasis in original)).  That argument, however, again rests on the contention that shares to be issued upon exercise of BRC warrants are

---

exercise of the warrants."  (Def. Mem. at 18 (quoting Form S-4 at ECF 313).)  But the quoted language is extracted from a portion of the Form S-4 that reproduces notes to a December 2020 SilverBox financial statement which is of questionable relevance to the transaction actually registered by the Form S-4 two years later and merely recites § 7.4.1 of the Warrant Agreement, which, as held above, is far from "clear" in requiring an additional registration.

not considered securities issued "in connection" with the merger transaction, a conclusion the Court does not accept as a matter of law.

It is plausible that the Form S-4 accomplished exactly what it stated in the fee chart (i.e., that one "class of security to be registered" when the Form S-4 became effective is "[s]hares of Class A Common Stock issuable upon exercise of warrants"), and exactly what was required by § 7.4.1 of the Warrant Agreement.  (*See* Warrant Agreement § 7.4.1 (requiring BRC to "as soon as possible … file … a registration statement for the registration … of the shares of Common Stock issuable upon exercise of the Warrants").)

The Form S-4 also included a preliminary proxy statement and prospectus to be provided to shareholders of SilverBox in advance of their vote to approve the merger. This proxy statement/prospectus noted in bold and capital type: "PROSPECTUS FOR 40,725,250 SHARES OF CLASS A COMMON STOCK[,] 17,766,667 WARRANTS TO PURCHASE SHARES OF CLASS A COMMON STOCK *AND* 17,766,667 SHARES OF CLASS A COMMON STOCK UNDERLYING WARRANTS OF BRC INC. (A DELAWARE CORPORATION, WHICH WILL BE CONVERTED INTO A DELAWARE PUBLIC BENEFIT CORPORATION UPON CONSUMMATION OF THE BUSINESS COMBINATION AS DESCRIBED HEREIN).  (Form S-4 at ECF 3 (emphasis added).) The warrants were further mentioned, inter alia, in the "Questions and Answers" in the proxy statement/prospectus.  In response to the question "Why is SilverBox proposing the Business Combination?" the answer stated, in part,

> SilverBox was organized for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses or entities. …
>
> There currently are 34,500,000 shares of SilverBox Class A Common Stock issued and outstanding and 8,625,000 shares of SilverBox Class B

Common Stock outstanding.  In addition, there currently are warrants issued and outstanding, consisting of 11,500,000 Public Warrants and 6,266,667 Private Placement Warrants.  Each whole warrant entitles the holder thereof to purchase one share of SilverBox Class A Common Stock at a price of $11.50 per share.  ***The warrants will become exercisable on the later of 30 days after the completion of a business combination and 12 months from the closing of the IPO, and expire at 5:00 p.m., New York City time, five years after the completion of a business combination or earlier upon redemption or liquidation.***  The Private Placement Warrants, however, are non-redeemable so long as they are held by the Sponsor or its permitted transferees.

Under the Existing Charter, SilverBox must provide all holders of Public Shares with the opportunity to have their Public Shares redeemed upon the consummation of SilverBox's initial business combination in conjunction with a stockholder vote.

(Form S-4 at ECF 22-23 (emphasis added).)  The emphasized language explicitly contemplates that the warrants could be exercised as early as 30 days after the merger, which, again, is contrary to BRC's position.  BRC did not disclose the need for a separate, subsequent registration before the warrants could be exercised.[19]

The Form S-4 also includes an opinion letter from BRC's then-counsel, Paul Hastings LLP, which delineates what is necessary for the warrant shares to be issued. In doing so, the opinion letter refers to only one Registration Statement, stating in part:

When (i) the Registration Statement has been declared effective by order of the Commission (and not suspended or withdrawn), (ii) the Merger Certificates have been filed with and accepted by the Delaware Secretary of State, (iii) the PubCo Charter has been filed with and accepted by the Delaware Secretary of State, (iv) the Warrants have been issued and paid for in the manner contemplated by and upon the terms and conditions set forth in the Registration Statement and the Business Combination Agreement, and (v) the Warrants are duly exercised in accordance with the terms of the Warrant Agreement, the Warrant Shares will be validly issued, fully paid and non-assessable.

---

[19] That BRC saw fit to discuss the exercise of warrants in answering why SilverBox proposed its merger with BRC also suggests that BRC viewed the purportedly separate Warrant-Exercise Transaction as part and parcel of the merger.

(Form S-4 at ECF 636.)  The first paragraph of the opinion letter defines "Warrant Shares" as "17,766,667 shares … of Class A Common Stock issuable upon exercise of Warrants, in connection with the Business Combination Agreement."  (Form S-4 at ECF 635.)  BRC contends that all the opinion letter provides is that the warrants will be exercisable according to the terms of the Warrant Agreement, and the terms of the Warrant Agreement mandate an additional registration before warrants can be exercised.  (*See* Def. Reply at 7.)  That is a reasonable interpretation, although not necessarily the only one.  But regardless, as explained above, a reasonable reading of the Warrant Agreement does not require two registrations, nor does the opinion letter disclose the need for one.  It is plausible that the opinion letter, together with the Form S-4 table and the preliminary proxy and prospectus statement, further supports Tang's interpretation.[20]

In short, the Complaint plausibly pleads that BRC's Form S-4 Registration included registration of the shares to be issued upon exercise of the warrants and that, as a result, BRC breached the Warrant Agreement when it refused Tang's attempts to exercise its warrant rights.

**D.   Tang Has Sufficiently Pled Contractual Standing**

As an additional ground for dismissal, BRC contends that Tang did not plead facts

---

[20] Tang also offers in the alternative that, regardless of whether the Form S-4 was the proper vehicle to register the shares issued upon exercise of the warrants, SEC Rule 401(g) ensures that the registration is deemed filed on the correct form absent objection from the SEC.  17 C.F.R. § 230.401(g)(1) ("a registration statement or any amendment thereto is deemed filed on the proper registration form unless the Commission objects to the registration form before the effective date").  BRC reiterates its argument that the Form S-4 did not purport to register the shares for purposes of the Warrant-Exercise Transaction and so Rule 401(g) is irrelevant.  Given the ambiguity discussed above, this argument is not dispositive for either party.

to support that it was a Registered Holder of the warrants at the time it attempted to exercise them and thus has not pled contractual standing.  (Def. Mem. at 19-22.)  Tang counters that detailed allegations of the timing of its Registered Holder status are not necessary at this stage to plausibly allege contractual standing.  (Pl. Mem. at 21-22.)  The Court agrees with Tang.

Contractual standing concerns "whether a party has the right to enforce a contract." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020).  A plaintiff has contractual standing if "the plaintiff is in privity of contract with the defendant or is a third-party beneficiary of the contract."  *Hillside Metro Associates, LLC v. JPMorgan Chase Bank, National Association*, 747 F.3d 44, 49 (2d Cir. 2014).  "It is ancient law in New York that to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed."  *Suffolk County v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir. 1984) (internal citation omitted).  Contractual standing is a prudential limitation on the Court, rather than a constitutional one.  As the Second Circuit has explained:

> Contractual standing is distinct from Article III standing and does not implicate subject-matter jurisdiction. Article III standing speaks to the power of a court to adjudicate a controversy; contractual standing speaks to a party's right to relief for breach of contract. Although the question of whether [defendant] breached a contract with [plaintiff] depends on whether [plaintiff] enjoyed a contractual relationship with [defendant], the existence of such a relationship is not a prerequisite to a court's power to adjudicate a breach-of-contract claim.

*SM Kids, LLC*, 963 F.3d at 211.

The Warrant Agreement defines "Registered Holder" as "the person in whose name such Warrant is registered in the Warrant Register" (§ 2.3.2), and further specifies that "[n]othing in [the] Agreement shall be construed to confer upon, or give to, any person

or corporation **other than the parties hereto and the Registered Holders of the Warrants** any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof." (§ 9.5 (emphasis added) (hereinafter the "Negating Clause").)   The parties agree that a Registered Holder of a warrant would have standing as an express third-party beneficiary to seek damages for breach of the Warrant Agreement.   (*See* Compl. ¶ 52; Def. Mem. at 19; Pl. Mem. at 21-22.)

In its Complaint, Tang alleges explicitly that it is a Registered Holder of the warrants it sought to exercise.  (*See* Compl. ¶¶ 17, 52.)  While BRC faults Tang for not specifying **when** it became a Registered Holder, such temporal detail is not necessary to survive a motion to dismiss premised on lack of contractual standing, particularly since Tang could have standing to sue even if it received authority to do so after its lawsuit was filed.  *See*, *e.g.*, *Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 245-46 (2d Cir. 2005) (affirming district court decision that beneficial owner of note had contractual standing after receiving authorization from record holder after lawsuit commenced); *accord Lovati v. Petróleos de Venezuela, S.A.*, No. 19-CV-4799, 2021 WL 5908953, at *2 (S.D.N.Y. Dec. 14, 2021*)* ("While Plaintiffs ultimately need authorization to sue from the registered holder, that authorization need not pre-date the filing of this lawsuit").

Cases relied on by BRC are distinguishable because they involve plaintiffs who did not plead that they were the Registered Holders or the analogous party under the contracts at issue, and instead sought to assert rights generally as third-party beneficiaries.   For example, in *Sudarsan v. Seventy Seven Energy Inc.*, the Court

dismissed plaintiff's claim for breach of a warrant agreement for lack of contractual standing because "[n]owhere in the Complaint does Plaintiff allege that a warrant is registered under his name in the Warrant Register."  No. 17-CV-2342, 2018 WL 1088004, at *4 (S.D.N.Y. Feb. 6, 2018).  In contrast, Tang alleges just that in its Complaint.[21] (Compl. ¶ 17 ("'Registered Holders' are those (such as Tang Capital) 'in whose name such Warrant is registered in the Warrant Register'").)

## E.   Claims Regarding Warrants Purchased After March 11, 2022 Survive At The Pleading Stage

BRC moves in the alternative for dismissal of Tang's breach claim insofar as it relates to warrants purchased after March 11, 2022, when BRC informed Tang of its position that the warrants were not yet exercisable.  BRC argues that once Tang was on notice of BRC's alleged breach that Tang had a duty to mitigate damages.  Because Tang's subsequent purchase of additional warrants was unreasonable in light of BRC's stated position, BRC posits, Tang cannot recover for the avoidable damages arising out of those later-purchased warrants.  (Def. Mem. at 22-23.)  Tang counters that BRC cannot

---

[21] In the alternative, Tang contends that even if it had not adequately pled it was a Registered Holder, it could maintain the action as a third-party beneficiary notwithstanding the negating clause in § 9.5.  (Pl. Mem. at 22-23.)  The negating clause states, "[n]othing in this Agreement shall be construed to confer upon, or give to, any person or corporation other than the parties hereto and the Registered Holders of the Warrants any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof."  (Warrant Agreement § 9.5.)  At least one court in this District has rejected that same interpretation of a negating clause similar to § 9.5.  *Sudarsan*, 2018 WL 1088004, at *5 (S.D.N.Y. Feb. 6, 2018) ("the intent of the parties to the Warrant Agreement is clear. It was specifically to exclude third parties like Plaintiff [who was not a Registered Holder] from having standing to enforce the agreement, despite whatever rights or benefits the agreement may confer on them" as beneficial owners or holders of a warrant).  As the Court finds other reasons set forth above to deny BRC's bid to dismiss based on lack of contractual standing, the Court need not and does not resolve the third-party beneficiary argument advanced by Tang.

raise an equitable defense because it comes to court with "unclean hands"; that ongoing attempts to cause BRC to understand Tang's position and change course preclude any duty to mitigate; and that whether Tang mitigated damages is a question of fact inappropriate to resolve on a motion to dismiss.  (Pl. Mem. at 23-24.)  In reply, BRC pivots, arguing that the Complaint does not plausibly state *any* damages arising out of later-purchased warrants in light of BRC's position.  (Def. Reply at 10.)

The Court finds that Tang's Complaint plausibly states damages for warrants purchased after March 11, 2022, and that any failure to mitigate damages is a factual issue to be resolved at a later stage of the litigation.

### 1.  Tang Has Adequately Pled Damages

To state a claim for breach of contract under New York law, a plaintiff must plead facts that, if true, would establish: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."  *Terwilliger*, 206 F.3d at 245-46 (internal quotation marks omitted).  As to the damages element, "stating some form of damages is all that is required to plead a *prima facie* claim of breach of contract."  *JTRE Manhattan Ave. LLC v. Capital One, N.A.*, 585 F. Supp.3d 474, 482 (S.D.N.Y. 2022) (citing *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015).)  Damages "need not be determined with mathematical precision, but they must be capable of measurement based upon known reliable factors without undue speculation."  *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp.3d 1, 5 (S.D.N.Y. 2020) (internal quotation marks omitted).

Here, Tang has plausibly pled damages for warrants purchased after March 11, 2022, despite its acknowledgement of BRC's position refusing exercise of the warrants.

Tang pled that it purchased warrants between March 7 and April 6, 2022; attempted to exercise those warrants on March 11 and April 13, 2022; and was refused by BRC. (Compl. ¶¶ 39-44.)   Tang pled that during the period that Tang was not permitted to exercise its warrants, BRC stock rose to a high of $34.00 per share, and that when Tang was able to exercise its warrants on April 20, 2022, that BRC's stock price had fallen to $18.00 per share.  (Compl. ¶¶ 45-46.)  Taking Tang's allegations as true, which the Court must do on a motion to dismiss, Tang plausibly pled that by delaying Tang's exercise of its warrants (contrary to the Warrant Agreement), BRC caused Tang to lose potential profit on selling BRC shares.  While the exact quantum of damages will be the subject of discovery and debate between the parties, the Complaint adequately alleges damages that are capable of measurement and not speculative.  *See*, *e.g.*, *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp.2d 293, 301 (S.D.N.Y. 2010) (calculating damages for failure to honor warrants and collecting cases doing same).

### 2.  Mitigation Is A Fact Issue That Cannot Be Resolved On A Motion To Dismiss

BRC argues that because it refused to allow exercise of the warrants on March 11, 2022, that Tang had a duty to mitigate its damages by not purchasing and attempting to exercise additional warrants, obviating any damages it could recover for warrants purchased after the initial refusal.  "In a breach of contract action, a plaintiff ordinarily has a duty to mitigate the damages that he incurs.  If the plaintiff fails to mitigate his damages, the defendant cannot be charged with them.  This duty applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense."  *U.S. Bank National Association v. Ables & Hall Builders*, 696 F. Supp.2d 428, 440-41 (S.D.N.Y. 2010); *see also Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d

Cir. 1985) (collecting cases).

BRC's affirmative defense of failure to mitigate damages, restyled as an attack on the sufficiency of Tang's pleading in its reply, is, in this instance, a fact issue not suitable for resolution at this time.  *See Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp.3d 323, 346 (S.D.N.Y. 2021) ("Whether a party puts forth sufficient effort to mitigate damages is a question of fact and typically resolved during trial") (internal quotation marks omitted); *Morgan Stanley High Yield Securities, Inc. v. Seven Circle Gaming Corp*., 269 F. Supp.2d 206, 222 (S.D.N.Y. 2003) (denying motion for summary judgement with respect to damages because defendant's failure to mitigate defense involved "questions of fact [that] cannot be resolved on summary judgment"); *see also IHS Acquisition XV, Inc. v. Kings Harbor Care Center*, No. 98-CV-7621, 1999 WL 223152, at *1 (S.D.N.Y. April 16, 1999) (Although "courts have held in certain circumstances that particular affirmative defenses may be raised in a pre-answer motion to dismiss if such a defense is raised on the face of the complaint … the fact that a complaint may allege facts that constitute a defense to the claims does not require dismissal of the complaint prior to discovery") (internal citations omitted).

When Tang first tried to exercise the warrants, BRC refused, and when pressed for an explanation, explained that a Form S-4 cannot be used for a "continuous" offering under SEC regulations.  (Compl. ¶¶ 41-42.)  Tang responded with legal authority to the contrary, which BRC did not rebut.  (Compl. ¶¶ 42-43.)  BRC couches its refusal and subsequent silence as an unequivocal repudiation, but other facts make plausible Tang's position that its subsequent purchase of additional warrants was not so unreasonable as

to preclude it from recovering damages.

First, BRC's position on March 11, 2022 was different from its apparent position only three days prior, when its Vice President of Investor Relations informed a warrant holder that his warrants would be exercisable "30 days post-transaction." (Compl. ¶ 37.) Drawing inferences in favor of Tang as the non-moving party, the Court cannot conclude at this juncture that it was unreasonable for Tang to assume that another change in position was possible. Second, the legal justification BRC offered for its refusal on March 11, 2022 (that "a Form S-4 cannot be used for a 'continuous' offering under SEC Rule 415," Compl. ¶ 42) is different from the justification it offers in its brief (that the Warrant-Exercise Transaction was not part of a "business combination" to which Form S-4 is applicable). (Def. Mem. at 15-16.)

Given the factual nature of the inquiry, the plausibility of Tang's allegations, and BRC's shifting explanations and actions, the Court declines to dismiss Tang's claims for breach arising out of warrants purchased after March 11, 2022. *Compare Colonial Funding Network, Inc. for TVT CapitaL, LLC v. Epazz, Inc.*, 252 F. Supp.3d 274, 287 (S.D.N.Y. 2017) (striking failure to mitigate damages affirmative defense based on "a premise contradicted by the Agreements' terms") *with Robin Bay Associates, LLC v. Merrill Lynch & Co.*, No. 07-CV-376, 2008 WL 2275902, at *8 (S.D.N.Y. June 3, 2008) (denying motion to dismiss claim for contract damages premised on failure to mitigate involving factual issues and "the absence of clear legal authority" for defendant's position).

## F.   Tang's Declaratory Judgment Claim Is Duplicative

BRC also moves to dismiss Tang's claim for a declaratory judgment for the same

reasons that it seeks dismissal of the breach of contract claim, and additionally because it is duplicative of the breach of contract claim.  Because the declaratory judgment claim is duplicative and only addresses past conduct, it will be dismissed.

### 1.  Declaratory Judgment Standard

The Declaratory Judgment Act ("DJA") provides in relevant part that, "[i]n a case of actual controversy within its jurisdiction ... any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126, 127 S. Ct. 764, 770 (2007)).  The Act "confers a discretion on the courts rather than an absolute right upon the litigant."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287, 115 S. Ct. 2137, 2143 (1995) (internal quotation marks omitted); *see also Medimmune*, 549 U.S. at 136, 127 S. Ct. at 776 (citing *Wilton*).  In determining whether a declaratory judgment action is warranted, a court considers the totality of circumstances, including whether declaratory judgment (1) will "serve a useful purpose in clarifying and settling the legal relations in issue;" or (2) "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *Continental Casualty Co. v. Coastal Savings Bank*, 977 F.2d 734, 737 (2d Cir. 1992); *see also Duane Reade, Inc. v. Saint Paul Fire & Marine Insurance, Inc.*, 411 F.3d 384, 389 (2d Cir. 2005) (reciting same considerations).

### 2.  Tang's Declaratory Judgment Claim Is Duplicative

Courts frequently find that a declaratory judgment will not serve a useful purpose when the claim is duplicative of another claim in the same action.  *See*, *e.g.*, *City of Perry, Iowa v. Procter & Gamble Co.*, 188 F. Supp.3d 276, 286 (S.D.N.Y. 2016) ("Courts

43

generally reject a [declaratory judgment] claim when other claims in the suit will resolve the same issues"); *Amusement Industry*, *Inc. v. Stern*, 693 F. Supp.2d 301, 311 ("[t]he fact that a lawsuit has been filed that will necessarily settle the issues for which the declaratory judgment is sought suggests that the declaratory judgment will serve 'no useful purpose'"); *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp.2d 231, 249 (S.D.N.Y. 2006) (dismissing declaratory judgment claim as duplicative where it sought "resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action").

Such is the case with Tang's declaratory judgment claim.  Tang seeks "a declaration that the Warrants and the shares of common stock underlying the Warrants were registered within the meaning of the Securities Act of 1933 as of January 13, 2022 when the Form S-4 was declared effective by the SEC and that, therefore, the Warrants should have been exercisable on March 11, 2022."  (Compl. ¶ 48.)  Tang argues that such a declaration would serve a useful purpose because it "would resolve any confusion over" the effect of the Form S-4 for Tang and for other warrant holders "without the ability to litigate the matter or located in other forums," thereby "promoting efficiency, uniformity, and clarity."  (Pl. Mem. at 25.)  But as discussed above, the effect of the Form S-4, and its consequences for BRC's obligations under the Warrant Agreement, will be decided in the course of resolving Tang's breach of contract claim.[22]

Because the declaratory judgment counterclaim seeks "resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of

---

[22]  Tang's Complaint essentially concedes this point; Tang avers that "[t]his underlying question of United States securities law is a core legal question upon which Tang Capital's other claims rely."  (Compl. ¶ 49.)

action," it does not serve a useful purpose and should be dismissed, notwithstanding the potential utility of such a declaration to other warrant holders who are not parties to this action. *Sofi Classic,* 444 F. Supp.2d at 249; *see also Personal Watercraft Product SARL v. Robinson*, No. 16-CV-9771, 2017 WL 4329790, at *11 (S.D.N.Y. Sept. 1, 2017) (granting motion to dismiss declaratory judgment action where "such a declaration [was] a necessary antecedent to a finding of liability under the breach-of-contract claim, and the Plaintiff … made no particularized argument as to why this would not be the case"); *Aeolus Down, Inc. v. Credit Suisse International*, No. 10-CV-8293, 2011 WL 5570062, at *5 (S.D.N.Y. Nov. 16, 2011) ("A cause of action for declaratory judgment is unnecessary and inappropriate when the plaintiff has an alternative remedy in another form of action, such as breach of contract") (internal quotation marks and citation omitted); *Intellectual Capital Partner v. Institutional Credit Partners LLC*, No. 08-CV-10580, 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009) ("declaratory relief would serve no useful purpose as the legal issues will be resolved by litigation of the breach of contract claim").

### 3.  Tang's Declaratory Judgment Claim Is Directed To Past Conduct

Tang's declaratory judgment claim also warrants dismissal because it is directed primarily to the past, not the future.  Declaratory judgments may provide relief from uncertainty when they are directed towards prospective relief, but declaratory judgments resolving disputes over past acts are inappropriate. *Lojan v. Crumbsie*, No. 12-CV-0320, 2013 WL 411356, at *5 (S.D.N.Y. Feb. 1, 2013) ("declaratory judgment is inappropriate when the alleged wrong has already been committed"); *National Union Fire Insurance Co. of Pittsburgh, Pennsylvania v. International Wire Group, Inc.*, No. 02-CV-10338, 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003) ("Anticipatory judgments of non-liability are

particularly appropriate where there are 'claims asserting unaccrued or undefined rights or obligations arising under contractual relations such as insurance and intellectual property,'" but "[t]here is no basis for declaratory relief where only past acts are involved").

Here, the Form S-4 that is the subject of Tang's declaratory judgment claim was filed in its final form on January 11, 2022 and became effective on January 13, 2022. (Compl. ¶¶ 20-21, Exs. B-C.)  Tang purports to have exercised its warrants on April 20, 2022 and does not allege any subsequent purchase of BRC Warrants or any additional warrants remaining to be executed.  (Compl. ¶ 55.)  The legal effect of the Form S-4 as to the ability of Tang to exercise the warrants is therefore only relevant to Tang's past alleged damages and has no impact on any ongoing or future events between the parties. A declaratory judgment claim is not appropriate under those circumstances.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED as to Plaintiff's declaratory judgement claim and DENIED in all other respects.  To the extent not discussed herein, the Court has considered all of the parties' arguments and determined them to be without merit.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:     March 8, 2023
           New York, New York