# EXHIBIT 153

AMERICAN
CASEBOOK
SERIES®

# Mergers and Acquisitions

## LAW, THEORY, AND PRACTICE

### Third Edition

■ ■ ■

Claire A. Hill

Brian JM Quinn

Steven Davidoff Solomon

## WEST ACADEMIC PUBLISHING'S
## LAW SCHOOL ADVISORY BOARD

**MARK C. ALEXANDER**
Arthur J. Kania Dean and Professor of Law
Villanova University Charles Widger School of Law

**JOSHUA DRESSLER**
Distinguished University Professor Emeritus
Michael E. Moritz College of Law, The Ohio State University

**MEREDITH J. DUNCAN**
Professor of Law
University of Houston Law Center

**RENÉE McDONALD HUTCHINS**
Dean & Professor of Law
University of Maryland Carey School of Law

**RENEE KNAKE JEFFERSON**
Joanne and Larry Doherty Chair in Legal Ethics &
Professor of Law, University of Houston Law Center

**ORIN S. KERR**
William G. Simon Professor of Law
University of California, Berkeley

**JONATHAN R. MACEY**
Professor of Law,
Yale Law School

**DEBORAH JONES MERRITT**
Distinguished University Professor,
John Deaver Drinko/Baker & Hostetler Chair in Law Emerita
Michael E. Moritz College of Law, The Ohio State University

**ARTHUR R. MILLER**
University Professor and Chief Justice Warren E. Burger Professor of
Constitutional Law and the Courts, New York University

**GRANT S. NELSON**
Professor of Law Emeritus, Pepperdine University
Professor of Law Emeritus, University of California, Los Angeles

**A. BENJAMIN SPENCER**
Dean & Trustee Professor of Law
William & Mary Law School

# MERGERS AND ACQUISITIONS

## LAW, THEORY, AND PRACTICE

### Third Edition

■ ■ ■

**Claire A. Hill**
*Professor and James L. Krusemark Chair in Law*
*University of Minnesota Law School*

**Brian JM Quinn**
*Professor of Law*
*Boston College Law School*

**Steven Davidoff Solomon**
*Alexander F. and May T. Morrison Professor of Law*
*University of California, Berkeley School of Law*

AMERICAN CASEBOOK SERIES®

WEST
ACADEMIC
PUBLISHING

reinforcing the notion that management can clear the field in an MBO. Ultimately, they find evidence that management buy-outs are potentially beneficial to shareholders, but also reasons for shareholders to be wary and support procedural protections in merger agreements.[35]

# D. OTHER CONFLICT TRANSACTIONS: THE EXAMPLE OF SPACs

As we discussed in Chapter XVI, the most exacting standard used by courts is entire fairness. Entire fairness is potentially the applicable standard for conflict transactions; although, as we have seen, there may be burden-shifting, where the burden becomes the plaintiff's to show that a transaction is not fair, or there may be sufficient procedural protections that business judgment deference becomes the applicable standard. Our discussion in the Freezeout section above relates to controlling shareholder transactions that are conflict transactions because the controller is buying the remainder of the company, and has the ability and incentive to proceed in a way that disadvantages the minority shareholders. There are other types of conflicted controller transactions, though, notably those where the controller receives benefits disproportionate to those received by other stockholders. Such transactions are also subject to entire fairness, although they too can benefit from a burden shift or business judgement deference if appropriate procedural protections are used. The regime is similar to what is described above in the context of freezeouts and common law fiduciary duties in director and officer conflicts transactions: burden shift results if some procedural protections (approval of independent special committee or majority of the minority) are used, and business judgement deference is the standard if MFW is met.

A 2022 case involving a Special Purpose Acquisition Company (SPAC) provides an example of this second type of conflicted controller transaction. As we discussed in Chapter VII.F, SPAC transactions involve a company becoming public for the purpose of acquiring funds to merge with a target it identifies. The volume of SPAC IPO transactions soared in recent years. In 2015, there were just 20 such transactions, with an aggregate dollar value of $3.61 billion. The respective numbers in the succeeding years were 13 transactions ($3.22 billion) in 2016; 34 transactions ($9 billion) in 2017; 46 transactions ($9.69 billion) in 2018; 59 transactions ($12.01 billion) in 2019; 247 transactions ($75.39 billion) in 2020, and 362 transactions ($106.66 billion) in 2021. In 2022, new SPAC volume declined dramatically; adverse regulatory developments limited the desirability of the transaction form, to both promoters and investors. In addition, there were a string of

---

[35] Non-MBOs with a pure go-shop clause are jumped 23% of the time, while MBO go-shops are never jumped. While the sample is small, this finding is consistent with practitioner impressions that potential bidders are generally unwilling to bid when management has publicly signed on with a preferred buyout partner. Cain & Davidoff, *supra* note 27.

well-publicized bad financial results associated with previous SPAC transactions. Indeed, at this writing, the volume of transactions in 2022 has plummeted. Compared with 2021, deal volume in 2022 was significantly lower, and the trend seems apt to continue.[36]

The SPAC transaction structure is rife with potential conflicts of interest. Public investors buy shares of a SPAC in the hope and expectation that the SPAC sponsors (also sometimes referred to as founders) will select a profitable merger target. SPAC sponsors also invest in the SPAC, but not on the same terms as public investors. SPAC sponsors are granted Founders Stock at a fraction of the cost. Although SPAC sponsors and public shareholders can expect to receive stock of the target in the merger on the same terms, the fact that they enter the transaction at vastly different price levels creates different payoffs for the SPAC sponsors and public investors. This sets up the potential conflict. Investors are given a vote as to whether a merger with an identified company will proceed; if they do not approve the SPAC sponsors face the prospect of finding an alternate merger partner or returning the public investors cash to them. If investors approve the proposed merger, SPAC sponsors obtain interests in the merged company at a price far lower than that paid by the investors. Thus, not surprisingly, SPAC sponsors' incentives are to find a merger that they can persuade investors to approve. Founders who do not have a good enough merger candidate may nevertheless try to persuade investors that the merger candidate warrants approval. Even a bad deal for public investors can be a good for SPAC sponsors who get their shares at a fraction of the price. That is precisely what is alleged in the following case: that the founders breached their duty of loyalty by depicting a merger candidate as being far better than it actually was. Note that the case also concerns allegations of conflicts relating to the directors as well.

## IN RE MULTIPLAN CORP. STOCKHOLDERS LITIGATION

Delaware Court of Chancery
268 A.3d 784 (Del. 2022)

WILL, VICE CHANCELLOR.

Churchill Capital Corp. III—a special purpose acquisition company, or SPAC—was formed as a Delaware corporation in October 2019... [T]he SPAC's primary purpose was to seek out and combine with a private operating company. The SPAC closed its $1.1 billion initial public offering in February 2020.

The SPAC's sponsor, led by Michael Klein, was compensated for its anticipated efforts in the form of "founder" shares constituting 20% of the SPAC's equity and purchased for a nominal price. The SPAC's directors

---

[36] See generally US SPACs Data Hub, WHITE & CASE https://www.whitecase.com/publications/insight/us-spacs-data-hub.