UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

TANG CAPITAL PARTNERS, LP,                          :

                                                    :          22-CV-3476 (RWL)

                                    Plaintiff,      :

                                                    :          **DECISION AND ORDER:**

                    - against -                     :          **<u>SUMMARY JUDGMENT</u>**

                                                    :

BRC Inc.,                                           :

                                                    :

                                    Defendant.      :

------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Tang Capital Partners, LP ("Tang") purchased and attempted to exercise
warrants to obtain shares of common stock in Defendant BRC Inc. ("BRC") at a specified
price. BRC rebuffed those attempts, preventing Tang from exercising the warrants when
it would have been particularly profitable to do so. Seeking damages for breach of
contract, Tang commenced the instant action. BRC filed a motion to dismiss, which the
Court denied. *See Tang Capital Partners, LP. v. BRC Inc.*, 661 F. Supp.3d 48 (S.D.N.Y.
2023) ("*Tang I*"). Following discovery, the matter now comes before the Court on the
parties' cross-motions for summary judgment. The outcome of those motions primarily
turns on the same question of whether, at the time Tang sought to exercise its warrants,
two contractual conditions had been met: that there was both an effective securities
registration for the stock for which the warrants would be exercised, and a current
prospectus. The parties also dispute whether Tang has established or can establish any
compensable damages. In conjunction with their summary judgment motions, the parties
have each filed a motion to exclude the opinions of the other party's securities expert.

For the reasons that follow, the Court grants in part and denies in part each party's motion to exclude the other party's securities expert; grants summary judgment to Tang that the two conditions for exercising BRC warrants – an effective registration and a current prospectus – were satisfied at the time Tang sought to exercise its warrants; and grants in part and denies in part summary judgment to BRC with respect to Tang's damages.

## FACTUAL BACKGROUND[1]

Unless otherwise noted, the material facts are undisputed. In responding to Tang's statement of undisputed material facts, BRC disputes many asserted facts on the basis of legal argument and evidentiary objections to their admissibility.[2] In most instances,

---

[1] The facts are drawn primarily from the parties' statements of undisputed and disputed material facts submitted pursuant to Local Rule 56.1 Those include: (1) Plaintiff's statement of material facts in support of its motion for summary judgment at Dkt. 147 ("Pl. 56.1"); (2) Defendant's counterstatement of material facts in response to Plaintiff's Rule 56.1 statement at Dkt. 168 ("Def. Counter 56.1"); (3) Plaintiff's reply counterstatement of material facts at Dkt. 189 ("Pl. Reply 56.1"); (4) Defendant's statement of material facts in support of its motion for summary judgment at Dkt. 159 ("Def. 56.1"); (5) Plaintiff's response to Defendant's Rule 56.1 statement at Dkt. 176 ("Pl. Counter 56.1"); and (6) Defendant's reply counterstatement of material facts at Dkt. 182 ("Def. Reply 56.1"). Additionally, facts are drawn from the parties' supporting affidavits and exhibits. The affidavits, all of which are counsel affidavits introducing exhibits, include: the declaration of David Salant in support of Plaintiff's motion for summary judgment at Dkt. 158 ("First Salant Decl."); declaration of Jason Sternberg in support of Defendant's motion for summary judgment at Dkt. 162 ("First Sternberg Decl."); declaration of Jason Sternberg in opposition to Plaintiff's motion for summary judgment at Dkt. 170 ("Second Sternberg Decl."); declaration of David Salant in opposition to Defendant's motion for summary judgment at Dkt. 179 ("Second Salant Decl."); and the reply declaration of David Sternberg David Salant in further support of Plaintiff's motion for summary judgment at Dkt. 191 ("Third Salant Decl.").

[2] Tang catalogs BRC's objections to Tang's asserted disputed facts in Tang's response to BRC's counterstatement of material facts. (*See* Pl. Reply 56.1 at 2-10.)

those responses are inapt and do not create a genuinely disputed fact.[3]   *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 314 (2d Cir. 2008) (stating, in the context of summary judgment, "[a]n objection to the admissibility of a document is not the equivalent of a contention that the document's contents are untrue"); *Emanuel v. Gap, Inc.*, No. 19-CV-3617, 2022 WL 3084317, at \*4 (S.D.N.Y. Aug. 3, 2022) (deeming facts admitted and characterizing as "unauthorized" objections to 56.1 statement "concerning, for example, issues of admissibility under the Federal Rules of Evidence"); *Kesner v. Buhl*, 590 F. Supp.3d 680, 691 (S.D.N.Y. 2022) (setting aside "[t]he portions of [the responding party's] 56.1 Statement that contain legal argument bereft of factual matter"), *aff'd sub nom. Kesner v. Dow Jones & Co.*, 2023 WL 4072929 (2d Cir. June 20, 2023).

Moreover, most of the objections are without merit.  For example, BRC repeatedly disputes facts about what particular documents or persons said, characterizing them as inadmissible hearsay, which may not be considered on summary judgment.  *See Mattera v. JPMorgan Chase Corp.*, 740 F. Supp.2d 561, 566 n.2 (S.D.N.Y. 2010) (stating that on a summary judgment motion, "a court will not entertain inadmissible hearsay unsubstantiated by any other evidence").  The challenged statements, however, are, in most instances, either non-hearsay or an exception to hearsay (because, for example,

---

[3] Regardless, the Court has conducted its own review to confirm that the evidentiary materials cited by the parties support the factual assertions set forth in their Rule 56.1 statements and that the evidence relied upon is admissible.  *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.  It must be satisfied that the citation to evidence in the record supports the assertion").

they are admissions by party-opponents or statements demonstrating the speaker's state of mind), or otherwise can be testified to at trial. *See Xu v. City of New York*, No. 08-CV-11339, 2020 WL 8671952, at *29 (S.D.N.Y. Dec. 22, 2020) ("[M]aterial relied on at summary judgment need not be admissible in the form presented to the district court. Rather, so long as the evidence in question will be presented in admissible form at trial, it may be considered at summary judgment" (internal quotation marks and citation omitted)), *R&R adopted*, 2021 WL 1222119 (S.D.N.Y. March 31, 2021); *GE Funding Capital Market Services, Inc. v. Nebraska Investment Finance Authority*, No. 15-CV-1069, 2017 WL 2880555, at *3 (S.D.N.Y. July 6, 2017) ("Hearsay evidence is admissible at the summary judgment stage if the contents would [or could] otherwise be admissible at trial" (brackets in original) (citation omitted)), *aff'd*, 767 F. App'x 110 (2d Cir. 2019).

As another example, BRC lodges numerous objections to Tang's asserted facts on the basis of relevance and prejudice under Federal Rules of Evidence 401, 402, and 403. Those objections, for the most part, are not well taken. First, the objections are perfunctory and conclusory. *See United States v. Malka*, 602 F. Supp.3d 510, 529 (S.D.N.Y. 2022) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (brackets omitted)) (quoting United *States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013)). Second, "while it is not unheard of to exclude evidence under Rule 403 at the summary judgment stage, … the balancing process contemplated by that rule is best undertaken at the trial itself." *Crye Precision LLC v. Bennettsville Printing*, No. 15-CV-221, 2017 WL 10978562, at *1 (E.D.N.Y. Feb. 7, 2017) (internal quotation marks and citation omitted). Third, having reviewed each item

to which BRC objects, the Court finds most of BRC's relevance and prejudice objections to be without merit.[4]

To be sure, there are some instances where BRC's objections to admissibility have saliency; where that is the case, the Court's analysis does not rely on those facts. BRC also advances several topic-specific objections, sometimes overlapping with its hearsay and relevancy concerns. Those objections raise legal issues – including, for example, what qualifies as relevant extrinsic evidence – that the Court addresses in the context of the discussion below. At bottom, the parties' material disputes do not concern facts so much as their differing interpretations of contractual provisions, the law, and the significance of various actors' statements and actions. After all, both Tang and BRC have moved for summary judgment on Tang's breach of contract claim, indicating that they each believe the facts material to resolution of Tang's claim for breach of contract are not genuinely disputed.[5]

---

[4] Other examples of BRC's problematic objections include those based on authenticity, *see Sanmina Corp. v. Dialight plc*, No. 19-CV-11710, 2023 WL 9022882, at *6 (S.D.N.Y. Dec. 29, 2023) ("Rule 56 merely requires that supporting documents be in a form that, if authenticated, could be admissible at trial" (internal quotation marks and citation omitted)); lack of personal knowledge and speculation (where the statements go to, for example, state of mind of BRC's own head of investor relations, or Kevin Tang's explanation of his own investment plans); and "self-serving testimony," *see Lodescar v. Denihan Hospitality Group*, No. 14-CV-8218, 2016 WL 11707673, at *3 n.1 (S.D.N.Y. Sept. 30, 2016) (stating that on summary judgment a "district court should not discredit a plaintiff's self-serving testimony unless it is … replete with inconsistencies and improbabilities" (internal quotation marks and citation omitted)).

[5] Of course, that both parties have cross-moved for summary judgment does not establish the absence of genuinely disputed material fact. As required on cross-motions for summary judgment, the Court draws all reasonable inferences in favor of BRC as the non-moving party with respect to Tang's motion, and draws all reasonable inferences in favor of Tang as the non-moving party with respect to BRC's motion. *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Although Tang and BRC each claim entitlement to judgment based on undisputed facts, the Court need not enter

## A.    The Warrants And Warrant Agreement

The warrants at issue (the "Warrants") were issued in connection with a corporate merger.  SilverBox Engaged Merger Corp I ("SilverBox") was a public special purpose acquisition company ("SPAC") formed to identify and combine with another business. (Def. Counter 56.1 ¶¶ 5-6.)  SilverBox issued warrants pursuant to a February 25, 2021 warrant agreement (the "Warrant Agreement") between SilverBox and Continental Stock Transfer & Trust Company ("Continental," also referred to as the "Warrant Agent").  (Def. Counter 56.1 ¶¶ 2-3; Pl. Counter 56.1 ¶ 11.)  SilverBox completed its initial public offering ("IPO") on March 2, 2021.  (Pl. Counter 56.1 ¶ 3.)

Later in 2021, SilverBox identified a merger target, Black Rifle Coffee Company, LLC ("Black Rifle Coffee").  (Def. Counter 56.1 ¶ 35.)  On November 2, 2021, in a so-called "Up-C" de-SPAC transaction, SilverBox entered into a business combination (the "Business Combination") with Black Rifle Coffee from which BRC Inc. emerged as the surviving entity.[6]  (Def. Counter 56.1 ¶ 36; Pl. Counter 56.1 ¶ 8.)  The de-SPAC transaction contemplated that BRC would issue its Warrants and shares of stock under

---

judgment for either.  *Id.*; *see also Trident International Ltd. v. American Steamship Owners Mutual Protection & Indemnity Association*, No. 05-CV-3947, 2008 WL 2909389, at *4 (S.D.N.Y. July 24, 2008) ("Based upon a review of the parties' arguments, their respective (and voluminous) 56.1 statements, and the competing affidavits issued in support of these cross-motions, it is apparent to the Court that summary judgment is wholly inappropriate in this case. Significant and genuine issues of material fact permeate every aspect of this dispute.").

[6] A "de-SPAC" transaction is a business combination between a SPAC and its target company.  (Def. Counter 56.1 ¶ 27.)  De-SPAC transactions can take various forms, with differing tax and securities law consequences.  (Def. Counter 56.1 ¶ 28.)  In an "Up-C" de-SPAC transaction, the new public holding company formed to acquire the target company has no material assets other than its equity interest in an existing pass-through entity which, in turn, owns an operating company.  (Def. Counter 56.1 ¶ 32 (although BRC disputes part of ¶ 32, it does not dispute the description of an Up-C transaction).)

the terms and conditions of the Warrant Agreement, and exchange them for SilverBox's Warrants and shares.[7]  (Def. Counter 56.1 ¶ 37.)  On February 9, 2022, when the Business Combination was completed, BRC irrevocably assumed SilverBox's obligations under the Warrant Agreement.  (Def. Counter 56.1 ¶ 9; Pl. Counter 56.1 ¶ 12.)

Each BRC Warrant entitles its holder to purchase one share of BRC's common stock at the price of $11.50 per share, subject to certain conditions.  (Def. Counter 56.1 ¶ 10; Warrant Agreement § 3.1.[8])  Section 3.2 of the Warrant Agreement establishes the timing for exercise of the Warrants and provides they may be exercised only during the "Exercise Period," which begins on "on the later of: (i) the date that is thirty (30) days after the first date on which the Company completes a merger, share exchange, asset acquisition, share purchase, reorganization or similar transaction, involving the Company and one or more businesses (a "Business Combination"), and (ii) the date that is twelve (12) months from the date of the closing of the Offering," provided, however, "that the exercise of any Warrant shall be subject to the satisfaction of any applicable conditions, as set forth in subsection 3.3.2 … with respect to an effective registration statement or a valid exemption therefrom being available."  (Def. Counter 56.1 ¶ 11; Warrant Agreement § 3.2.)  The Exercise Period could last up to five years and could be extended at SilverBox's option subject to several conditions.  (Warrant Agreement § 3.2.)

---

[7] As stated in the transaction prospectus:  "Pursuant to the Business Combination [i.e., the Silverbox – Black Rifle Coffee merger], among other things ... each warrant of SilverBox outstanding immediately prior to the effectiveness of the SilverBox Merger [will be] converted into the right to receive one warrant of PubCo [i.e., BRC], … with PubCo assuming SilverBox's obligations under the existing warrant agreement."  (First Salant Decl. Ex. 2 at ECF 3.)

[8] The Warrant Agreement is located at First Salant Decl. Ex. 1.

Under § 3.3.1 of the Warrant Agreement, a Warrant holder may exercise a Warrant by surrendering the Warrant with an executed election-to-purchase form and payment in full.[9]  (Warrant Agreement § 3.3.1.)  Section 3.3.2 governs the issuance of shares of common stock once the Warrants are exercised, including conditions precedent to issuance.  Specifically, no Warrant will be honored unless two conditions are satisfied: "(a) a registration statement under the Securities Act covering the issuance of the Common Stock underlying the [Warrants] is then effective and (b) a prospectus relating thereto is current."  (Def. Counter 56.1 ¶ 12; Warrant Agreement § 3.3.2.)  Those conditions are common to many SPAC warrant agreements, and are consistent with the United States securities laws, which require an effective registration statement and current prospectus for issuance of securities.  (Def. Counter 56.1 ¶ 25; *see, e.g.*, 15 U.S.C § 77j(a)(3); 17 C.F.R. §§ 229.512(a), 230.424(b).)

Addressing the requisite registration statement and its timing, Section 7.4.1 of the Warrant Agreement provides that "as soon as practicable, but in no event later than fifteen (15) Business Days after the closing of its initial Business Combination, [BRC] shall use its reasonable best efforts to file with the [SEC] a registration statement for the registration … of the shares of Common Stock issuable upon exercise of the Warrants.  [BRC] shall use its reasonable best efforts to cause the same to become effective within sixty (60) Business Days following the closing of the initial Business Combination and to maintain

---

[9] BRC asserts that the Warrant Agreement § 3.3.1 required holders to specify the number of Warrants to be exercised in an Election to Purchase Form.  Neither § 3.3.1, nor the Election To Purchase Form attached to the Warrant Agreement, refer to any such requirement.  (Pl. Reply 56.1 ¶ 5; Warrant Agreement § 3.3.1 and Ex. A-5.)  Of course, as a practical matter, the holder would need to communicate the number of Warrants it sought to exercise.

the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration or redemption of the Warrants."  (Def. Counter 56.1 ¶ 13; Warrant Agreement § 7.4.1.)

The Warrant Agreement also contains provisions allowing BRC to "redeem" the Warrants at the end of a 30-day redemption period.  (Warrant Agreement §§ 6.1-6.3.) During the redemption period, Warrant holders may exercise their Warrants on a cash basis or, alternatively, a cashless basis in exchange for a fractional share of BRC common stock per Warrant.  (Def. Counter 56.1 ¶¶ 152-53; Warrant Agreement §§ 6.2, 6.4.)  The fraction varies with the fair market value of the stock but is capped at 0.361 shares per Warrant at a stock price of more than $18.00.  (Warrant Agreement § 6.2.)  If, however, a shareholder does not exercise their Warrants within the 30-day redemption period, they lose their exercise rights and BRC would be able to redeem each Warrant for $0.01, if the share value of BRC stock was equal to or more than $18.00, or for $0.10, if the share value was between $10.00 and $18.00 per share.  (Warrant Agreement §§ 6.1-6.2.)

There is little documentation of the drafting history of the Warrant Agreement. Drafts were exchanged between SilverBox, through its Chief Operating Officer Jin Chun; lawyers at Ellenoff, Grossman & Schole LLP, SilverBox's outside counsel in connection with the IPO; Shearman & Sterling LLP ("Shearman"), outside counsel who advised the underwriters in connection with the transaction; and at least one SilverBox director.  (*See* Def. Counter 56.1 ¶¶ 16-22; Pl. Reply 56.1 ¶ 26.)  A proposed edit by Shearman, which was included in the final version, modified § 7.4.1 in part to insert the words "the issuance of" in a sentence referencing maintenance of an effective registration statement "covering the issuance of the shares of Common Stock issuable upon exercise of the Warrants."

(Def. Counter 56.1 ¶¶ 20-21; First Salant Decl. Ex. 9 at -265.)  At the time that language was added, § 3.3.2 already included the language "a registration statement under the Securities Act covering the issuance of the Common Stock underlying the Public Warrants is then effective."  (First Salant Decl. Ex. 9 at -255.)  BRC had no involvement in drafting or negotiating the Warrant Agreement.  (Def. Counter 56.1 ¶ 24.)

**B.    The Form S-4 Registration**

On November 10, 2021, BRC filed with the SEC a 638-page Form S-4 registration statement to register stock and warrants for the de-SPAC transaction (the "Form S-4" or "S-4").  (Def. Counter 56.1 ¶¶ 40-42.)  According to the SEC, a Form S-4 is used for "[r]egistration of securities issued in business combination transactions."[10]  The Form S-4 included a prospectus and proxy statement that BRC would use to solicit and obtain the consent of SilverBox shareholders for the Business Combination transaction, including the exchange of their SilverBox warrants for BRC warrants.  (Def. Counter 56.1 ¶ 43; Pl. Counter 56.1 ¶¶ 25-27; First Salant Decl. Ex. 2.)

The cover page of the Form S-4 lists three sets of securities "to be registered" and for which fees were calculated and paid: 1) 41,883,740 "Shares of Class A Common Stock, par value $.0001 per share"; 2) 17,766,667 "Warrants to purchase shares of Class A Common Stock" and 3) 17,766,667 "Shares of Class A Common Stock issuable upon exercise of warrants."[11]  (Def. Counter 56.1 ¶ 44; First Salant Decl. Ex. 2 at ECF 2.)  The fee table indicates that BRC paid a registration fee of $18,940.15 for the third category;

---

[10] SECURITIES AND EXCHANGE COMMISSION, *Edgar Filer Manual (Volume II)*, 3-1, 3-42 (Dec. 2020), https://www.sec.gov/info/edgar/forms/edgform.pdf.

[11] Of the 17,766,667 warrants, 11,500,000 were public; the remainder were private.  (*See* First Salant Decl. Ex. 2 at ECF 32.)

i.e., the shares of Class A common stock issuable upon exercise of warrants.  (Def. Counter 56.1 ¶¶ 44, 47; First Salant Decl. Ex. 2 at ECF 33 & n.9.)  The prospectus included with the S-4 similarly states in bold and capital letters that it is a "**PROSPECTUS FOR 40,725,250 SHARES OF CLASS A COMMON STOCK[;][12] 17,766,667 WARRANTS TO PURCHASE SHARES OF CLASS A COMMON STOCK[;] AND 17,766,667 SHARES OF CLASS A COMMON STOCK UNDERLYING WARRANTS OF BRC INC.**"[13]  (Def. Counter 56.1 ¶ 45; First Salant Decl. Ex. 2 at ECF 3.)  The Form S-4 included the Warrant Agreement as an exhibit.  (Pl. Reply 56.1 ¶ 11.)  The Form S-4 also included an opinion letter from SilverBox counsel Paul Hastings.  (First Salant Decl. Ex. 2 at ECF 635-36.)  The opinion letter states that the warrant shares "will be validly issued, fully paid and non-assessable" upon the occurrence of various events, the last being the exercise of the Warrants "in accordance with the terms of the Warrant Agreement."  (*Id.*)

The Form S-4 referenced BRC's intention to file future registration statements covering the issuance of additional securities, such as shares in connection with an Employee Stock Purchase Plan and Class C common stock in connection with a "PIPE Subscription Agreement."[14]  (Def. Counter 56.1 ¶ 50; *see, e.g.*, First Salant Decl. Ex. 2 at

---

[12] This number excludes the 1,158,500 shares the sponsor agreed to forfeit after consummation of the merger.  (*See* Form S-4 at ECF 35, 45.)

[13] BRC's former CFO and corporate representative testified that the 17,766,667 "shares of Class A Common Stock Underlying Warrants of BRC Inc." listed in the Prospectus are the same 17,766,667 "shares of Class A Common Stock issuable upon exercise of the warrants" listed on the Form S-4 cover page.  (Def. Counter 56.1 ¶ 46.)  BRC disputes the implication of those admissions but does not dispute the testimony of its own corporate representative.

[14] "PIPE" is an acronym for Private Investment in Public Equity, which, according to the SEC, "refers to any private placement of securities of an already-public company that is made to selected accredited investors (usually to selected institutional accredited

ECF 196, 201.)  For the PIPE Class C shares, the Form S-4 expressly contemplated the potential future filing of a Form S-1 (Def. Counter 56.1 ¶ 50); indeed, the PIPE Subscription Agreement required it (*see* First Salant Decl. Ex. 21 § 7(a)).  Neither the Form S-4 nor accompanying legal opinion letter, however, referenced any Form S-1 or other future registration for the stock shares exchangeable upon exercise of the warrants for Class A common stock.  (*See* Def. Counter 56.1 ¶¶ 49, 54;[15] *see generally* First Salant Decl. Ex. 2.)

BRC filed amended versions of the Form S-4 registration on December 14, 2021, January 4, 2022, and January 11, 2022, in response to comments from the Securities and Exchange Commission ("SEC").  (Def. Counter 56.1 ¶ 41.)  None of the SEC's comments addressed the Warrants and shares issuable upon exercise of the Warrants.[16] (*See* First Salant Decl. Exs. 22, 24, 25.)  On January 13, 2022, BRC filed a prospectus supplement to the Form S-4.  (Def. Counter 56.1 ¶ 60.)

---

investors) wherein investors enter into a purchase agreement committing them to purchase securities and, usually, requiring the issuer to file a resale registration statement covering the resale from time to time of the securities the investors purchased in the private placement." Anna T. Pinedo & James R. Tanenbaum, Frequently Asked Questions About PIPEs, https://www.sec.gov/info/smallbus/gbfor25_2006/pinedo_ tanenbaum_pipefaq.pdf.

[15] BRC disputes any implication that the Warrant Agreement **required** the warrant shares to be registered on a Form S-4.  (Def. Counter 56.1 ¶ 49.)  That is beside the point.  Tang does not contend that there was any such requirement but rather that the Form S-4 filed by BRC did in fact register the Warrant shares.

[16]  Tang asserts that "the SEC did not question or interfere with BRC's inclusion of the offer or sale of the Warrants and shares issuable upon exercise of the Warrants on the Form S-4." (Pl. 56.1 ¶ 58.)  The parties dispute any implication to be drawn from that fact.  (Def. Counter 56.1 ¶ 58.)  The Court does not draw any implication as the SEC's comments do not address whether or not the Form S-4 did or did not in fact register the warrant shares issuable upon exercise of the warrants.

The S-4 prospectus contained unaudited financial information for BRC current through September 30, 2021.  (Pl. Reply 56.1 ¶ 13; Pl. Counter 56.1 ¶ 28.)  It also disclosed numerous risk factors with respect to both the proposed Business Combination and BRC's business and operations following consummation of the transaction.  (Pl. Counter 56.1 ¶ 29; First Salant Decl. Ex. 2 at ECF 63-117.)  The prospectus informed investors that before consummation of the Business Combination, holders of SilverBox Class A common stock had the right to either redeem their shares for cash or to accept new shares of BRC for their SilverBox shares. (Pl. Counter 56.1 ¶ 30; First Salant Decl. Ex. 2 at ECF 140.)  The prospectus also discussed the way redemptions potentially could affect BRC's capital structure.  (*E.g.*, Pl. Counter 56.1 ¶¶ 30-31; First Salant Decl. Ex. 2 at ECF 118.)

Also on January 13, 2022, the SEC declared effective the amended Form S-4, prospectus, and proxy statement.  (Def. Counter 56.1 ¶ 61; Pl. Counter 56.1 ¶ 35.)  SilverBox's shareholders approved the Business Combination on February 3, 2022, and the deal closed on February 9, 2022.  (Def. Counter 56.1 ¶ 62.)  Of the 34,500,000 shares of SilverBox Class A common stock existing prior to approval of the transaction, 26,870,683 shares, or 77.8 percent, were redeemed by SilverBox shareholders for cash. (Pl. Counter 56.1 ¶¶ 32, 36.)

**C.    Trading Begins**

The same day the deal closed, February 9, 2022, BRC filed a Form 8-A registration statement to list on a stock exchange "the shares of Class A common stock and warrants of BRC Inc." as previously described in the Form S-4.  (Def. Counter 56.1 ¶ 63; First Salant Decl. Ex. 28.)  Acting on BRC's application to list its securities, the NYSE issued

a certification letter registering "Class A common stock, $0.0001 par value per share," and "Redeemable warrants, each whole warrant exercisable for one share of Class A common stock at an exercise price of $11.50." (Def. Counter 56.1 ¶ 64; First Salant Decl. Ex. 29.)  On February 10, 2022, BRC filed a Form 8-K announcing the closing of the Business Combination and related transactions, including the sale of shares of BRC Class A Common Stock to funds and accounts managed by Engaged Capital, PIPE investors, and so-called Backstop investors.  Those three categories of shares are the only ones listed under the Form 8-K section for identifying "unregistered securities."  (Def. Counter 56.1 ¶ 67; First Salant Decl. Ex. 5 at 18-19.)  Trading of BRC's Class A common stock and Warrants commenced on February 10, 2022.  (Def. Counter 56.1 ¶ 66.)

**D.    BRC Offers Shifting Views On When The Warrants Can Be Exercised**

Starting in February 2022, BRC's Vice President and Head of Investor Relations Tanner Doss fielded questions from investors and provided answers, including BRC's position on the registration and exercise of the Warrants.  (Def. Counter 56.1 ¶¶ 69-70; Pl. Reply 56.1 ¶ 18.)  In communicating with investors, Doss "sp[oke] for BRC."  (Def. Counter 56.1 ¶ 69; *see also id.* ¶ 82.)  In mid-February 2022, Doss conferred by email with Jonathan Ko of Paul Hastings, counsel to SilverBox,[17] along with SilverBox COO Chun, about when investors would be able to exercise the Warrants.  Ko explained that "[w]hile the shares underlying the public warrants were registered on the S-4, some issuers register the shares underlying the public warrants on the S-1 registration statement to avoid keeping the S-4 current."  (Def. Counter 56.1 ¶ 87; First Salant Decl.

---

[17] Neither Doss nor Paul Hastings was involved in drafting or negotiating the Warrant Agreement.  (Pl. Reply 56.1 ¶ 25.)

Ex. 44 at -356.)   Seeking clarification "and from a practical perspective," Chun then asked "can public warrant holders exercise their warrants (and pay $11.50 per share for each warrant) without the S-1 being declared effective beginning March 9)."   Ko responded "Yes."   Although Ko first indicated the Warrants would be exercisable as of "3/12 (30 calendar days after the business combination closing)," he confirmed that 3/11 was the correct date.  (Def. Counter 56.1 ¶ 88; First Salant Decl. Ex. 44.)

Paul Hastings was not the only outside advisor confirming to BRC that the Warrants could be exercised as of March 11, 2022, based on the Form S-4 registration. Investment bankers at Citibank did the same.  (Def. Counter 56.1 ¶ 92.)  For a February 28, 2022 meeting with SilverBox and BRC, Citibank prepared a presentation titled "Warrant Management Discussion" to educate BRC about the Warrants.  (Def. Counter 56.1 ¶ 90; First Salant Decl. Ex. 46.)   A portion of Citibank's presentation addressed "When are Warrants exercisable?," answering that "warrants become exercisable on 03/11/22."  (Def. Counter 56.1 ¶ 91; First Salant Ex. 46 at -853.)   The audit firm KPMG similarly designated March 11, 2022, as the start date when the Warrants could be exercised.  BRC retained KPMG to provide "Economic and Valuation Services" and "estimate the fair value" of the public and private Warrants and an earnout arrangement. (Def. Counter 56.1 ¶ 105; First Salant Decl. Ex. 55 at -255.)   Based on the Warrant Agreement and information provided by BRC, KPMG's analysis listed the "Start of Exercisability" as "11-Mar-22," that date being the later of 30 days from the Business Combination or one year from issuance.  (First Salant Decl. Ex. 56 at -131.)

Consistent with Paul Hastings' advice, Doss repeatedly informed inquiring investors that the shares underlying the Warrants had already been registered and that

the Warrants could be exercised 30 days after closing, being March 11, 2022. (Def.

Counter 56.1 ¶¶ 71-83.) For example, Doss told investors:

- "[T[he publicly traded warrants … have already been registered as well as the shares underlying … through the SBEA [SilverBox] S-4. … The warrant agreement states that after the combination of SBEA/BRCC, those warrants will become exercisable 30 calendar days post transaction close (Feb 9ᵗʰ), which would be ~Mar 11." (First Salant Decl. Ex. 33 at -019.)

- "After going back and forth with outside counsel, they confirmed a few things for me. The public warrant holders, which you are, those underlying shares have already been registered through the SBEA [SilverBox] transaction and you should be able to exercise those warrants 30 days post-transaction." (First Salant Decl. Ex. 32 at -002.)

- "I finally spoke with not only our lawyers but also the lawyers for the Silverbox team. They told me that the underlying shares ARE registered and will be able to be exercised 30 days post transaction closed. Our GC apologized and misunderstood my original question. So, those shares are fully registered and will be exercisable starting March 11." (First Salant Decl. Ex. 41 at -581-82.)

- "I triple-checked with our lawyers as well as the COO for SBEA and they confirmed (from their counsel) that the underlying shares for the warrants WERE registered on the S-4. … So they will be exercising on 3/11." (First Salant Decl. Ex. 39.)

Doss confirmed that in making those statements, he relied on the advice of counsel and

believed his statements were true at the time they were made. (Def. Counter 56.1 ¶ 83.)

On or about March 3, 2022, however, Doss started telling investors that they could

not exercise the Warrants pursuant to the Form S-4 registration. Based on discussion

with BRC's counsel Kirkland & Ellis ("Kirkland"), Doss newly responded to investor

inquiries about exercise of the Warrants by telling them that the S-4 had not registered

the stock underlying the Warrants and that the Warrants could not be exercised until BRC

filed a Form S-1 and it became effective:

16

> Any issuance of Class A Common Stock upon exercise of a warrant is a new offering that must be covered by a registration statement, and the S-4 does not cover such exercise because the S-4 does not cover offerings done on a continuous basis (i.e., in the future), unlike an S-1. The fact that the Class A Common Stock underlying the warrants are registered on the S-4 does not change anything, because the S-4 does not register continuous (future) exercise of the warrants. That's why we need to wait for the S-1 to be effective for the warrants to become exercisable.[18]

(Def. Counter 56.1 ¶ 84; Pl. Reply 56.1 ¶ 19.) Doss did not, however, write back to all investors who had previously inquired and whom Doss had told that the Warrants could be exercised as of March 11, 2022 based on the Form S-4 registration. (Def. Counter 56.1 ¶ 85.) That is so, even though BRC and its former CFO testified at deposition that Doss's statements to investors that the Warrants could be exercised on March 11, 2022 based on BRC's Form S-4 were false when made.[19] (Def. Counter 56.1 ¶ 86.)

On March 8, 2022, Doss also communicated BRC's changed position to Citibank, explaining that, according to Kirkland, "while the S4 registered the warrants shares, they will not be exercisable until the S-1 is deemed effective and the shares are registered

---

[18] Not all investor inquiries referenced the Form S-4 registration statement; after BRC had already changed its position, some investors asked about timing for filing of the S-1 registration and why the Warrants were not yet exercisable. (*See* Pl. Reply 56.1 ¶¶ 27-30; Second Sternberg Decl. Exs. 9-11.)

[19] An inquiry from Warberg Asset Management ("Warberg"), passed on to Kirkland through the Warrant Agent Continental appears to have gone unanswered. On March 11, 2022, Matt Edwards of Warberg wrote to Continental: "Can the [BRC] company counsel clarify why the shares were not registered on th[e] S-4 [Link]? I have seen other SPACs that listed the shares underlying the public warrants on their S-4s and claim that the shares were eligible for exercise upon the 30 days time requirement without a separate S-1 for the warrant shares because the S-4 included them." (Def. Counter 56.1 ¶ 100; First Salant Decl. Ex. 53 at -588.) Continental twice forwarded the inquiry to Kirkland, but the record does not reflect a response. (Def. Counter 56.1 ¶¶ 101-04; First Salant Decl. Exs. 53-54.)

under a continuous offering." (Def. Counter 56.1 ¶ 95; First Salant Decl. Ex. 45.) Citibank stated that it would defer to BRC counsel's judgment. (*Id.*) Citibank subsequently revised its presentation for BRC's board, but still referred to the Warrants being "first exercisable (03/11/22)," while also stating that cash exercise of the Warrants required "an effective registration statement covering the issuance of the ordinary shares issuable upon exercise of the warrants and a current prospectus" and noting further that the "registration statement that will be issued to register the PIPE shares [i.e., the Form S-1] will suffice if it explicitly covers registration of the warrants."[20] (Def. Counter 56.1 ¶ 96; First Salant Decl. Ex. 51 at -298-99.)

At the BRC board meeting, held on March 10, 2022, board members and Citibank discussed the "Presentation on 'Warrant Flush.'" (Def. Counter 56.1 ¶¶ 109-11.) As reflected in the presentation deck, BRC insiders stood to gain as much as $132 million in cash proceeds if, rather than exercising their Warrant rights within the first 30 days the Warrants could be exercised, BRC instead redeemed the Warrants for as little as $0.01 as they would be permitted to do under the Warrant Agreement. (*See* First Salant Decl. Ex 51 at -295.) By the end of the board meeting, the board concluded that the next step, subject to formal approval, was to seek to redeem the Warrants. (Def. Counter 56.1 ¶ 113.)

---

[20] BRC asserts that during development of the Citibank presentation, SilverBox's COO Chun "suggested language" along the same lines. (Pl. Reply 56.1 ¶ 24.) That is not correct. Chun posed the question whether the S-1 "that is anticipated to be filed for the benefit of the PIPE holders" sufficed as the effective registration statement and suggested that, if so, it may be helpful to make that point. (First Salant Decl. Ex. 49 at -803.) And later in the development of the presentation, Chun stated that "per my earlier comment we can say 'current S-4 should be sufficient'". (*Id.* at -799.)

**E.    Tang's Initial Purchases Of, And Attempt To Exercise, Warrants**

Tang first brought BRC Warrants on March 7, 2022, purchasing a total of 556,977 Warrants.  (Pl. Counter 56.1 ¶ 44.)  Tang purchased another 28,856 Warrants on March 8, 2022, and 14,167 Warrants on March 9, 2022, bringing its total to 600,000.  (*Id.* ¶¶ 49-50; First Salant Decl. Ex. 100.)  On March 10, 2022, Tang's broker, Jefferies, informed Tang by email that "We have received an update from DTC regarding BRC Inc Warrants. The agent has indicated that these warrants are currently not exercisable as the S-1 is not effective."[21]  (Pl. Counter 56.1 ¶ 53.)  As of that time, however, BRC had not even filed an S-1, and, according to Tang's deposition testimony, Tang believed that the information provided was a mistake.  (Salant Decl. Ex. 60 at 116:5-25.)  Tang ordered 100,000 additional Warrants that same day.  (Def. Reply 56.1 ¶ 12.)

On March 11, 2022, thirty days after the February 9, 2022 closing of the SilverBox-BRC Business Combination, Tang placed orders for another 100,000 Warrants (Def. Reply 56.1 ¶¶ 16-17), and for the first time attempted to exercise BRC Warrants to purchase 50,000 BRC shares at the price of $11.50 per share.  (Def. Counter 56.1 ¶¶ 114, 175, 200; Pl. Counter 56.1 ¶ 56.)  Tang again was informed that the Warrants were "still not setup in DTC to exercise" and that "the agent has indicated these warrants are not exercisable as the S-1 is not effective."  (Pl. Counter 56.1 ¶ 58.)  BRC did not authorize Warrants to be exercised at that time on the purported basis that permitting exercise of

---

[21] "DTC" is an acronym for the Depository Trust Company, a central securities depository that provides settlement services for securities issued in and outside the United States. *See* The Depository Trust Company (DTC), https://www.dtcc.com/about/businesses-and-subsidiaries/dtc.

the Warrants without an effective Form S-1 would violate SEC rules and securities law. (Def. Counter 56.1 ¶¶ 115-16.)

Tang's outside counsel at Gibson Dunn & Crutcher LLP ("Gibson") then had a phone call with BRC's outside counsel at Kirkland who, according to Gibson's confirmation of their discussion, expressed the view that an S-4 cannot be used for a delayed or continuous offering under Rule 415. (Def. Reply 56.1 ¶¶ 4-5; Salant Decl. Ex. 58 at -514.) Gibson followed up with an email to Kirkland stating that Gibson understood BRC's "view that S-4 cannot be used" but then explaining that "the instructions and adopting release [for the Form S-4] expressly contemplate a continuous offering under Rule 415. Based on this, and how the warrant shares were included in the S-4 fee registration table, it seems clear that the warrants have been registered and are currently exercisable." (Salant Decl. Ex. 58 at -514.) The email asked for confirmation that the Warrants could be exercised. (*Id.*) No response was forthcoming. (Def. Counter 56.1 ¶ 120.)

Several other investors in addition to Tang sought an explanation from BRC as to why their Warrants were not exercisable as of March 11, 2022. Some provided examples of other instances where, to their understanding, warrants were exercisable based on a Form S-4 registration. (*Id.* ¶¶ 122-30.) Some investors inquired when BRC's Form S-1 would be filed, with at least one investor connecting exercisability of their Warrants to filing of the Form S-1. (*See* Pl. Reply 56.1 ¶¶ 27-30; Second Sternberg Decl. Exs. 9-11.)

## F.    BRC Insiders' Earnout Shares And The Redemption Notice

Public investors were not the only ones who stood to profit from the BRC de-SPAC transaction. The de-SPAC transaction set aside 20 million "Earnout" shares of BRC stock, which would be issued to BRC's management, directors, and early investors if

BRC's stock price exceeded certain threshold values for 20 out of 30 consecutive trading days.  (Def. Counter 56.1 ¶¶ 132, 134.)  BRC's  Form S-4 estimated the Earnout shares to be worth $171.1 million.  (*Id.* ¶ 133.)  After the shares were issued, BRC estimated their value at approximately $260 million.  (*Id.*)  BRC carefully tracked whether and when the vesting thresholds for the Earnout shares had been met.  (*Id.* ¶¶ 135-49.)

BRC's Earnout shares vested during the same time period that Tang and other Warrant holders attempted, but were denied, exercise of their Warrants.  The first tranche vested on March 14, 2022, and the second tranche on April 5, 2022, as a result of which more than 20 million Earnout shares were issued to BRC's management, directors, and early investors.  (*Id.* ¶¶ 140-41, 147-48.)

On April 4, 2022 – the day before its final tranche of Earnout shares vested – BRC issued a press release stating, *inter alia*, that BRC had filed an S-1 registration statement for "the issuance of shares of Class A Common Stock upon exercise of the Warrants for cash"; that, in the meantime, Warrant holders could exchange their Warrants on a cashless basis for a fractional share per Warrant; that the Warrants would cease trading on the NYSE on May 3, 2022; that BRC would redeem all outstanding Warrants for $0.10 per Warrant on May 4, 2022; and that the registration had not yet been declared effective and may not be declared effective prior to the redemption date.  (*Id.* ¶¶ 151-53; Pl. Reply 56.1 ¶ 43; First Salant Decl. Ex. 77.)  In short, because BRC maintained its position that the Warrants were not exercisable from March 11, 2022 through May 4, 2022 (when its Form S-1 became effective), Warrant holders were left with the choice of either engaging in the cashless exercise at a capped value or having their Warrants redeemed for $0.10 per Warrant.  (Def. Counter 56.1 ¶ 155.)

G.    **BRC's Form S-1 Registration**

On March 16, 2022, BRC filed with the SEC a Form S-1 registration statement (the "Form S-1" or "S-1").[22]    (*Id.* ¶ 159.)    The Form S-1 fee table contemplated a primary offering of "17,766,641 Shares of Class A Common Stock Issuable Upon the Exercise of Warrants," for which BRC paid a registration fee of $18,940.13, and a secondary (i.e., resale) offering of 203,821,303 shares of Class A common stock and 6,266,667 private placement warrants for which BRC paid a registration fee of $316,667.38.    (*Id.* ¶ 160; First Salant Decl. Ex. 81.)    The first page of the S-1 prospectus stated that the prospectus "relates to (i) the issuance by [BRC] of up to 17,766,641 shares of Class A Common Stock … of BRC Inc. ... that may be issued upon exercise of Warrants (as defined herein) to purchase Class A Common Stock," as well as "the offer and sale" of 203,821,303 shares of Class A common stock (the so-called PIPE shares) and the 6,266,667 private placement warrants.    (Pl. Counter 56.1 ¶ 64; First Salant Decl. Ex. 80 at ECF 4.)

The same day, BRC also filed a Form 10-K annual report disclosing audited financial information for its complete 2021 financial year.    (Def. Counter 56.1 ¶ 161.)    The S-1 prospectus included that information as well, thus providing an additional quarter of financial statement data not included with the earlier-filed S-4.    (*See* First Salant Decl. Ex. 80 at ECF 60, 75, 142-164.)    The S-1 prospectus also disclosed the number of shares (26,870,683) of SilverBox stock that SilverBox stockholders had redeemed in advance of the Business Combination – information that had been disclosed a month earlier in a BRC Form 8-K filing.    (Pl. Counter 56.1 ¶ 68; Third Salant Decl. Ex. 143 at ECF 3.)    The parties

---

[22] The Form S-1 was assigned a different Registration File Number than the Form S-4, and was not designated as a post-effective amendment to an existing registration.    (Def. Reply 56.1 ¶¶ 38-39.)

dispute the extent and significance of new information disclosed by the S-1 prospectus. (Pl. Reply 56.1 ¶ 40; Pl. Counter 56.1 ¶¶ 69-70, 73-74; Def. Reply 56.1 ¶¶ 31-36.)  Tang reviewed BRC's Form S-1 when it was published.  (Pl. Counter 56.1 ¶ 75.)

On April 8, 2022, the SEC provided comments on the Form S-1 and requested revisions, including additional disclosures; BRC responded ten days later on April 18, 2022.  (Def. Counter 56.1 ¶¶ 163-64; Pl. Counter 56.1 ¶¶ 91-93; Pl. Reply 56.1 ¶¶ 49-53; First Sternberg Decl. Ex. 29.)   BRC filed an amended Form S-1 and prospectus incorporating many of the revisions requested by the SEC.  (Pl. Counter 56.1 ¶¶ 94-95; *see also* Def. Counter 56.1 ¶ 165; First Sternberg Decl. Ex. 29.)  On May 2, 2022, the SEC informed BRC's counsel that the SEC had completed its review of the Form S-1 and that BRC could file an acceleration request.  (Def. Counter 56.1 ¶ 166; First Salant Decl. Ex. 11 at 94:24-95:4.)  BRC did so that day, asking that the SEC declare the Form S-1 effective at 4:00 p.m. on May 4, 2022 – the day after the Warrants ceased trading on the NYSE, and only one hour before expiration of the redemption period – which would, absent cash exercise by Warrant holders, enable BRC to redeem the Warrants for $0.10 per warrant.  (Def. Counter 56.1 ¶¶ 166-67.)  That is exactly what happened.  The SEC granted BRC's acceleration request, the Form S-1 registration became effective on May 4, 2022, and approximately 99 percent of the Warrants were exchanged on a cashless basis at a redemption price of only $0.10 per Warrant.  (*Id.* ¶¶ 168-69.)

## H.   Tang's Additional Purchases And Sales Of Warrants And Attempts To Exercise Them

Between March 7 and April 6, 2022, Tang purchased 1,035,364 BRC Warrants. (*Id.* ¶ 172.)  Up to and including March 11, 2022, when Tang first attempted to exercise Warrants and was denied, Tang had purchased a total of 707,000 Warrants and ordered

93,000 more. (Def. Counter 56.1 ¶ 171; Pl. Reply 56.1 ¶ 36; First Salant Decl. Ex. 100; Second Salant Decl. Ex. 142.) Between March 12, 2022 and April 7, 2022, Tang increased its Warrant holdings by 235,364 Warrants (not including the 93,000 previously ordered) to the high of 1,035,364 Warrants. (Pl. Reply 56.1 ¶ 36; Def. Reply 56.1 ¶ 22; First Salant Decl. Ex. 100; Second Salant Decl. Ex. 142.)

On April 4, 2022, Tang reviewed BRC's redemption press release issued that day and acknowledged internally and to its broker Jefferies that Tang effectively had only two viable options in light of BRC's stance: either exercise the Warrants for cash once the S-1 becomes effective, or exercise them on a cashless basis no later than May 4 in the absence of that event. (Pl. Reply 56.1 ¶ 44; Pl. Counter 56.1 ¶¶ 81-82, 84, 86; Second Salant Decl. Ex. 144 at 160:5-162:25; First Sternberg Decl. Ex. 24 at ECF 6.)

Nonetheless, between April 4 and 6, 2022, Tang purchased another 174,394 Warrants. (Pl. Reply 56.1 ¶ 46; First Salant Decl. Ex. 100.) And, in three transactions on April 7, 8, and 11, Tang sold 300,000 Warrants. (Def. Counter 56.1 ¶ 176; First Salant Decl. Ex. 100.) Tang did not try to exercise those Warrants; according to Tang, had BRC not previously rejected Tang's attempt to exercise Warrants, Tang would have exercised the 300,000 Warrants and then sold the stock that would have been received in exchanged for the Warrants rather than selling the Warrants themselves. (Def. Counter 56.1 ¶ 178; Pl. Counter 56.1 ¶¶ 88-89.)

A few days later, on April 13, 2024, over a span of 20 minutes, Tang sent a series of emails to Jefferies, first directing Jefferies to transfer 735,364 Warrants to a specific account, then directing Jefferies to disregard the instruction because "we plan to exercise the warrants instead of transferring them out," and then "requesting again to allow us to

24

exercise for cash the BRCC warrants." (Def. Counter 56.1 ¶¶ 180-83; First Salant Decl. Exs. 105 at ECF 2-3, 106 at -484, and 107; *see* Pl. Reply 56.1 ¶¶ 57-59.) The third email, from Tang's Executive Director of Finance and Accounting, added: "As I mentioned before, our legal counsel has indicated that the underlying shares are already registered under the S-4 that went effective January 13, 2022. With the recent high in the stock of $33, the warrants are about $22 in the money, so I am sure you appreciate the urgency in the matter." (First Salant Decl. Ex. 105 at ECF 2-3; Def. Counter 56.1 ¶ 183.) Jefferies responded, stating that BRC's counsel had advised that only cashless exercises were permitted based on the redemption call. (Def. Counter 56.1 ¶ 185; Pl. Counter 56.1 ¶ 98.)

Despite BRC's continued intransigency against exercising Warrants on a cash basis, Tang purchased 25,942 additional Warrants in three transactions on April 19, 20, and 25, 2022. (Def. Counter 56.1 ¶ 189; First Salant Decl. Ex. 100.) Between April 25 and April 29, 2022, Tang sold 250,000 Warrants. (Def. Counter 56.1 ¶ 190; First Salant Decl. Ex. 100.) As of May 3, 2022, Tang owned 511,306 Warrants. (Def. Counter 56.1 ¶ 191.) On May 3, 2022, Tang exercised all remaining Warrants on a cashless basis at the rate of 0.361 shares per Warrant; Tang thus received 184,581 shares of BRC common stock, which it then sold for approximately $12.20 per share. (*Id.* ¶ 194; First Salant Decl. Ex. 100.)

Between April 13 and May 3, 2022, BRC's stock price declined from $26.01 to $13.84. (Def. Counter 56.1 ¶ 187.)

25

## I.    Tang's Claimed Damages

Tang seeks damages in connection with 1,035,364 BRC Warrants – the total number it purchased between March 7 and April 6, 2022, before Tang began to sell any Warrants.  (*See* Def. Reply 56.1 ¶ 8.)  Tang does not seek damages in connection with the 25,942 Warrants it purchased after April 13, 2022.  (*Id.* ¶ 23.)  Its damages analysis is set forth in the expert report of Dr. Jonathan Arnold.  Dr. Arnold calculates the profits Tang would have made had it been permitted to exercise its Warrants.  (Def. Counter 56.1 ¶ 195; First Salant Decl. Ex. 104.)  To do so, Dr. Arnold subtracted the exercise price of $11.50 per Warrant from the mean market value of BRC common stock, and multiplied that figure by the number of Warrants that Tang would have exercised.  (Def. Counter 56.1 ¶ 196; First Salant Decl. Ex. 104 ¶ 28 & n.44.)

Tang divides its damages into three tranches.  The first tranche is March 11, 2022, when Tang attempted to exercise 50,000 Warrants.  Factoring in proceeds Tang received from disposing of the Warrants, Tang had a net gain of $28,194 with respect to the 50,000 warrants.  Tang has subtracted that amount from its damages calculation.  (Def. Counter 56.1 ¶¶ 200-03; First Salant Decl. Ex. 104 at Ex. 1 Column [A].)  The second tranche is April 7-11, 2022, when Tang sold a total of 300,000 Warrants.  Taking into account the price Tang paid to purchase the Warrants, the proceeds Tang received from selling the Warrants, and the mean stock price, Dr. Arnold calculates a net loss of $2,691,318 for the April 7-11, 2022 tranche.  (Def. Counter 56.1 ¶¶ 204-07; First Salant Decl. Ex. 104 at Ex. 1 Column [B].)

The third tranche for Tang's alleged damages is April 13, 2022, when Tang purports to have attempted to cash-exercise its remaining 735,364 Warrants.  Factoring

in the price Tang paid to purchase the Warrants, the proceeds Tang received from disposing of the Warrants, the mean stock price, and backing out the 50,000 Warrants already accounted for, Dr. Arnold calculates a net loss of $7,871,463 for the April 13, 2022 tranche.  (Def. Counter 56.1 ¶¶ 208-13; First Salant Decl. Ex. 104 at Ex. 1 Column [C].)  In total, Dr. Arnold calculates, and Tang claims, damages of $10,534,588.    (Def. Counter 56.1 ¶ 198; First Salant Decl. Ex. 104 at Ex. 1.)

BRC and its damages expert, Professor Terry Hendershott, do not dispute the numerical calculations performed by Dr. Arnold.  BRC does dispute, however, whether the damages sought are recoverable.  (Def. Counter 56.1 ¶ 199; First Salant Decl. Ex. 110 at 44:4-45:21.)  First, BRC asserts that Tang did not incur any damages in connection with the first 50,000 Warrants, because their sale yielded a net gain for Tang.  (Pl. Reply 56.1 ¶ 34.)  Second, BRC asserts that Tang cannot recover damages for (1) Warrants Tang never sought to exercise, including the 300,000 warrants that Tang sold in early April, and (2) the Warrants Tang exercised on a cashless basis on May 3, 2024, because Tang allegedly did not specify the quantity of Warrants it sought to exercise on April 13, 2022.  Third, BRC asserts that Tang failed to mitigate its damages and should not be able to recover damages for Warrants Tang purchased after March 11, 2022, when BRC's counsel informed Tang's counsel of BRC's position that an effective Form S-1 was required to cash exercise the Warrants.  (Def. Counter 56.1 ¶ 198; Pl. Reply 56.1 ¶¶ 70-73; *see generally* First Sternberg Decl. Ex. 4 (Hendershott Rebuttal Report).)

## PROCEDURAL BACKGROUND

Tang filed its Complaint on April 28, 2022, asserting claims for breach of contract and declaratory judgment.  (Dkt. 1.)  On June 28, 2022, the parties consented to my

jurisdiction for all purposes.  (Dkt. 22.)  On July 29, 2022, BRC moved to dismiss both causes of action asserted by Tang.  (Dkts. 30-32.)

The Court granted the motion to dismiss in part and denied it in part.  The Court dismissed Tang's claim for declaratory judgment as duplicative of its breach-of-contract claim and inapt since the only conduct at issue is BRC's past, not future, conduct.  *Tang I*, 661 F. Supp.3d at 77-78.  The Court denied BRC's motion, however, as to Tang's claim for breach of contract.

In moving to dismiss, BRC argued that the Warrant Agreement required registration of two transactions with the SEC before BRC would be obligated to issue stock upon exercise of a Warrant.  According to BRC, the Form S-4 registration did not register and could not have registered the sale of common stock to be purchased upon exercise of a warrant; instead, that could be accomplished only by filing the later Form S-1 registration.  In opposition, Tang argued that the Warrant Agreement's requirement for an effective registration statement could be fulfilled by either a Form S-4 or Form S-1, and that the securities laws and regulations provided for registration of the Warrant shares and their exercise on a Form S-4 as part of a business combination transaction like the BRC de-SPAC transaction.  Based on the record before it, the Court found the contractual language to be ambiguous and indicated that the parties could expand the record in discovery with extrinsic evidence such as statements or actions of the parties, evidence of custom and practice, expert testimony, and other material.  *Id.* at 62-65.

In recognizing competing reasonable interpretations, however, the Court found BRC's theory "suspect," *id.* at 69; recognized "there is much in the Form S-4 that makes it plausible that BRC registered the shares at that time for purposes of exercise of the

warrants," *id.* at 70; and rejected BRC's argument that as a matter of law the Form S-4 could not have registered the common law stock to be received upon a warrant-holder's exercise of their rights, *id.* at 65 ("BRC's arguments do not stand up to scrutiny, at least not on the current record"), 67 ("BRC has not provided any legal authority … that supports its contention that the Form S-4 could not have registered the stocks to be issued upon exercise of the warrants"), 69 ("BRC's position is not supported by any authority").    In other words, from the get-go, BRC faced an uphill battle in developing a record sufficient to support either its own motion for summary judgment or to defeat a motion for summary judgment by Tang.[23]

Following completion of discovery, the parties cross-moved for summary judgment.  They filed opening briefs and supporting evidence on April 11, 2024, opposing briefs and evidence on May 7, 2024, and replies on May 31, 2024.  The parties also filed motions to exclude each other's securities expert.  The Court heard oral argument on October 23, 2024.

## THE *GETTY* CASE

Between the time this Court issued its decision on the motion to dismiss and the time the parties filed their summary judgment motions, Judge Rakoff issued a decision in a case addressing several of the same issues in play on the instant motion.  *See Alta Partners, LLC v. Getty Images Holdings, Inc.*, 700 F. Supp.3d 32 (S.D.N.Y. 2023).  The decision currently is on appeal.  Both parties (particularly Tang) cite *Getty* frequently, and

---

[23] The Court's decision on the motion to dismiss also rejected BRC's argument that Tang lacks contractual standing to pursue its claims, 661 F. Supp.3d at 72-74; held that Tang adequately pled damages, *id.* at 74-75; and determined that whether or not Tang had and fulfilled an obligation to mitigate its damages could not be resolved at the motion to dismiss stage, *id.* at 75-76.

the instant opinion references it in discussing varied issues. For context, the Court briefly describes the case up front.

Like the instant case, *Getty* arose out of a de-SPAC transaction in which Getty (the equivalent of BRC) emerged as the surviving company. As here, the terms governing exercise of the warrants at issue were set forth in a warrant agreement between Getty's corporate predecessor (the equivalent of SilverBox), and the transfer agent Continental. And, as in the instant case, the warrant holder, Alta, attempted to exercise its warrants after the Form S-4 registration had been filed and before the Form S-1 registration had become effective. Getty rebuffed Alta's attempted exercise of the warrants, and Alta sued. Like BRC here, Getty argued that the warrants could not be exercised because although they had been registered on Getty's Form S-4, Getty's Form S-1 had not yet become effective. And, again like BRC here, Getty also argued that the prospectus filed with its Form S-4 was not current once Getty filed its Form S-1 registration with an updated prospectus. Judge Rakoff rejected Getty's arguments across the board and awarded summary judgment to Alta.

While *Getty* bears many similarities to the instant case, there are some differences. For instance, the language of the warrant agreement in *Getty* was not identical to the Warrant Agreement at issue here. In particular, the Getty agreement required, as a condition to exercise of warrants, that there be an effective registration statement "with respect to," the underlying warrant shares, whereas the Warrant Agreement in the instant case requires an effective registration statement "covering the issuance of" the underlying warrant shares. (*Compare* 700 F. Supp.3d at 36, *with* Warrant Agreement § 3.3.2.) Additionally, Getty's Form S-1 expressly referred to the underlying warrant shares

30

"previously registered" on the Form S-4, and, although listing those shares on the Form S-1 as well, specified that no additional registration fee was being paid in connection with them.   700 F. Supp.3d at 40.   BRC's Form S-1 did not contain similar "previously registered" language, and both BRC's Form S-4 and S-1 included the warrant shares in their fee table.

## THE EXPERTS AND MOTIONS TO EXCLUDE

Before discussing the merits of the cross-motions for summary judgment, the Court first addresses the parties' motions to exclude each other's securities expert.  The parties have not challenged the admissibility of the opinions of each other's damages expert.

## A.    Legal Standards For Expert Evidence

The admissibility of expert testimony is governed by the Federal Rules of Evidence and the standard set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).   Pursuant to Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" and render an opinion at trial if:   "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."   Fed. R. Evid. 702; *see also* Fed. R. Evid. 703 (experts may rely on inadmissible evidence if experts in the particular field would reasonably rely on those kinds of facts or data, but that evidence may be presented to the jury only if its probative value in helping the jury substantially outweighs its prejudicial effect).   Expert opinion is

not limited to only scientific subject matter that can be tested by scientific methodology but extends to "technical and other specialized knowledge."  Fed. R. Evid. 702 advisory committee's note to 2000 amendment (internal quotation marks omitted).

Pursuant to *Daubert*, the Court acts as "gatekeeper" to ensure that expert opinions pass muster under the rules.  *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 259 (2d Cir. 2002).  That responsibility requires assessing the expert's qualifications in relation to the subject matter to which he or she will testify and determining whether the testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  The Court must execute its gatekeeping function to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).  "The proponent of the expert testimony has the burden to establish these admissibility requirements."  *In re Pfizer Inc. Securities Litigation*, 819 F.3d 642, 658 (2d Cir. 2016).

Courts in the Second Circuit liberally construe expert-qualification requirements. *Washington v. Kellwood Co.*, 105 F. Supp.3d 293, 305 (S.D.N.Y. 2015).  But even otherwise qualified experts may not simply offer conclusory opinions.  *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).  Conclusory opinions are a form of "ipse dixit," and an insufficient basis upon which to assess reliability. *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert")  "A court

may conclude that there is simply too great an analytical gap between the data and the opinion proffered" to find the expert evidence admissible.  *Id.*

Additionally, courts exclude irrelevant expert evidence as well as relevant evidence the probative value of which is substantially outweighed by concerns such as unfair prejudice, confusing the issues, or misleading the jury.  Fed. R. Evid. 401, 403.  Rule 403 carries particular significance when evaluating expert evidence:  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Bustamante v. KIND, Inc.*, 100 F.4th 419, 427 (2d Cir. 2024) (quoting *Daubert*, 509 U.S. at 595)).

**B.    Tang's Expert Huber**

John J. Huber describes his having been retained on behalf of Tang "as an expert witness in the custom, usage and practice with respect to registration statements filed with the SEC."  (Huber Report ¶ 7.[24])  His opinions, however, are not so much about custom and practice, as they are (1) an insider's view of the proposal, adoption, purpose, and interpretation of various SEC rules, regulations, and forms, including the adoption of Form S-4, and (2) his "interpretation" of BRC's Form S-4 and S-1 registrations, including what they registered, the currency of the S-4 prospectus, and when Warrant holders could exercise their rights.  (*Id.* ¶¶ 7, 62.)  Huber does much the same in his rebuttal report to BRC's  securities expert.  (*See* Huber Rebuttal Report.[25])

---

[24] The Huber Report is located at Dkt. 153-1.

[25] The Huber Rebuttal Report is located at Dkt. 153-2.

Huber has a uniquely apt background for addressing the history of the relevant rules and regulations: during his tenure at the SEC from 1975-1986, he personally drafted and supervised the drafting, proposal, and adoption of the "integrated" disclosure requirements for registration statements. (Huber Report ¶ 10.) As part of that endeavor, he personally drafted and supervised the drafting, proposal of, and adoption of Rule 415 (for shelf registration of delayed and continuous offerings) as well as Form S-4 itself. (*Id.*) He also drafted and supervised drafting of a number of interpretive releases published by the SEC. (*Id.* ¶ 11.) After the SEC, Huber was the senior SEC partner at the firm Latham & Watkins LLP, and now provides consulting services and expert testimony for FTI Consulting. (*Id.* ¶¶ 12, 14.)

BRC moves to exclude Huber's opinions for two fundamental reasons, arguing that his opinions are impermissible legal conclusions, and that Huber's methodology – applying his 35 years of experience – does not meet the reliability requirements of Federal Rule of Evidence 702.    Alternatively, BRC argues that Huber's opinions should be excluded pursuant to Federal Rule Evidence 403 because the relevance of Huber's opinions is outweighed by the prejudice of admitting them.

The Court first addresses BRC's challenge to Huber's methodology. An expert may "base[ their] testimony on practical experience rather than scientific analysis." *Lickteig v. Cerberus Capital Management, L.P.*, 589 F. Supp.3d 302, 330 (S.D.N.Y. 2022) (internal quotation mark omitted) (quoting *Davis v. Carroll*, 937 F. Supp.2d 390, 412 (S.D.N.Y. 2013)). When an expert bases their opinions on their experience, "[t]he reliability inquiry may ... focus upon personal knowledge and experience of the expert." *Id.* "If the witness is relying solely or primarily on experience, then [he] must explain how

that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, 691 F. Supp.2d 448, 473 n.148 (S.D.N.Y. 2010) (internal quotation marks and citation omitted) (quoting Fed. R. Evid. 702 Advisory Committee's Note).  Huber readily meets those requirements.  As described above, he has directly relevant experience – both regulatory and practical, and personal knowledge of the subject matter he addresses.  His opening report in particular explains in depth the relevance of his experience as well as how and why his experience provides a reliable basis for his conclusions.  He supports his opinions with extensive references to SEC regulations, rules, guidance, and industry sources.  His opinions are not merely conclusory or "ipse dixit."

BRC's other basis for challenging Huber's testimony has more traction.  "As a general rule an expert's testimony on issues of law is inadmissable [sic]." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see also United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) (holding that expert's statements that defendants violated securities laws were legal conclusions that "went well beyond his province as an expert"), *modified on other grounds*, 856 F.2d 5 (2d Cir. 1988).  Courts, however, permit experts to testify about regulatory frameworks, rules, purposes, and background.  *See, e.g.*, *Bilzerian*, 926 F.2d at 1294-95 (upholding admissibility of expert's testimony about "general background on federal securities regulation and the filing requirements of Schedule 13D, which he presented by referring to a blank form," and quoting with favor the trial court's instruction that the expert was there "to furnish [the jury] with background concerning the meaning of terms, the procedures which are followed and his opinion as

to the reason for these procedures"); *In re Elysium Health-ChromaDex Litigation*, No. 17-CV-7394, 2022 WL 421135, at *23-25 (S.D.N.Y. Feb. 11, 2022) (allowing expert in false advertising action concerning dietary supplements to provide "an overview of the relevant FDA regulations" and to trace "the statutory and regulatory background"). "Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts." *Bilzerian*, 926 F.2d at 1294. At the same time, "[i]ts use must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Id.*

The rationale for the rule against expert legal opinion is that such opinion is not helpful to a jury because the Court interprets and instructs about the law, and the jury applies the law to the facts. *See id.* at 1295 (excluding opinion of former director of SEC's Division of Corporate Finance about meaning of language appearing on SEC disclosure "because it related directly to the issue of whether [defendant]'s … disclosures complied with the legal requirements" and therefore "would have constituted an impermissible instruction on governing law"); *Scop*, 846 F.2d at 140 (disallowing expert testimony that "drew directly upon the language of the statute and accompanying regulations concerning" terms of art and thereby "invade[d] the province of the court to determine the applicable law and to instruct the jury as to that law" (internal quotation marks and citation omitted)); *Securities and Exchange Commission v. Tourre*, 950 F. Supp.2d 666, 678 (S.D.N.Y. 2013) (excluding opinions that "improperly invade[ ] both the province of the judge to instruct on the law and the jury to find the facts").

Huber's opinions extend beyond the line of permissible testimony about statutory and regulatory background on one hand and, on the other, impermissible legal interpretation and application of the law to the facts. Huber's reports engage in legal analysis, opining that "[t]he application of SEC statutes, rules, and guidance to the facts in this case resolve [the relevant] issues." (Huber Rebuttal ¶ 9.) At deposition, Huber conceded, albeit in light of his experience at the SEC and in private practice, that the "upshot of all of my opinions is based on my interpretation of what I see in these releases and what I see in these registration statements and what I see in rules." (First Salant Decl. Ex. 130 at 50:4-7.) Tang asserts that Huber's opinions are not improper because they do not tell the jury what the result should be with respect to the ultimate issue of whether BRC did or did not breach the Warrant Agreement. (Dkt. 173 at 13.) That argument is a bit glib – Huber's opinions about what BRC's Forms S-4 and S-1 did or did not register directly address dispositive issues.[26]

That is not to say that all aspects of Huber's opinions are inadmissible. *See Kleen Products LLC v. International Paper*, No. 10-C-5711, 2017 WL 2362567, at *19-21 (N.D. Ill. May 31, 2017) (allowing Huber to opine that the defendant's communications with investors and analysts were required or expected by the SEC where the dispositive issue

---

[26] In defending Huber's opinions in their entirety, Tang emphasizes the *Getty* case in which Huber tendered opinions very similar to those submitted in this case. Tang asserts that "[t]here were no questions about the admissibility or reliability of Mr. Huber's testimony, and Judge Rakoff awarded summary judgment to plaintiffs, expressing in his opinions the same views as Mr. Huber." (Dkt. 174 at 4.) That assertion is true as far as it goes. Judge Rakoff was not asked, in connection with summary judgment, to rule on the admissibility of Huber's opinions, and he did not reference Huber or cite his opinions in the decision. No conclusion can be drawn about whether Judge Rakoff accepted or rejected or even considered Huber's opinions.

was about whether certain disclosures surreptitiously communicated confidential information to co-conspirators, and his opinion therefore was "not the kind of legal conclusion that will determine the outcome of the case" (internal quotation marks omitted)); *Securities and Exchange Commission v. Bankatlantic Bancorp, Inc.*, No. 12-60082-CIV, 2013 WL 12009694, at *12 (S.D. Fla. Nov. 14, 2013) (allowing Huber to opine about adequacy of disclosure controls and procedures but only "so long as Huber's testimony does not veer into the subject of securities laws violations").  The regulations, rules, and forms at issue are technical and esoteric.  As in *Bilzerian*, they are the type of complex regulatory scheme about which expert testimony can be helpful to a jury.  And Huber has the requisite qualifications to explain the framework, terminology, purposes, and the like.  Huber's explanation of the regulatory framework, terminology, purposes, and background is admissible testimony.

BRC's motion to exclude Huber's opinions is granted in part and denied in part. At this juncture, however, the Court need not demark the line of what specific parts of Huber's opinions are and are not admissible.[27]  As explained below, the Court finds that Tang is entitled to summary judgment on the merits, and that analysis does not rely on Huber's opinions.

---

[27] Beyond opinions that are impermissible interpretation and application of the law, the Court finds that BRC's alternative argument for exclusion pursuant to Federal Rule of Evidence 403 – that Huber's opinion testimony is more prejudicial than probative – lacks merit.  Put another way, the Court finds merit in BRC's prejudice argument only with respect to the extent Huber's opinions cross the line into impermissible interpretation and application of the law.

C.    **BRC's Expert Solomon**

BRC's securities expert, Steven Davidoff Solomon, is a tenured professor at the University California Berkeley School of Law and has taught courses in areas such as mergers and acquisitions and securities regulation. (Solomon Report ¶¶ 26-27.[28]) Earlier in his career, Solomon worked as a corporate lawyer at Shearman and then Freshfields Bruckhaus Deringer.  Solomon regularly represented companies in a wide variety of corporate matters, including preparation of registration statements such as Form S-4.  (*Id.* ¶ 28.)  He has authored books, including a leading casebook on mergers and acquisitions, written numerous articles on corporate law, and styles himself as having "broad experience in the study and research of SPACs."  (*Id.* ¶¶ 29-30.)  He has served as an expert witness in many cases (37 within the last five years), including for the SEC and private parties, on a variety of subjects, including SPACs, registration forms, and disclosure practices and procedures.  (*Id.* ¶ 29 and App'x B.)  Although his testimony has been accepted much of the time, in at least one case his opinions were initially excluded as "patently improper expert testimony."  *Spizz v. Eluz (In re Ampal-American Israel Corp.)*, No. 12-13689, Adv. Proc. No. 14-02110, 2020 WL 2529337, at *4 (S.D.N.Y. Bankr. May 14, 2020).[29]

In his report, Solomon provides an overview of SPAC transactions (Solomon Report ¶¶ 35-74), narrates a lengthy recitation of the facts of the case even though he

---

[28] The Solomon Report is located at Dkt. 158-128.

[29] After submitting a revised report, Solomon was permitted to testify at trial "as to typical or customary corporate structures and governance procedures."  Transcript of Hearing at 46:14-20, *Spizz*, 2020 WL 2529337 (June 10, 2022) (Dkt. 192).  As explained above, this Court similarly finds permissible Solomon's testimony about SPAC transactions.

has no personal knowledge of them (*id.* ¶¶ 75-121), and tenders three overall opinions. (*Id.* at i-ii (Table of Contents) ¶ 123.)  First, he opines about custom and practice in registering de-SPAC transactions.  The centerpiece of that opinion is his survey and analysis of 139 de-SPAC transactions registered between July 1, 2021 and June 30, 2022, roughly contemporaneous with when the BRC de-SPAC transaction and registration process took place.  Second, Solomon opines that once BRC filed its Form S-1, the S-4 prospectus was no longer current.[30]  Third, he opines that the legal opinions annexed to BRC's Form S-4 and S-1 did not address registration of the public Warrant shares but instead addressed only state law issues.

For the most part, Solomon's second and third opinions, as well as much of his rebuttal report,[31] are legal opinions and interpretation and application of laws and regulations to the facts that are not admissible.  Additionally, his factual narrative usurps the jury's function.  Similar to his proffered testimony in *Spizz*, Solomon's proffered testimony improperly "includes a factual narrative, despite Solomon's lack of personal knowledge, … usurps the role of the jury …, declares the law that this Court should apply essentially charging the jury, and renders a decision on the appropriate outcome based on the facts and the law."  2020 WL 2529337, at *4.  Solomon's recitation of the facts and his second and third opinions, to the extent they opine on the law, and application of the law to the facts, are not admissible.  The Court nonetheless takes them into account in the substantive discussion below.

---

[30] Solomon compiled a list of information he found contained in the S-1 prospectus that was not previously included in the S-4 prospectus.  (*See* Solomon Report Ex. 7.)

[31] The Solomon Rebuttal Report is located at Dkt. 158-129.

That leaves Solomon's description of SPACs and his empirical analysis of de-SPAC transactions. Tang challenges Solomon's opinions on two fronts. It asserts that Solomon lacks "on-point" registration experience necessary to equip him with specialized knowledge that would be helpful to the jury. That argument can be summarily dispensed with – Solomon has experience with mergers and acquisitions and SPAC transactions sufficient to speak to SPAC and de-SPAC transactions. Even if his experience and education were not "on-point" in certain respects, he could still testify as an expert. *See Securities and Exchange Commission v. Revelation Capital Management, Ltd.*, 215 F. Supp.3d 267, 274 (S.D.N.Y. 2016) ("The Court disagrees that these concerns make Erb unqualified. From his experience in the securities industry in an international capacity and his previous work on underwritings, Erb has provided more than adequate credentials to qualify him as an expert who can assist the fact finder in understanding the underwriting at issue. He need not have experience or education directly on point"); *In re Zyprexa Products Liability Litigation*, 489 F. Supp.2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent"). If trial were necessary, Tang could test the bounds of Solomon's expertise through cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

Tang's principal argument is that Solomon's empirical analysis of custom and practice is unreliable and therefore inadmissible, and, in any event, is more prejudicial

than probative.  Solomon's empirical analysis is indeed flawed.  The analysis fails to account for variations in de-SPAC transaction structure.  De-SPAC transactions can be structured in different ways, and the one used by BRC was a less common one – an "Up-C" structure (a term with which Solomon was unfamiliar even though it appears on the third page of BRC's Form S-4).  (First Salant Decl. Ex. 125 at 183:6-19.)   Transaction structure is important, because different transactions may have different registration requirements.  As the SEC has explained, "SPACs currently use a variety of legal structures to effect de-SPAC transactions, and the particular transaction structure and the consideration used can affect (1) the Commission filings required for the transaction, … and (3) the disclosures provided in connection with the transaction."  (First Salant Decl. Ex. 3 at 12 n.22.)  By conflating all types of de-SPAC transactions, Solomon's analysis does not account for that variable.

BRC argues that transaction structure is irrelevant (and Solomon opined similarly) because the relevant time at issue is when the parties to the SPAC transaction – SilverBox and Continental – entered into the Warrant Agreement, and, at that time, would not yet have known what form the de-SPAC transaction would take.  (Dkt. 165 at 16.)  But that explains why the Warrant Agreement does not, as explained in detail below, specify any particular SEC registration form or forms to register warrant shares.  Precisely because the parties did not know what form the transaction would take, they needed flexibility in the registration process.

Solomon's analysis proves the point:  he determined that among the transactions he considered, 100% of the companies filed both a Form S-4 and Form S-1 in connection with the de-SPAC transaction.  (Solomon Report ¶¶ 160, 171.)  Of the 139 transactions,

55% included public warrant shares in their fee table, and 86% included them on a Form S-1 after completion of the business combination.[32]  (*Id.* ¶ 168.)  That means in at least approximately 14% of the transactions, the company filed a Form S-4 without then registering warrant shares on a Form S-1.  For 10% of the transactions, the Form S-1 described public warrants shares as previously registered.  (*Id.*)  In other words, there is no uniform custom or practice with respect to the method of registering warrant shares in a de-SPAC transaction.[33]  *See Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) ("proof of custom and usage consists of proof that the language in question is fixed and invariable in the industry in question" (internal quotation marks and citation omitted)).  And given that up-C de-SPAC transactions are a relatively less common transaction structure than other de-SPAC forms, it makes sense that Solomon found a minority of de-SPAC transactions that did not register warrant shares on an S-1.  Even that statistic is of questionable relevance – BRC purported to

---

[32] Solomon found similar results in 38 de-SPAC transactions for which Continental, the Warrant Agent for each of the transactions and the BRC transaction, provided data about the date on which the DTC was engaged for the deposit of the underlying shares, a prerequisite for exercise of public warrants.  Solomon determined that in 84% of those transactions, DTC was not engaged – and therefore exercise of the public warrants was not permitted – until after the company's post-business combination Form S-1 was declared effective; conversely, public warrants were exercisable before the S-1 filing in 16% of the transactions.  (Solomon Report ¶¶ 200-01.)

[33] BRC cites a case in which a court accepted and considered empirical analyses by opposing experts, one of whom was Solomon, of transaction agreements to assess the customary understanding of certain terms in those agreements.  *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, No. 2020-CV-310, 2020 WL 7024929, at *63 (Del. Ch. Nov. 30, 2020).  The court found it "difficult to reach strong conclusions based on these data," but determined that one could not conclude that certain terms like "calamity" or "Act of God" could never include a pandemic.  *Id.* at 64.  As discussed below, that finding is similar to the conclusion to be drawn from Solomon's analysis of transactions in this case, i.e., regardless of the majority practice, the analysis shows that a "meaningful number of agreements" counsel against a "narrow interpretation" of the agreement at issue.  *See id.*

register "shares issuable upon exercise of warrants" on *both* its S-4 and S-1.  Solomon's analysis does not address that scenario or its significance.  Indeed, Solomon's analysis does not take account of the classes of securities registered on each registration Form, thus failing to directly address the scenario presented by BRC's registrations, both of which reference the shares issuable upon exercise of the Warrants.  Nor does Solomon's analysis account for variability in the language and requirements of each transaction's warrant agreement.

The Court finds that Professor Solomon's empirical analysis is both flawed and of questionable relevance.  *Cf. Getty*, 700 F. Supp.3d at 43 n.9 (dismissing expert's empirical analysis of transactions as both "unconvincing" and "practically meaningless").  BRC argues that the purported flaws and limitations of Solomon's analysis go to its weight and are not so fundamental as to bar its admission.  *See, e.g.*, *GeigTech East Bay LLC v. Lutron Electronics Co.*, No. 18-CV-5290, 2023 WL 6614486, at *13 (S.D.N.Y. Sept. 20, 2023) (criticisms of "sample size, whether as over or under inclusive, go to the weight a trier of fact should accord his testimony"); *Pacific Life Insurance Co. v. Bank of New York Mellon*, No. 17-CV-1388, 2021 WL 673479, at *17 (S.D.N.Y. Feb. 22, 2021) (challenges to factual completeness "go to weight, not admissibility, and are fodder for cross-examination"); *AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411, 2019 WL 1254763, at *3 (S.D.N.Y. March 19, 2019) ("Any contentions that the expert's assumptions are unfounded go to the weight, not the admissibility, of the testimony" (internal quotation marks and citation omitted)).    The Court agrees.  And even though the analysis is of questionable relevance, the Court rejects Tang's argument that its probative value is outweighed by prejudice under Federal Rule of Evidence 403.  Were the merits of the

case to require trial, Tang could elicit the limitations and flaws of the analysis and also demonstrate how its results support Tang's case.

In sum, Tang's motion to exclude the opinions of Professor Solomon is granted in part and denied in part. Professor Solomon's testimony about SPAC transactions in general is admissible as is his empirical analysis of de-SPAC transactions. The remainder of his proffered opinions are excluded. Ultimately, however, neither Solomon nor Huber's testimony will be needed for trial because the Court finds that Tang is entitled to summary judgment on the merits.

**STANDARD OF REVIEW ON SUMMARY JUDGMENT**

To obtain summary judgment under Federal Rule of Civil Procedure 56, the movant must show that there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a). The Court may grant summary judgment "only if no reasonable trier of fact could find in favor of the nonmoving party." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). Conversely, "[s]ummary judgment is improper if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Banks v. General Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023) (internal quotation marks and citation omitted).

The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may demonstrate the absence of a genuine issue of material fact "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v.*

*Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

The opposing party must then come forward with specific evidence establishing the existence of a genuine dispute; conclusory statements or mere allegations are not sufficient to defeat summary judgment. *Anderson*, 477 U.S. at 248; *Geyer v. Choinski*, 262 F. App'x 318, 318 (2d Cir. 2008) (summary order). Where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex*, 477 U.S. at 322; *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986) (finding that, if there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper).

In assessing the record to determine whether there is a genuine issue of material fact, the Court must "eschew credibility assessments," *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) (internal quotation marks and citation omitted), and resolve all ambiguities and draw all reasonable factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

The same standards apply on cross-motions for summary judgment. "[E]ach moving party has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor." *City of New York v. Tavern on the Green International LLC*, 351 F. Supp.3d 680, 688 (S.D.N.Y. 2018) (internal quotation marks and citation omitted). "[W]hen both parties move for summary judgment,

asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).

## DISCUSSION

The Warrant Agreement is governed by New York law. (Def. Counter 56.1 ¶ 15; Warrant Agreement § 9.3.) "To prevail on a breach of contract claim under New York law, a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000) (internal quotation marks and citation omitted). "Plaintiffs bear the burden of proof as to all elements of a breach of contract claim." *Choquette v. Motor Information Systems, Inc.*, No. 15-CV-9338, 2017 WL 3309730, at *3 (S.D.N.Y. Aug. 2, 2017). Here, the first element is undisputed and satisfied by the Warrant Agreement. The parties dispute the extent to which Tang actually or properly exercised the Warrants, but that issue is addressed by them within the context of damages. Accordingly, the following discussion is divided into two sections: breach and damages.

## I.  BREACH

Pursuant to the Warrant Agreement, Tang was entitled to exercise its Warrants by March 11, 2022 – being 30 days from closing of the BRC de-SPAC transaction – so long as two conditions were met:  that there was both (1) an effective SEC registration statement "covering the issuance of the Common Stock underlying the Public Warrants," and (2) a current "prospectus relating thereto." (Def. Counter 56.1 ¶¶ 11-12; Warrant

Agreement §§ 3.2, 3.3.2.)  Each party argues that it is entitled to summary judgment as to whether those two conditions were satisfied by the S-4 registration, as Tang contends, or not until the S-1 registration became effective, as BRC contends.  The Court addresses each condition in turn.

## A.    Effective Registration Statement

The S-4 was indisputably an effective registration statement for purposes of exercising the Warrants.  That conclusion is based on a plain reading of the Warrant Agreement; securities law, rules, and regulations; the Form S-4 itself; and relevant extrinsic evidence.

### 1.   The Warrant Agreement

The Warrant Agreement expressly contemplates that a Warrant holder will be able to exercise the Warrants within 30 days of a registration statement becoming effective. (Warrant Agreement § 3.2.)  The agreement does not specify whether that registration has to be made by a Form S-1, Form S-4, or any other specific form.  Nor does it expressly refer to a process requiring two separate registrations of the stock underlying the Warrants before the Warrants can be exercised.  The Warrant Agreement thus does not limit the type of registration that may be used for the Warrant shares, so long as the SEC has declared it effective.

On its motion to dismiss, BRC focused on § 7.4.1 of the Warrant Agreement, which addresses registration of the common stock issuable upon exercise of the Warrants.  That section provides that as soon as practicable, but in no event later than 15 days after the Business Combination transaction closing, BRC will use its reasonable best efforts to file an SEC registration "of the shares of Common Stock issuable upon exercise of the

Warrants" and "to cause the same to become effective within 60 days after the Business Combination transaction." (Warrant Agreement § 7.4.1.) BRC argued that § 3.3.2 of the Warrant Agreement contemplates registration of the Warrant shares so that they could be offered, while § 7.4.1 addresses registration for purposes of exercise and that any other reading would render meaningless § 7.4.1's registration requirement. *Tang I* found, however, that § 7.4.1 "can be reasonably read as a backstop to protect the interests of warrant holders" in the event BRC had not otherwise registered the Warrant shares before the merger transaction closed. *Tang I*, 661 F. Supp.3d at 64.

*Tang I* further found that because both BRC and Tang's interpretations appeared to be reasonable, the Warrant Agreement was ambiguous "as to the number and type of SEC filings contractually required before BRC must issue stock upon exercise of a warrant." *Id.* at 62. To resolve that ambiguity, the Court determined it would need to consider extrinsic evidence such as, but by no means limited to, industry custom and practice. *Id.* at 64-65. Any ambiguity now has been indisputably dispelled. The applicable legal framework, the Form S-4 itself as authored and filed by BRC, and relevant extrinsic evidence all demonstrate that the Form S-4 registration was sufficient to and did register the Warrant shares for purposes of exercise by Warrant holders as of March 11, 2022.

### 2. Securities Law, Rules, And Regulations

BRC argues that Tang's reading of the Warrant Agreement would render it unlawful under the securities laws. (BRC Opp.[34] at 16-19.) BRC's argument fares no

---

[34] "BRC Opp." refers to BRC's Memorandum of Law in Opposition to Tang's Motion for Summary Judgment at Dkt. 166.

better now than it did on the motion to dismiss when BRC argued that such an arrangement was not legally permissible.  *See Tang I*, 661 F. Supp.3d at 65-69.  The securities laws, rules, and regulations permit use of a single registration, such as the Form S-4, to register shares of stock that will be sold upon exercise of the warrants in the future without the need for a second registration for the warrants to be exercised.[35]

In short, Form S-4's instructions state the Form S-4 may be used for registration of securities in various types of transactions, including those under Rule 145.  (From S-4 General Instruction A(1).[36])  Rule 145(a) includes, among other transactions, mergers or consolidations in which securities of one corporation will be exchanged for securities of another.  17 C.F.R. 230.145(a).  Form S-4 also instructs that it may include offering of securities pursuant to Rule 415(1)(viii).  (Form S-4 General Instruction H.[37])  That rule provides that "[s]ecurities may be registered for an offering to be made on a ***continuous or delayed basis in the future***" provided that "[t]he registration statement pertains only to … Securities which are to be issued ***in connection with business combination transactions***." 17 C.F.R. § 230.415(a)(1)(viii) (emphasis added).  BRC does not dispute that the SilverBox de-SPAC transaction from which BRC emerged was a "business

---

[35] The regulatory history of the proposal and adoption of Form S-4 generally indicates that the purposes for its adoption, among others, were to "extend[ ] the principles of integration to all business combination registration statements" and "to simplify the registration of securities issued in such transactions."  49 Fed. Reg. 20833, 20834, 20851 (May 17, 1984) (proposing release); 50 Fed. Reg. 18990, 18998 (May 6, 1985) (adopting release).  Those principles support a broader use of Form S-4 than the more constricted view advanced by BRC.  The Court does not, however, rely on that history in rendering the instant decision.

[36] https://www.sec.gov/files/forms-4.pdf at p.3 of 38.

[37] https://www.sec.gov/files/forms-4.pdf at p.7 of 38.

combination." The Warrants and Warrant shares were registered – together on the Form S-4, as part of that business combination. The exercise of those Warrants to purchase the Warrant shares in the future – after the Business Combination closed – necessarily is "in connection with" the Business Combination transaction.[38]

Moreover, the SEC itself has provided guidance **requiring** the contemporaneous registration of warrants and the shares for which they are to be exercised within a particular time frame. Specifically, "[w]here the offer and sale of convertible securities or warrants are being registered under the Securities Act, and such securities are convertible or exercisable within one year, … the underlying securities [must] be registered at that time"). SEC Division of Corporate Finance, *Compliance and Disclosure Interpretations*, Section 139. Securities Act Section 5, Q. 139.01 (Aug. 14, 2009).[39] Here, the Warrant Agreement provided that the Warrants could be exercised within 30 days of the completed Business Combination. The Warrants thus were "exercisable within one year."[40] And, as the Court found at the motion to dismiss stage, "[f]rom a plain reading of the SEC's guidance, the shares underlying the warrants are those that are issued when

---

[38] The Court previously rejected BRC's effort to unduly narrow the meaning of "in connection with." *See Tang I*, 661 F. Supp.3d at 66-67.

[39] While SEC guidance documents are not binding, they are "persuasive, particularly in light of the absence of any contrary precedent put forth by Defendants" to the Court when interpreting the meaning of the Securities Act and SEC regulations promulgated thereunder. *Chechele v. Standard General L.P.*, No. 20-CV-3177, 2021 WL 2853438, at *7 (S.D.N.Y. July 8, 2021), *motion to certify appeal denied*, 2022 WL 766244 (S.D.N.Y. March 14, 2022); *accord Chechele v. Elstain*, No. 11-CV-3320, 2012 WL 607448, at *3 (S.D.N.Y. Feb. 24, 2012) (giving persuasive weight to SEC guidance).

[40] That the Warrant Exercise Period potentially could have lasted up to five years does not change the fact that they first could be exercised within 30 days of closing of the business combination transaction.

the warrant is exercised, and those must have been registered when the warrants were registered to comply with the SEC's interpretation of the Securities Act."[41]  *Tang I*, 661 F. Supp.3d at 68.

In arguing otherwise, BRC merely recycles failed legal arguments from its motion to dismiss.  The most notable is its attempt to cleave registration of the "offering" of the Warrant shares in connection with the merger transaction from registration of the "issuance" and "sale" by which the Warrant shares will be exercised to purchase those same shares.  (*See* BRC Opp. at 16-19.)  In denying BRC's motion to dismiss, however, the Court rejected that argument.  *See* 631 F. Supp.3d at 69.  Judge Rakoff rejected the same argument in *Getty*, stating that the "invented-for-litigation distinction between a registration statement for the offer of shares, and a separate registration statement for the issuance and sale of those same shares, finds no support in the federal securities law."  700 F. Supp.3d at 42.  While there is a difference between an issuance, an offer, and a sale – and the securities laws acknowledge such difference – the distinction is, as Judge Rakoff found, irrelevant to whether an S-4 registration can register shares that are issuable upon exercise of warrants without the need for a second registration to allow the

---

[41] As it did in opposition to BRC's motion to dismiss, Tang again argues that SEC Rule 401(g) independently establishes that BRC's Form S-4 registration extended to exercise of the Warrants.  *See* 17 C.F.R. § 230.401(g)(1) ("a registration statement or any amendment thereto is deemed filed on the proper registration form unless the Commission objects to the registration form before the effective date").  To the extent BRC's S-4 registration included Warrant shares for purposes of being exercised, the Court agrees.  But, as the Court held in denying the motion to dismiss, Rule 401(g) itself does not shed light on whether the S-4 registration did or did not encompass the shares for purposes of being exercised.  *See* 661 F. Supp.3d at 72 n.20.

exercise of the warrants.[42]

### 3. BRC's Form S-4

Several aspects of the Form S-4 registration as filed by BRC and deemed effective by the SEC demonstrate that the S-4 registration fully registered the Warrant shares without the need for a second registration to allow those shares to be exercised.

The S-4's Registration Fee table describing the securities to be registered expressly includes registration not only of the 17,766,667 "Warrants to purchase shares of Class A Common Stock," but also "17,766,667 Shares of Class A Common Stock *issuable upon exercise* of warrants" which "[c]onsists of shares of [BRC] Class A Common Stock *issuable upon exercise* of the warrants." (First Salant Decl. Ex. 2 at ECF 2 (emphasis added).) The plain language of the S-4 states that it is registering the shares of stock that will issue "upon exercise" of the Warrants. The description expressly refers to the shares as being those that the Warrant holder will receive "upon exercise."

Moreover, the "issuable upon exercise" language mirrors that of § 7.4.1 of the Warrant Agreement, addressing registration "of the shares of Common Stock *issuable upon exercise* of the Warrants." (Warrant Agreement § 7.4.1 (emphasis added).) Recall from above that BRC argues, incorrectly, that § 7.4.1 addresses registration for purposes of exercising the Warrants distinct from the registration referred to in § 3.2.2 for offering

---

[42] BRC cites to *SEC v. Cavanaugh*, 155 F.3d 129, 133 (2d Cir. 2007) for the proposition that "[i]t is really the offering or sale of the particular security that is registered and not the security itself." *Cavanaugh*, however, is inapt. First, the Second Circuit was addressing whether a second, subsequent offering of securities previously registered required a new, second registration, which is not the issue before this Court. *See id.* Second, the Second Circuit recognized that successive registrations are not required for "delayed or continuous offering and sale of securities," which are at issue here. *Id.* (citing 17 C.F.R. § 230.415).

the Warrants.   Even were that so, the S-4 registration expressly mirrored the terms of §
7.4.1 by registering "shares of … Common Stock issuable upon exercise of the warrants."
In other words, the S-4 registration covered exactly what § 7.4.1 of the Warrant
Agreement calls for.   There can be no genuine dispute that the Form S-4 accomplished
exactly what it stated in the fee chart (i.e., that one "class of security to be registered"
when the Form S-4 became effective is "[s]hares of Class A Common Stock issuable
upon exercise of warrants"), and exactly what was required by § 7.4.1 of the Warrant
Agreement.   (*See* Warrant Agreement § 7.4.1 (requiring BRC to "as soon as practicable
… file … a registration statement for the registration … of the shares of Common Stock
**issuable upon exercise** of the Warrants") (emphasis added).)

      The fee table is not the only part of the Form S-4 filing expressly stating that the
registration includes the shares that may be purchased upon exercise of the Warrants.
The accompanying preliminary proxy statement and prospectus to be provided to
shareholders of SilverBox in advance of their vote to approve the merger, states in bold
and capital type: "PROSPECTUS FOR 40,725,250 SHARES OF CLASS A COMMON
STOCK[,] 17,766,667 WARRANTS TO PURCHASE SHARES OF CLASS A COMMON
STOCK **AND** 17,766,667 SHARES OF CLASS A COMMON **STOCK UNDERLYING
WARRANTS** OF BRC INC."  (First Salant Decl. Ex. 2 at ECF 3 (emphasis added).)   Like
the fee table, the S-4 prospectus expressly states that the registration includes the
Warrant shares.[43]  The question-and-answer portion of the S-4 prospectus also reaffirms
that the Warrants will be exercisable within 30 days of the S-4 registration, not some other

---

[43] BRC has not identified any authority that reference to the stock "underlying" the
Warrants in the prospectus is meaningfully different than the "issuable upon exercise"
language used in the Fee Table.

future registration.  (*Id.* at ECF 22-23.)  Indeed, nothing in the S-4 prospectus discloses the need for a separate, subsequent registration before the warrants could be exercised. In contrast, the only reference the S-4 makes to an S-1 filing is in connection with the private PIPE shares.[44]  (*See id.* at ECF 466 (referring to S-1 in context of "Preferred Units").[45])

One might ask, if the Form S-4 registration was sufficient to register the Warrant shares for purposes of their being exercised, why would BRC have then paid another $18,940.13 to register the same quantity of shares similarly described as "17,766,641 Shares of Class A Common Stock Issuable Upon the Exercise of Warrants"?  (*See* First Salant Decl. Ex. 81.)  There could be any number of reasons.  For instance, doing so could have been a mistake, or to provide cover for BRC's reversal of its position on whether the S-4 sufficed for the Warrants to be exercised, or, assuming neither mistake nor malfeasance, for the purpose of no longer having to amend the Form S-4 should

---

[44] Tang also points to the legal opinion letter of SilverBox's counsel Paul Hastings filed as part of the S-4 registration as further confirmation that no subsequent registration was necessary for the Warrants to be exercised. (*See* First Salant Decl. Ex. 2 at ECF 636.) BRC contends that the opinion letter provides merely that the Warrants will be exercisable according to the terms of the Warrant Agreement.  Assuming that is so for purposes of the motion, the opinion letter is not inconsistent with Tang's claim and does not affirmatively add anything in favor of BRC.  The Court therefore finds the parties' dispute about the import of the opinion letter to be immaterial.   For the same reason, the Court need not resolve the legal disagreement between the parties' experts as to whether the legal opinion addresses state or federal securities' issues.

[45] The S-4 registration also refers to the S-1 filed in connection with SilverBox's IPO dated February 8, 2021.  (*See* First Salant Decl. Ex. 2 at ECF 476, 630.)  That S-1 is not at issue.

doing so otherwise become necessary.[46]    That is all speculative, however.    And, regardless of the motive, while the Form S-1 was necessary to register the private-placement PIPE warrants and shares not previously registered by the S-4, it was not necessary, for purposes of Warrant holders' exercise of the Warrants, to include the "17,766,641 Shares of Class A Common Stock Issuable Upon the Exercise of Warrants" which, word for word, already had been registered by the S-4 registration.

### 4. Extrinsic Evidence

"It is a fundamental principle of contract law that agreements are interpreted in accordance with the parties' intent, and the best evidence of the parties' intent is what they expressed in their written contract." *Volt Electric NYC Corp. v. A.M.E., Inc.*, 586 F. Supp.3d 262, 276 (S.D.N.Y. 2022) (citing *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 963 N.Y.S.2d 613, 986 N.E.2d 430 (2013)).  In *Tang I*, the Court found the Warrant Agreement ambiguous as to the required registration process.  The Court therefore looks to extrinsic evidence for evidence of the parties' intent.  "Review of extrinsic evidence may include looking to 'negotiations ... made prior to or contemporaneous with the execution of a written contract which may tend to vary or contradict its terms.'"  *Volt*, 586 F. Supp.3d at 277 (quoting *United States Fire Insurance Co. v. General Reinsurance Corp.*, 949 F.2d 569, 571 (2d Cir. 1991)) ; *accord Shann v. Dunk*, 84 F.3d 73, 80 (2d Cir. 1996). "The

---

[46] An email sent by SilverBox's outside counsel to SilverBox's COO acknowledged that "some issuers register the shares underlying the public warrants on the S-1 registration statement" even if they were also registered on the S-4 "to avoid keeping the S-4 current." (First Salant Decl. Ex. 44 at -356.)  Neither the email (which was cited by Tang for a different passage) nor anything else brought to the Court's attention elaborates on that strategy or its legal underpinnings.  Even in connection with the current prospectus issue discussed below, BRC does not argue that it listed the Warrant shares on both its S-4 and S-1 registrations for that reason.

review of the surrounding facts and circumstances may also include consideration of industry custom and practice, *see U.S. Naval Institute v. Charter Communications, Inc.*, 875 F.2d 1044, 1048-49 (2d Cir. 1989), and any relevant course of performance or course of dealing, *see Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006)." *Volt*, 586 F. Supp.3d at 277.

Tang identifies several categories of extrinsic evidence it contends further demonstrate that BRC's S-4 registration was all that was required to register the Warrant shares under the Warrant Agreement so that the Warrants could be exercised within 30 days of closing of the Business Combination.  That evidence includes, *inter alia*, negotiation of the Warrant Agreement; BRC's statements with respect to registering the Warrants and Warrant shares at issue; the statements and understanding of others, including SilverBox and its counsel, BRC's bankers and auditors, and investors; the SEC's comment letters; and custom and practice of others in the industry.  Tang also alludes to BRC's motive to maximize value for BRC insider Earnout shares.  For its part, BRC characterizes all of the evidence cited by Tang, with the exception of negotiation history, as irrelevant to resolving any ambiguity in the Warrant Agreement.  BRC instead offers as evidence of custom and practice the Solomon Analysis of de-SPAC transactions involving other parties.  The Court addresses the relevance and import of each category.

### a.  Warrant Agreement Negotiations

Discovery revealed little about negotiation of the Warrant Agreement.   Tang contends that the record is devoid of any evidence that the parties to that agreement – SilverBox and Continental – intended that the Warrants could be exercised only after filing a second registration.  In opposition, BRC highlights one specific change made during the

drafting and negotiation process: the insertion in § 7.4.1 of the phrase "the issuance of" in a clause addressing the rights of Warrant holders during any period when BRC "shall fail to have maintained an effective registration statement covering ***the issuance of*** the shares of Common Stock issuable upon exercise of the Warrants." (Def. Counter 56.1 ¶¶ 20-21; First Salant Decl. Ex. 9 at -264-65 (emphasis added).) According to BRC, that addition implicitly references the need for an effective post-merger S-1 statement before the Warrants could be exercised. (BRC Opp. at 12.)

That is not a reasonable inference. First, the parties nowhere in the Warrant Agreement refer to any specific form of registration, be it an S-1, S-4, or something else; had the parties wanted to specify a particular form, they could have done so. Second, the immediately preceding portion of § 7.4.1 references the ***same registration statement*** – to be filed and maintained as effective – describing it as registration "of the Shares of Common Stock ***issuable upon exercise*** of the Warrants," not registration of the "issuance of the Shares of Common Stock issuable upon exercise of the Warrants." (First Salant Decl. Ex 9 at -265; Warrant Agreement § 7.4.1 (emphasis added).) The parties did not insert the phrase "the issuance of" into the affirmative contractual obligation to file the registration statement in the first place. Third, BRC's interpretation again is grounded in BRC's false dichotomy between registering an offer of warrant shares on one hand and issuance and sale on the other in the context of a delayed and continuous merger transaction like the one at issue here. In short, the limited evidence of the Warrant Agreement's negotiation history provides no meaningful guidance.

### b.  Statements Of BRC, SilverBox, And SilverBox Counsel[47]

Tang cites BRC's "contemporaneous" statements as relevant extrinsic evidence, including repeated statements by BRC's head of investor relations, Doss, who, after consulting and "triple-check[ing]" with lawyers, told investors that the Form S-4 had registered the shares at issue and that Warrant holders would be able to exercise their Warrants as of March 11, 2022.  (*See* First Salant Decl. Ex. 39.)  The statements on which Tang relies, however, are not contemporaneous with entry into the Warrant Agreement. Rather, they are contemporaneous to the events surrounding BRC's filing of the Form S-4 and Form S-1.  In that respect, the statements may be party admissions of what BRC purported to register with its S-4 filing.   But they are not contemporaneous extrinsic evidence of what the parties to the Warrant Agreement intended.

Tang also points to the statements of SilverBox's COO Chun and SilverBox's counsel Paul Hastings in early 2022, the latter of whom informed Chun that Warrant holders would be able to exercise their Warrants starting March 11, 2022.  (First Salant Decl. Ex. 44.)  As BRC correctly observes, those statements are post-contractual.  BRC

---

[47] Tang also refers to BRC's contemporaneous "conduct," particularly BRC having filed an Exchange Act Form 10-K in which BRC listed three categories of "unregistered securities" but did not include the stock shares Warrant holders would receive upon exercise.  (First Salant Decl. Ex. 5 at 18-19.)  BRC disputes any implication to be drawn from that fact.   (Def. Counter 56.1 ¶ 67.)   The record does not contain sufficient information to determine what significance may or may not be attributed to what BRC listed or did not list in the "unregistered securities" section.  The issue is immaterial, however; BRC does not cite the omission as supporting its position, and the outcome is the same even if the fact does not have the implication that Tang suggests it does.  The same goes for Tang's reliance on BRC's application to list securities on the NYSE, as a result of which the NYSE issued a certification letter registering Class A common stock, and "Redeemable warrants, each whole warrant exercisable for one share of Class A common stock."  (*See* Def. Counter 56.1 ¶ 64; First Salant Decl. Ex. 29.)  That fact is either neutral or in Tang's favor, and BRC does not suggest otherwise.

thus dismisses them, along with Doss's statements, as immaterial to determining the mutual intent of the parties – SilverBox and Continental – at the time they entered into the Warrant Agreement.    (BRC Opp. at 13-15, citing, *inter alia*, *Faulkner v. National Geographic Society*, 452 F. Supp.2d 369, 378 (S.D.N.Y. 2006) (holding that defendant executive's post-contractual testimony that contractual provision supported plaintiff's claims would not be considered on summary judgment because the testimony "sa[id] nothing about [defendant's] views at the time the contracts were entered").)

Even so, what SilverBox and BRC did and said about registration and exercise of the Warrants represents their course of dealing with others, such as the SEC and investors.  As the Supreme Court explained long ago, "[g]enerally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118, 33 S. Ct. 967, 972 (1913); *accord Ocean Transport Line, Inc. v. American Philippine Fiber Industries, Inc.*, 743 F.2d 85, 91 (2d Cir. 1984) ("The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent"); *Starr Indemnity & Liability Co. v. Brightstar Corp.*, 388 F. Supp.3d 304, 329 (S.D.N.Y. 2019) (the "parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties" (internal quotation marks and citation omitted)).  This principle applies to successors like BRC.  *Jim Henson Products, Inc. v. John T. Brady & Associates, Inc.*, 16 F. Supp.2d 259, 287 (S.D.N.Y. 1997) ("Deliberate informed acts of … successors subsequent to the … Agreements and before any controversy arose … may be used in determining the meaning of the Agreements").

To be sure, none of the post-contractual statements by BRC and SilverBox or its counsel represent a course of dealing between them and Continental, the other party to the Warrant Agreement.  That does not, however, render the statements irrelevant, particularly to the extent BRC published those statements to others as BRC did to investors.  *See In re MPM Silicones, LLC*, 874 F.3d 787, 797 (2d Cir. 2017) (holding that defendant's "repeated[ ] [post-contractual] represent[ations] … to the financial community" were probative of meaning of indenture).  For purposes of summary judgment, however, the Court agrees with BRC that the statements, and any fact disputes about those statements, are not material.[48]

### c. Statements Of Advisors And Investors

Apart from the conduct and statements by BRC, Tang also points to the statements and actions of "[n]umerous others, including BRC's bankers [Citibank], BRC's auditors [KPMG], … and sophisticated and unsophisticated investors writing to BRC" who "all understood contemporaneously that the S-4 registered the underlying Warrant shares, and the Warrants were exercisable starting on March 11."  (Tang Mem. at 17.[49])  BRC eschews such statements as even further afield than those of BRC, SilverBox, and Paul

---

[48] BRC asserts that even if the statements of Doss, SilverBox, and others were relevant extrinsic evidence, they are fraught with factual disputes, particularly in light of BRC having changed its position following BRC's input from Kirkland.  (BRC Opp. at 15.)  The Court agrees that BRC's flip-flop (mirrored by its advisors, Citibank and KPMG, discussed below) presents credibility issues that are not properly considered on summary judgment.  But those credibility issues do not stand in the way of summary judgment.  As explained above, the statements are not relevant extrinsic evidence of the mutual intent of the parties to the Warrant Agreement.  And, at best for BRC, the evidence of its change in position neutralizes Doss's earlier admissions consistent with Tang's position but adds nothing to BRC's side of the scales of relevant extrinsic evidence.

[49] "Tang Mem." refers to Tang's Memorandum of Law in Support of Its Motion for Summary Judgment at Dkt. 144.

Hastings as post-contractual subjective understanding of non-contracting parties. (BRC Opp. at 14.) The Court agrees that for purposes of summary judgment, the statements at issue are not material.

### d. SEC Comment Letters

As additional extrinsic evidence, Tang asserts that the SEC, "[i]n its review of and comments on BRC's draft Form S-4," "never indicated the Form S-4 was unsuited or unable to register the shares issuable upon Warrant exercise, even while it rejected the inclusion of a different tranche of shares [the private PIPE shares] on BRC's S-4." (Tang Mem. at 17.) That is true. BRC attempts to circumvent that fact by returning to its meritless argument that the S-4 registration merely registered a "deemed offering" of the Warrant shares but not did not register those same shares for purposes of their being exercised. (BRC Opp. at 17.) BRC notes that the SEC also did not object to BRC's duplicative inclusion of the same shares on the later Form S-1. (*Id.*) But that is meaningless, both because BRC has not provided any explanation why doing so would be a cause for the SEC to object, and because, as mentioned above, there may be valid reasons for BRC to have done so.

Tang additionally refers to SEC comment letters in two other de-SPAC transactions (not involving either of the instant parties) that in Tang's view "rejected issuers' attempts to *disclaim* registration of shares issuable upon exercise of warrants in de-SPAC transactions registered on Form S-4 or F-4 (the Form S-4's foreign-issuer equivalent)." (Tang Mem. at 17.) The Court does not construe the letters to be so definitive, and, in any event, the SEC letters address purportedly inconsistent statements made by the issuer in non-final registrations; they do not address an issuer's actions upon

an attempted exercise of warrants.[50]  (*See* First Salant Decl. Exs. 114, 115.)  That said,
as Judge Rakoff observed in *Getty* in reference to one of the letters, "[t]he SEC made no
distinction between registering the shares underlying the warrants only for offer, rather
than for both offer and sale."  700 F. Supp.3d at 43.

### e.  Custom And Practice

Both parties point to evidence of custom and practice in the industry to support
their positions.  The centerpiece of BRC's custom-and-practice evidence is the Solomon
Analysis of how parties to other de-SPAC transactions registered their transactions and
related securities.  As explained above, the Solomon Analysis is flawed in its failure to
account for different types of de-SPAC transactions.  It also is largely irrelevant in that it
does not address either the reasons that warrant shares may be registered on both Forms
S-4 and S-1, or the terms of the warrant agreements governing the transactions.  The
analysis appears no more helpful than a similar analysis (from a different expert)
presented in *Getty*, where Judge Rakoff relegated it to a footnote and characterized it as
"practically meaningless."  *Getty*, 700 F. Supp.3d at 43 n.9.

Regardless, far from establishing a uniform practice, the results of the Solomon
Analysis, if anything, show considerable variation in how parties to de-SPAC transactions
register warrant shares.  It also shows that registrants sometimes use a Form S-4 alone
to register the warrant shares thereby undermining BRC's contention that doing so is

---

[50] BRC asserts that the issuers in those two other de-SPAC transactions did not permit
exercise of warrants until after the S-1 (or F-1 foreign equivalent) became effective; Tang
disputes the assertion.  (Pl. Reply 56.1 ¶ 64.)  The dispute is immaterial as the Court finds
the SEC comment letters in those cases to be inconsequential.  To the extent BRC cites
those transactions as evidence of industry custom and practice, the Court addresses that
topic below.

neither permissible nor an industry practice.  Thus, the Solomon Analysis, even if accepted as relevant and helpful, is not proof of a uniform industry custom and practice of employing a two-step registration process to register warrant shares.[51]

### f.  Motive

Finally,[52] Tang urges consideration of BRC's motive, specifically its incentive to maximize the value of the Earnout shares for BRC's insiders by "flushing" out the Warrants and inhibiting their exercise for cash.  As BRC correctly observes and this Court previously has recognized, motive is not an element of a claim for breach of contract. *UMB Bank, N.A. v. Sanofi*, No. 15-CV-8725, 2017 WL 6398628, at *2 (S.D.N.Y. Nov. 22, 2017).  Tang has not offered any authority to the contrary.  Motive and financial interest

---

[51] BRC emphasizes a subset of five transactions included in the Solomon Analysis for which Tang's counsel, Gibson, served as transaction counsel for other parties and in which warrant shares were registered "via an S-1."  (Dkt. 181 ("BRC Reply") at 1-2.)  That subset does not advance the ball for BRC any more than does the Solomon Analysis as a whole.  In two of the transactions, the emerging company did not register the warrants or warrant shares on Form S-4, thus using only a one-step registration process; in two others, Gibson was not responsible for the S-1 filing; and the last involved a re-domiciliation of the SPAC that triggered certain requirements.  (*See* Dkt. 149 at 16-17; First Salant Decl. Exs. 131 at ECF 2-4, 132 at ECF 2-4, 133 at ECF 2, 134 at ECF 2, and 135 at ECF 2-3.)

[52] As extrinsic evidence, Tang also offers quotes from investor correspondence and articles by law firms to the effect that registering warrant shares on an S-4 is sufficient for them to be exercised.  (Tang Mem. at 17.)  Those statements, among others, are hearsay, and at this juncture Tang has not offered a basis for their admission.  Accordingly, the Court does not consider them for purposes of the instant motions.  Tang also alludes to "analogous disputes," namely the two SEC comment letters discussed above, the *Getty* case, and another case brought by the same plaintiff as in *Getty* against a different issuer. (*Id.* at 18.)  Two other of the "scenarios" invoked by Tang, are cases currently in litigation. *See Alta Partners, LLC v. Forge Global Holdings, Inc.*, No. 23-CV-2647, 2024 WL 1116682, at *8 (S.D.N.Y. March 13, 2024) (denying in part and granting in part partial motion to dismiss).  To the extent *Getty* and *Forge* provide substantive guidance, the Court cites to them.  But the fact that there is ongoing litigation involving similar claims as here is not relevant extrinsic evidence.

are relevant to credibility and bias, but on summary judgment the Court does not make any credibility determinations. Accordingly, evidence of BRC's motive is irrelevant for present purposes and does not add to clarifying any ambiguity in the Warrant Agreement.

### g. Summary Of The Evidence

"When the resolution of a contract depends on an ambiguous term or phrase, summary judgment should usually be denied and the ambiguity submitted to the factfinder for resolution by resort to the extrinsic evidence. But if the tendered extrinsic evidence is itself conclusory and will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court and there is no role for the factfinder in interpreting the contract." *Ezrasons, Inc. v. Travelers Indemnity Co.*, 89 F.4th 388, 396 (2d Cir. 2023) (internal quotation marks and citations omitted). Similarly, summary judgment is appropriate "if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *see also Endurance American Specialty Insurance Co. v. Century Surety Co.*, 46 F. Supp.3d 398, 414 (S.D.N.Y. Sept. 15, 2014) ("even when a contract is ambiguous, if the parol evidence offered by the parties does not resolve that ambiguity, or after opportunity to do so the parties do not offer extrinsic evidence to resolve the ambiguity, the Court must construe the contract as a matter of law on a summary judgment motion"); *Faulkner*, 452 F. Supp.2d at 376 ("If all the extrinsic evidence supports a single interpretation, the court may grant summary judgment for the party advocating the interpretation, almost as if the language had been unambiguous in the first place").

Here, there is considerable evidence of statements by BRC and others that BRC's filing of its Form S-4 was sufficient to enable Warrant holders to exercise their Warrants as of March 11, 2024.  There also is evidence that BRC only changed its view after consulting new counsel.  And, there is evidence of motive favorable to Tang.  None of that, however, is material extrinsic evidence to resolving any ambiguity in the Warrant Agreement (as distinct from evidence of what BRC intended to register with the Form S-4).  The two pieces of evidence that fall squarely within extrinsic evidence that may be considered are negotiation history and industry custom and practice.  As explained, above, however, the scant negotiation history of the Warrant Agreement does not shed light on whether that agreement required a second registration before Warrant holders could exercise their Warrants.  Meanwhile, the Solomon Analysis, faulty as it is, supports Tang.  It shows variation in how parties register warrants and warrant shares and that parties to de-SPAC transactions, to a not-insignificant extent, do not follow a two-step registration process for warrant shares.  There is no other extrinsic evidence that BRC has pointed to that would resolve the Warrant Agreement's ambiguity in its favor.

In sum, the Warrant Agreement does not specify the use of any particular registration form or the number of registrations required; SEC regulations, rules, and guidance allow for registration of warrant shares along with their corresponding warrants without the need for a second registration to enable exercise of the warrants; the plain language of the Warrant Agreement permits exercise of the Warrants within 30 days of an effective registration statement; and the Court is left with no admissible extrinsic evidence that supports BRC's view that the Warrant Agreement requires a two-step registration process for the Warrant Shares to be exercised.  To the contrary, BRC's Form

S-4 expressly registered the shares issuable upon exercise of the warrants and made no mention of a second registration that would be required to exercise them.

Under these circumstances, Tang is entitled to summary judgment that the Warrant Agreement's condition that there be an effective registration prior to exercise of Warrants was satisfied as of March 11, 2024, and at all times Tang attempted to exercise its Warrants. *See Topps Co.*, 526 F.3d at 68 (2d Cir. 2008); *Endurance American Specialty Insurance Co.*, 46 F. Supp.3d at 414.

**B.    Current Prospectus**

BRC's second merits argument on summary judgment is that even if the first condition – an effective registration – for exercise of the Warrants was satisfied, the second condition – a current prospectus – was not.    BRC appears to have come across this argument after-the-fact: it did not assert the argument at either the motion to dismiss stage or, more notably, in any of its communications to investors when it reversed course on its earlier position that the Warrants could be exercised before the Form S-1 registration became effective.

BRC's Form S-4 registration, declared effective by the SEC on January 13, 2022, included an extensive prospectus of more than 600 pages disclosing everything from capital structure, to the terms governing exercise of the Warrants, to the maximum proceeds BRC could receive from exercise of the Warrants, along with more that 50 pages of risk factors, and hundreds of pages of financial disclosures.    (*See* First Salant Decl. Ex. 2.)  BRC nonetheless contends that the S-4 prospectus was no longer current as of March 16, 2022, when BRC filed its Form S-1 with a prospectus that included,

among other new information, audited financial statements for all of 2021.[53]  (BRC Opp. at 21-22; BRC Mem. at 21-23.[54])  Tang counters that the Form S-4 prospectus remained effective at the times Tang attempted to exercise its Warrants and that, if the prospectus was not current, BRC cannot escape liability because it prevented the very condition on which it relies and failed to comply with its contractual obligation under the Warrant Agreement to maintain a current prospectus.  (Tang Mem. at 20-23; Tang Opp. at 16-19.[55])  Tang is correct.

"A prospectus is not current if there have been 'post-effective developments which materially alter the picture presented in the registration statement.'"  *Getty*, 700 F. Supp.3d at 43 (brackets omitted) (quoting *Securities and Exchange Commission v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1095 (2d Cir. 1972), *abrogated on other grounds by Liu v. Securities and Exchange Commission*, 591 U.S. 71, 140 S. Ct. 1936 (2020)).  On many occasions, a prospectus can be brought up to date with a short prospectus supplement referred to as a "sticker," which does not require SEC approval.  *See Manor Nursing Centers, Inc.*, 458 F.2d at 1095 n.14 ("The way [ ] new facts … are brought to the attention of offerees as a matter of mechanics is by putting a sticker on the prospectus or supplementing it otherwise"); *see generally* 17 C.F.R. § 230.424(b)(3).  As stated by the SEC, sticker supplements may be appropriate for "[m]aterial changes that can be stated

---

[53] BRC contends that the S-4 prospectus was no longer current as of March 16, 2022, implicitly conceding that the prospectus was current as of March 11, 2022, when Tang first attempted to exercise Warrants.  (BRC Opp. at 19.)

[54] "BRC Mem." refers to BRC's Memorandum of Law in Support of Its Motion for Summary Judgment at Dkt. 156.

[55] "Tang Opp." refers to Tang's Memorandum of Law in Opposition to BRC's Motion for Summary Judgment at Dkt. 172.

accurately and succinctly," 47 Fed. Reg. 11,373, 11395 (March 16, 1982).  Alternatively, the issuer must file a post-effective amendment where facts or events, either individually or in the aggregate, arising after the effective date of the registration statement "represent a fundamental change in the information set forth in the registration statement."  17 C.F.R. § 229.512 (a)(ii); *see* 47 Fed. Reg. at 11395.

Tang and BRC dispute whether developments between the effective date of the Form S-4 registration (January 13, 2022) and BRC's filing of the Form S-1 registration (on March 16, 2022) were material such as would render the Form S-4 prospectus no longer current.  The parties also dispute whether, if the developments were material, they were so significant as to be fundamental, such that BRC would be required to file a post-effective amendment rather than proceeding by sticker supplement.  BRC identifies various items in the S-1 prospectus that were not included in the S-4 prospectus.  BRC particularly emphasizes that the S-1 prospectus included newly available audited year-end 2021 financial results (showing an additional $70 million in net revenue); that the S-1 prospectus also disclosed redemption of 77.8 percent of SilverBox Class A shares; and that the SEC requested additional disclosures, such as the likely effect on the price of BRC stock resulting from the extent of the redemption.  (BRC Opp. at 21; BRC Mem. at 22.)

BRC's contention that the developments it cites were material but could not be addressed by sticker or that the changes were fundamental is dubious.  A change is material if "there is a substantial likelihood that the disclosure of [the information] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38,

131 S. Ct. 1309, 1318 (2011) (internal quotation marks and citation omitted).  BRC asserts it "determined that the combined effect of the new developments reflected in the S-1 prospectus amounted to a fundamental change, or at least to material changes that could not be both 'accurately and succinctly' represented in a sticker."  (BRC Opp. at 21.)  That assertion is problematic in multiple respects.

First, BRC does not cite any evidence of record that BRC "determined" anything apart from the fact of its having filed the Form S-1 and when it did so.  Second, BRC does not say it could not have accurately and succinctly represented changes individually or in groups as they occurred with separate sticker supplements, just as it did ten separate times with respect to its S-1 registration.  (*See* Def. Counter 56.1 ¶ 170.)

Third, the pivotal new development prompting BRC was release of BRC's audited year-end 2021 financial statements.  In *Getty*, Judge Rakoff rejected the same "current-prospectus" argument BRC asserts here.  As here, the S-4 prospectus "had already provided voluminous pro forma financials, extensive information on Getty's post-closing capital structure, and the maximum proceeds Getty could receive from warrant exercise." 700 F. Supp.3d at 44 (internal quotation marks omitted).  And, as here, the defendant in *Getty* "does not even attempt to explain, or mobilize evidence in the record that shows, ***how*** the post-effective disclosures were material. … Getty does not argue, for instance, that the additional quarter of financial information materially changed the picture that a reasonable investor would have of the company or that the information in the S-4 prospectus did not adequately capture the business and financials of post-closure Getty." *Id.* at 43-44 (emphasis added).

BRC does not explain why an "additional quarter of financial information materially

changed the picture that a reasonable investor would have of the company." *Id.* at 44. To the contrary, BRC advised investors that "the results of any one quarter should not be relied upon as an indication of future performance" due to "moderate seasonal fluctuation" and that BRC "tend[s] to have higher revenues and cash flows during the holiday season in the fourth quarter."  (First Sternberg Decl. Ex. 19 at ECF 54, 154.)  Despite reporting $70 million in new revenue over the previous year, BRC did not suggest that was unexpected or unusual.[56]  Tellingly, BRC's securities expert Solomon characterizes as "relevant" to the Warrants and their exercise the new developments and information set forth in the S-1 prospectus that were not included in the earlier S-4 prospectus.  (Solomon Report ¶¶ 214-26.)  He does not, however, characterize them as either material or fundamental.[57]  (*See id.*)

---

[56] The unaudited financial data reported with the S-4 in January 2022 indicated that for the first three quarters of 2021, revenue increased over the same period of the previous year by $57 million.  (First Salant Decl. Ex. 2 at ECF 236.)  Extrapolated to a full year, the anticipated revenue for 2021 year would have been approximately $76 million.

[57] Solomon opines that the S-4 prospectus necessarily was "stale" as of February 14, 2022, being 45 days after the end of BRC's fiscal year.  (Solomon Report, ¶¶ 204-09.) He cites to the SEC Financial Reporting Manual, available at https://www.sec.gov/ corpfin/cf-manual, § 1210.  Section 1210 states that SEC "staff may not make a review decision or commence a review of a filing unless the registrant's financial statements comply with the rules for age of financial statements and audit at the date of filing or submission."  By its terms, that directive applies to filings that have not yet been acted upon; it does not address already-effective registrations such as BRC's Form S-4. Solomon also quotes portions of "practitioner literature" that are derived from sections 1220.2 and 1220.3 of the SEC Financial Reporting Manual.  (*Compare* Solomon Report, ¶¶ 206-07, *with* SEC Financial Reporting Manual §§ 1220.2, 1220.3.)  But like § 1210, those sections address review of filings not yet declared effective.

In addressing Solomon's staleness arguments, Tang's expert Huber employs language that if taken out of context could suggest that he concludes the new information in the S-1 prospectus was material and fundamental (even though he did not use those words). In context, however, Huber makes the point that because BRC had filed a 2021 Form 10-

But even if there is a factual dispute as to the materiality of the post-S-4 developments and what could have been done to address them, Tang is still entitled to summary judgment on whether the second condition for exercise of the Warrants was satisfied.  To the extent that post-S-4 information was material or even fundamental, BRC failed in its obligation to maintain the S-4 prospectus as current and thereby bears responsibility for preventing the very condition it now says was not met.

Section 7.4 of the Warrant Agreement requires BRC to use its reasonable best efforts not only to file a registration "of the shares of Common Stock issuable upon exercise of the Warrants" within 60 days following closing of the Business Combination, but also to "maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration or redemption of the Warrants."  (Warrant Agreement § 7.4.1.)  As established above, BRC's Form S-4 registration registered the shares of common stock "issuable upon exercise" of the Warrants.  Under § 7.4.1, BRC had the obligation to maintain a current prospectus relating to "such registration statement."[58]

Even if BRC did not have that contractual obligation, it cannot assert the absence of a condition precedent – a current prospectus relating to the registration previously

---

K on March 16, 2022, the same day it filed the S-1 registration, BRC was required under SEC rules to file a post-effective amendment to the S-4 registration and could have done so that same day.  (Huber Rebuttal Report ¶¶ 36-39.)  Regardless, accepting for present purposes that the new information contained in the S-1 prospectus was material or even fundamental, Tang is still entitled to summary judgment for the reasons explained above.

[58] The obligation to maintain an effective registration and current prospectus lasted "until the expiration or redemption of the Warrants," which, in this instance was only until May 4, 2022.  (Warrant Agreement § 7.4.1; First Salant Decl. Ex. 77.)

made effective – that BRC itself "was instrumental in preventing or frustrating its occurrence." *St. Christopher's, Inc. v. JMF Acquisitions, LLC*, No. 20-CV-3808, 2021 WL 6122674, at *4 (2d Cir. Dec. 28, 2021) (internal quotation marks and citation omitted); *see also Consolidated Edison, Inc. v. Northeast Utilities*, 426 F.3d 524, 528 (2d Cir. 2005) ("a party may not avoid performance of a contractual duty by preventing the occurrence of a condition precedent").  BRC could have kept the S-4 prospectus current either by deploying sticker supplements (as BRC later did many times with respect to its Form S-1 registration) or by filing a post-effective amendment to the S-4 prospectus (as BRC also later did with respect to the S-1 registration).[59]  But it did neither; indeed, BRC did not make any effort to do so whatsoever.  *See Holland Loader Co. v. FLSmidth A/*S, 313 F. Supp.3d 447, 473 (S.D.N.Y. 2018) ("compliance with a 'commercially reasonable efforts' clause requires at the very least some conscious exertion to accomplish the agreed goal" (citation omitted)), *aff'd*, 769 F. App'x 40 (2d Cir. 2019).  BRC cannot now escape liability

---

[59] Both securities experts agree that under SEC rules, sales of a security are suspended between the filing date and effective date of a post-effective amendment.  (Solomon Report ¶ 148 & n.191; Huber Rebuttal ¶ 31.)  *See* SEC Division of Corporate Finance, *Compliance and Disclosure Interpretations*, Section 139. Securities Act Section 5. Q. 139.28 (Aug. 14, 2009) (requiring suspension of sales if a "post-effective amendment is filed for the purpose of a  Section 10(a)(3) amendment and the prospectus is already stale for Section 10(a)(3) purposes").  In a but-for world where BRC had filed a post-effective amendment to the S-4 as of March 16, 2022, sales – and thus exercise of warrants – would have been suspended until the amendment were deemed effective.  The Court cannot speculate as to how long that would have taken.  But the transaction dates for the first tranche of Warrants for which Tang claims damages following March 16, 2022, were not until April 7-11, 2022, approximately three weeks after the theoretical post-effective amendment would have been filed.  As a point of comparison, it took only nine days for the SEC to deem effective a post-effective amendment BRC filed to its S-1.  (*See* Huber Rebuttal Report ¶  40), which was discussed at oral argument.   To the extent that amendment may have been different in kind, length, and import, BRC should not benefit from the lack of any certainty as to whether a post-effective amendment to the S-4 would have been deemed effective within three weeks given that BRC did not make any effort to submit any such amendment in the first place.

based on its own failure to do what was necessary to maintain a current prospectus. *See Adler v. Solar Power, Inc.*, No. 16-CV-1635, 2018 WL 1626162, at *6 (S.D.N.Y. March 30, 2018) ("A party can impermissibly frustrate the occurrence of a condition precedent either through affirmative obstruction or through inaction where they party has a duty to act").

BRC argues that it did in fact do what was necessary to maintain a current prospectus by filing the Form S-1.[60]  As BRC would have it, the Form S-1 prospectus was a post-effective amendment to the Form S-4 prospectus.  (BRC Mem. at 21-22; BRC Opp. at 19.)  In particular, BRC posits that the prospectus filed with its Form S-1 registration was a "combined prospectus" pursuant to SEC Rule 429.  That rule provides that "[w]here a registrant has filed two or more registration statements, it may file a single prospectus in the latest registration statement" and that "the registration statement containing the combined prospectus shall act, upon effectiveness, as a post-effective amendment to any earlier registration statement whose prospectus has been combined in the latest registration statement."  17 C.F.R. § 230.429.

BRC did not, however, comply with the requirements that would indicate the S-1 prospectus was a combined prospectus pursuant Rule 429.  The rule requires that the

---

[60] BRC also asserts that Tang may not pursue a "theory of breach" based on failure to maintain a current prospectus because Tang did not plead it.  (BRC Opp. at 20.)  BRC misses the point.  Tang is not asserting a claim for breach of the Warrant Agreement grounded in BRC's breach of its obligation to maintain a current prospectus; rather, Tang points to BRC's failure to maintain a current prospectus as an explanation of why the current-prospectus condition precedent is not an impediment to Tang's claim for breach of BRC's failure to honor Tang's exercise of the Warrants.  Moreover, Tang pled BRC's breach of § 3.3.2 of the Warrant Agreement, which subjects the current-prospectus condition to BRC's "satisfying its obligations under Section 7.4," including the obligation to maintain a current prospectus.  (Warrant Agreement § 3.3.2.)

registrant "identify any earlier registration statement to which the combined prospectus relates by setting forth the Commission file number at the bottom of the facing page of the latest registration statement."  17 C.F.R. § 230.429.  BRC's Form S-1 filing did not do so.  It did not mention anywhere, let alone the facing page, the Form S-4's registration number.  Indeed, it made no mention of the Form S-4 at all.  BRC's assertion that its Form S-1 filing was a post-effective amendment of the Form S-4 has no support in the factual record.[61]

In short, BRC's contention that Tang's claim is foreclosed because the current-prospectus condition was not met is meritless.  Either the Form S-4 prospectus remained current at the time Tang attempted to exercise its Warrants, or, if it did not, BRC is responsible for frustrating fulfillment of the condition.  In either instance, Tang is entitled to summary judgment that the current-prospectus condition did not stand in the way of Tang's exercise of the Warrants.

## II. DAMAGES

Tang claims $10,534,588 in damages for BRC's refusal to honor the exercise of Warrants at three different junctures.  Tang seeks summary judgment against BRC for those damages.  BRC, however, argues that, even if the conditions to exercise were met, BRC is entitled to summary judgment for multiple reasons:  (1) that Tang did not in fact

---

[61] Inasmuch as BRC's combined-prospectus and post-effective-amendment arguments lack merit, so does its assertion that it was required to suspend sales, and thus exercise the Warrants, between filing of the Form S-1 registration and the SEC's approval of it as effective.  (BRC Mem. at 21-22; BRC Opp. at 19.)  *See generally* SEC Division of Corporate Finance, *Compliance and Disclosure Interpretations*, Section 139. Securities Act Section 5 (Aug. 14, 2009); *id.* Section 225. Rule 429 – Prospectus Relating to Several Registration Statements, Q. 225.01 (Jan. 26, 2009)  (stating that "[o]nce Rule 429 is used to create a combined prospectus, the prospectus that is a part of the earlier registration statement generally may not be used by itself").

incur any damages, (2) that Tang did not actually attempt to exercise the majority of the Warrants for which it claims damages, and (3) that Tang failed to mitigate its damages and cannot recover for any Warrants it purchased after March 11, 2022, when BRC rejected Tang's first attempt to exercise Warrants. The Court begins its discussion with the applicable legal principles for the damages that potentially may be recovered, and then addresses the three tranches of damages and BRC's mitigation argument.

## A.    Applicable Law Of  Damages

"[D]amages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Boyce v. Soundview Technology Group, Inc.*, 464 F.3d 376, 384 (2d Cir. 2006) (internal quotation marks and citation omitted). In New York, a non-breaching party "is entitled, as a matter of law, to recover market value damage to the extent that they can be proven with reasonable certainty." *Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) (internal quotation marks and citation omitted). A plaintiff must prove "the fact of damages by a preponderance of the evidence" and establish a "stable foundation for a reasonable estimate of the damages incurred as a result of the breach." *Id.* Once the plaintiff has done so, "the burden of any uncertainty as to the amount of damages is on the breaching party." *Id.*

"'[T]he measure of damages' for failing to deliver a stock in accordance with an option or warrant agreement 'is the difference between the option price and the market value of the stock.'" *Getty*, 700 F. Supp.3d at 44 (quoting *Boyce*, 464 F.3d at 385). For a publicly traded stock, like that of BRC, the market value is "the mean between the highest and lowest quoted selling prices, as provided by the public exchange upon which

the stock traded" at the time of the breach.  *Boyce*, 464 F.3d at 385 (internal quotation marks and citation omitted).  Damages are "calculated from the date that the non-breaching party expected to receive the benefit of the contract."  *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 618 F. Supp.2d 280, 294 (S.D.N.Y. 2009).

"New York's courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages."  *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985).  Accordingly, "[i]n a breach of contract action, a plaintiff ordinarily has a duty to mitigate the damages that he incurs.  If the plaintiff fails to mitigate his damages, the defendant cannot be charged with them.  This duty applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense."  *U.S. Bank National Association v. Ables & Hall Builders*, 696 F. Supp.2d 428, 440-41 (S.D.N.Y. 2010).  Mitigation of damages is an affirmative defense for which the defendant has the burden of proof.  *Travellers International, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994); *SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, 700 F. Supp.3d 146, 158 (S.D.N.Y. 2023).  "More specifically, the breaching party must show that the plaintiff *unreasonably* failed to minimize damages."  *SuperCom*, 700 F.3d at 158 (internal quotation marks and citation omitted).

## B.    First Tranche:  March 11, 2022

The parties agree that Tang has no damages in connection with the 50,000 Warrants it attempted to exercise on March 11, 2022.  That is because Tang received a net gain from its later disposition of those Warrants in the amount of $28,194.  Tang has subtracted that amount from the damages it seeks.  (*See* Tang Mem. at 24 and App'x A

at 1, Column [A].)

**C.    Second Tranche: April 7, 8, and 11, 2022**

Tang seeks damages in connection with 300,000 Warrants it sold on April 7, 8, and 11, 2022.  Tang incurred a net capital loss of $2,691,318 in connection with those Warrants by virtue of having sold them rather than exercising them.  (Tang Mem. at 24 and App'x A at 1, Column [B].)  Tang's damages expert Arnold arrived at that figure by subtracting the exercise price of $11.50 from the mean market value of BRC common stock, and then multiplying that figure by the number of Warrants that Tang claims it would have exercised but for BRC's breach.  (Def. Counter 56.1 ¶ 196.)

BRC does not dispute the calculation of alleged damages.  Rather, BRC argues that Tang is not entitled to any damages in connection with sale of the 300,000 Warrants because Tang never attempted to exercise them.  (BRC Opp. at 23; BRC Mem. at 24.)  In other words, BRC says, it had no obligation to perform because Tang did not itself do what was required to obtain BRC's performance.  *See Gillespie v. St. Regis Residence Club*, 343 F. Supp.3d 332, 348 (S.D.N.Y. 2018) ("Nonperformance of a required duty under a contract is not a breach … until the performance is due") (internal quotation marks and citation omitted).

Tang argues in response, and Tang's principal testified at deposition, that it "had no choice" but to sell the 300,000 Warrants because BRC was refusing to allow exercise of Warrants while Tang was being informed by brokers when the stock price was rising that Tang had to "unwind the call position" it had created as part of its strategy to profit from the Warrants.  (Tang Mem. at 24-25; Pl. Counter 56.1 ¶¶ 45-46; First Salant Decl. Ex. 60 at 254-55.)  According to Tang, it would have preferred to exercise the Warrants

and then sell the stock obtained from doing so, which would have been financially more advantageous.   Knowing that BRC was blocking the exercise of Warrants, Tang "reasonably attempted to reduce its losses by selling this tranche of Warrants."  (Tang Opp. at 22.)

Tang's argument implicates two principles – mitigation and futility.   First, as explained above and BRC argues below, Tang had the obligation to mitigate its losses by reasonably acting to do so.   Second, "where it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts or conditions precedent."  *Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 135 A.D.2d 891, 892, 522 N.Y.S.2d 292, 293 (3d Dep't 1987); *see also Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991) (excusing contractual obligation where complying "would have been a 'useless act' in the face of [counter-defendant's continued breach]"); *Tavern on the Green International LLC*, 351 F.Supp.3d at 693 (notice requirement excused because defendant's conduct made "clear that [it] never would have availed itself of the opportunity to cure" even if notice had been provided);  *Concorde Financial Corp. v. Value Line, Inc.*, No. 03-CV-8020, 2004 WL 1687205, at *3 (S.D.N.Y. July 28, 2004) (collecting cases).   Going through the formality of attempting to exercise the second tranche of Warrants arguably would have been futile since BRC already had rejected Tang's first attempt to exercise on the basis that the Form S-1 was not yet effective.

But whether Tang reasonably believed that BRC continued to stand by the position it asserted on March 11, 2022, over three weeks earlier, and whether Tang acted reasonably in selling the 300,000 Warrants when it did as a means of stemming losses,

are questions of fact that the Court cannot resolve on summary judgment.  Perhaps most pointedly, Tang's own conduct is inconsistent and raises credibility issues.  Despite its assertion that it "had no choice" but to sell starting on April 7, 2022, only the day before began Tang started selling the 300,000 Warrants, Tang completed a three-day round of buying 174,394 warrants, for which it now claims damages.  (*See* First Salant Decl. Ex. 100.)  And, just two days after Tang sold the last tranche of the 300,000 Warrants, Tang attempted to exercise Warrants, apparently making the choice it claims not to have had just two days earlier.  (Def. Counter 56.1 ¶ 208.)  Indeed, Tang's argument that it should recover for the largest tranche of Warrants in this case (discussed below) is premised on its having attempted to exercise them on April 13, 2022.  A reasonable juror could well reject the notion that Tang "had no choice" and would have deemed it futile to attempt exercise Warrants on April 7, 8, and 11, but not on April 13; another reasonable juror might conclude otherwise.

Accordingly, neither party is entitled to summary judgment with respect to whether Tang may recover damages in connection with the 300,000 Warrants it sold between April 7-11, 2022.[62]

## D.    Third Tranche: April 13, 2022

Tang seeks damages in the amount of $7,871,463 for the 735,364 Warrants Tang

---

[62] BRC argues that it is entitled to summary judgment on the second tranche of Warrants, citing *Getty* for the proposition that without the actual attempt to exercise of Warrants, there can be no damages.  (BRC Mem. at 24.)  BRC overstates *Getty*'s damages holding. In *Getty*, Judge Rakoff held that the plaintiff could not recover damages for warrants it had not owned at the time of breach and thus could not "meet its burden to prove that those holders performed (or would have performed) under the Warrant Agreement."  700 F. Supp.3d at 45 (quoting *Getty* brief) (internal quotation marks omitted).  In contrast, it is undisputed that Tang held the Warrants at the time of BRC's breach and therefore had the requisite knowledge.

sought to exercise on April 13, 2022.  As with the second tranche of Warrants, BRC does

not challenge Tang's calculation of damages, arguing instead that Tang is not entitled to

any damages at all.  Specifically, BRC argues that Tang failed to identify the number of

Warrants it sought to exercise on April 13, 2022, and faults Tang for not completing an

election-to-purchase form that would have provided that information.[63]  (BRC Opp. at 23-

24; BRC Mem. at 24-25.)

Tang responds that it did specify the number of Warrants to be exercised through

the three emails sent on April 13, 2022, between Tang and its broker Jefferies within the

span of 20 minutes.  At 6:49 a.m., Brandon Wang of Tang emailed Vick Kahwadjian at

Jefferies to transfer Tang's 735,364 Warrants to a particular Tang account; at 7:00 a.m.,

Wang sent another email instructing Kahwadjian to disregard the earlier email because

"we plan to exercise the warrants instead of transferring them"; and finally at 7:09 a.m.,

Danica Mock of Tang emailed Kahwadjian "requesting again to allow us to exercise for

cash the BRCC warrants" and stating that the matter was urgent.  (Def. Counter 56.1 ¶¶

---

[63] In its two principal briefs, BRC does not argue that the absence of a completed election-to-purchase form, even though called for by the Warrant Agreement, bars Tang's claim with respect to exercising the Warrants on April 13, 2022.  Rather, BRC relies on it as demonstrating the importance of specifying the quantity to be transacted and properly documenting requests to exercise to avoid later disputes.  (*See* BRC Mem. at 24-25; BRC Opp. at 24.)  But the election-to-purchase form included with BRC's Form S-4 does not include a space for identifying the quantity of Warrants to be exercised.  (*See* Warrant Agreement at Ex. A-5.)  In any event, as Tang explains, Warrant holders in actual practice elect to exercise not by submitting election-to-purchase forms but by electing online, which is precisely what Jefferies instructed Tang to do.  (Tang Opp. at 23 n.16; First Salant Decl. Ex. 105.)  In reply in support of its motion, BRC does not dispute the practice and instead argues that Tang is not excused from the requirement of the Warrant Agreement's plain language.  (BRC Reply at 9.)  That argument is not tenable given that BRC does not dispute either the actual practice or the instructions given to Tang by Jefferies.

181-83.)  Taken together, the three emails, all sent to the same person, instructed Tang's broker to exercise the remaining 735,364 Warrants.

BRC's argument that Tang's instructions were ambiguous at best and did not specify the number of Warrants to be exercised is specious.  Within less than 20 minutes, Tang (1) instructed Jefferies to transfer the specific quantity of 735,364 Warrants; (2) instructed Jefferies to disregard that instruction because Tang planned to exercise "the" Warrants instead; and (3) requested Jefferies to exercise "the" Warrants for cash. Nothing in the record indicates that Jefferies had any doubt about the instructions or the number of Warrants at issue.  For instance, there is no email from Kahwadjian to Mock asking for clarification or expressing any confusion about the quantity of Warrants to be exercised.  To the contrary, later the same morning, Jefferies informed Mock that "we have been advised by the agent that per the company's counsel only cashless exercises are permitted based on the redemption call." (*Id.* ¶ 185.)  No reasonable juror could find that Tang did not identify the quantity of Warrants it sought to exercise on April 13, 2022. Tang is entitled to summary judgment on BRC's failure-to-quantify argument.

## E.    Failure To Mitigate

BRC has asserted the affirmative defense that Tang cannot recover damages because Tang failed to mitigate them.  BRC advances two different mitigation arguments: that (1) Tang may not recover damages for Warrants it purchased after BRC informed Tang on March 11, 2022, that BRC would not honor exercise until its Form S-1 became effective; and 2) Tang should have but did not pursue alternative trading strategies that would have lessened its claimed damages.  The Court concludes there are genuinely disputed issues of material fact concerning mitigation with respect to both arguments

advanced by BRC.

### 1.   Warrants Purchased After March 11, 2022

BRC argues that because it refused to allow Tang's first attempt to exercise Warrants on March 11, 2022, Tang had a duty to mitigate its damages by not purchasing and attempting to exercise additional Warrants.   The Court agrees with BRC that rather than mitigating its damages, Tang exacerbated them – to some extent.

On both March 10 and March 11, 2022, Tang was informed that the Warrants could not be exercised in the absence of the Form S-1 registration being effective.  (Pl. Counter 56.1 ¶¶ 53, 58.)  On March 11, 2022, Tang and BRC's outside counsel exchanged views by phone about BRC's position that a Form S-4 could not be used for a delayed or continuous offering under Rule 415.  (Def. Reply 56.1 ¶¶ 4-5; First Salant Decl. Ex. 58 at -514.)   Tang's outside counsel Gibson then sent an email to BRC's outside counsel Kirkland stating that Gibson understood BRC's view but at the same time explaining why Kirkland was incorrect and that the Warrants could be exercised.  (Salant Decl. Ex. 58 at -514.)   Gibson's email expressly requested confirmation that the Warrants could be exercised, but no response was provided that day or after.  (Def. Counter 56.1 ¶ 120.)

Thus, as of March 11, Tang knew that BRC had rejected Tang's attempted exercise of Warrants and the reasons BRC gave for doing so.  Yet in the following days, and without any confirmation by BRC that the Warrants could be exercised, Tang purchased 435,634 additional Warrants.  Of those, 200,000 already had been ordered on March 10 and March 11 (Def. Reply 56.1 ¶ 10), but Tang did not cancel those orders.[64]

---

[64] Tang does not contend that it could not have cancelled the Warrants that had been ordered but not yet settled.

(*See* Def. Reply 56.1 ¶ 11; First Salant Decl. Ex. 100.)  Tang asserts that it was justified in both not cancelling those orders and also purchasing additional Warrants because Tang "had good reason to believe BRC would change its position or at least answer Tang Capital's March 11 email."  (Tang Opp. at 25; Tang Reply at 9-10.[65])

Tang had the obligation to make reasonable efforts to mitigate its damages.  *U.S. Bank*, 696 F. Supp.2d at 440-41.  That is an objective standard, not a subjective one. *Impax Laboratories, Inc. v. Turing Pharmaceuticals AG*, No. 16-CV-3241, 2017 WL 4357893, at *19 (S.D.N.Y. Sept. 29, 2017).  When Tang should have started to take steps to mitigate is a question of fact the factfinder must resolve.  Should Tang have mitigated starting March 11, 2022 since it did not have the confirmation it asked for, and the last word from BRC had been that the Warrants could not be exercised?  *See Air Et Chaleur, S.A.*, 757 F.2d at 494 ("When plaintiffs learned … that [the defendant] intended to breach the contract, they were not at liberty to hold their stocks" and had a duty to "minimize their damages"); *Royal Park Investments SA/NV v. Deutsche Bank National Trust Co.*, No. 14-CV-4394, 2016 WL 4613390, at *20 (S.D.N.Y. Aug. 31, 2016) (the "duty to mitigate damages comes into play once there has been a breach").

If not on March 11, 2022, was there was some time soon thereafter when Tang "should have realized that [BRC] was not going to change its mind."  *See Drummond v. Morgan Stanley & Co.*, No. 95-CV-2011, 1996 WL 631723, at *3 (S.D.N.Y. Oct. 31, 1996). Was that time a couple days later on March 13, 2022, when Warrants on order had not

---

[65] "Tang Reply" refers to Tang's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment at Dkt. 185.

yet settled such that Tang could have cancelled the orders?[66]  Was it March 30, 2022, when Tang next purchased Warrants?  (*See* First Salant Decl. Ex. 100.) Was it at some later time?  The question is a disputed fact that cannot be resolved on summary judgment. *See Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp.3d 323, 346 (S.D.N.Y. 2021) ("Whether a party puts forth sufficient effort to mitigate damages is a question of fact and typically resolved during trial") (internal quotation marks and citation omitted); *Morgan Stanley High Yield Securities, Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp.2d 206, 222 (S.D.N.Y. 2003) (denying motion for summary judgment with respect to damages because defendant's failure to mitigate defense involved "questions of fact that cannot be resolved on summary judgment").

Accordingly, neither party is entitled to summary judgment on the extent to which Tang may recover damages for Warrants purchased (or on pending order) after March 11, 2022.

### 2.    Alternative Trading Strategies

BRC's other mitigation argument is that regardless of which Warrants are actionable, Tang had a duty to minimize its damages by implementing a different trading strategy than holding onto Warrants until just prior to redemption.  BRC's damages expert Hendershott delineates several different strategies that Tang could have pursued to reduce any resulting damage.  (Second Sternberg Decl. Ex. 4 ¶¶ 14, 35-53.)  Hendershott opines that had Tang adopted any one of those alternatives, Tang's purported loss would be reduced to a range of $2.1 million to $6.4 million.  (*Id.* ¶ 14.)  Tang responds that BRC's

---

[66] A chart of Tang's trading of the Warrants shows that 93,000 of the 200,000 Warrants that had been ordered but not yet purchased as of March 11, 2022, settled on March 16 and 17, 2022.  (*See* Second Salant Decl. Ex. 142.)

mitigation defense is flawed because BRC's expert does not specify which one of the strategies to better manage its position in the Warrants Tang "should have" implemented. (Tang Reply at 10.)  That argument is misguided.  The question of mitigation is one of reasonableness, taking into account various factors, including risk, burden, and expense. *U.S. Bank*, 696 F. Supp.2d at 440-41; *see also SuperCom*, 700 F. Supp.3d at 172 ("factors that courts have considered relevant" to when would be a reasonable time for a plaintiff to begin mitigating, "are the complexity of the transaction, the volatility of the stock in question, recent market activity, the need to consult with counsel, the size of the transaction, and the need to determine whether further negotiation would be futile").  The reasonableness of Tang's actions and whether, to what extent, when, and how Tang should have pursued an alternative strategy, if any, to reduce its damages are questions of disputed fact.  Again, the question of mitigation in this instance cannot be resolved on summary judgment.

## CONCLUSION

For the foregoing reasons, the parties' motions are GRANTED IN PART and DENIED IN PART as follows:

1.    BRC's motion to exclude the expert opinions of John J. Huber is granted in part and denied in part as discussed above.

2.    Tang's motion to exclude the expert opinions of Professor Steven D. Solomon is granted in part and denied in part as discussed above.

3.    Tang is entitled to summary judgment that the conditions required under the Warrant Agreement for a Warrant holder to exercise the Warrants were satisfied as of March 11, 2022, and remained so before BRC's S-1 registration became effective.

4.      BRC is entitled to summary judgment that Tang did not incur any damages for its attempt to exercise 50,000 Warrants on March 11, 2022.

5.      Summary judgment is denied as to whether and to what extent Tang may recover damages for the Warrants it sold on April 7-11, 2022, and its remaining Warrants, including those purchased after March 11, 2022.

To the extent not discussed herein, the Court has considered all of the parties' arguments and determined them to be either moot or without merit.

The parties shall meet and confer, and, within 14 days of entry of this Decision and Order, shall file a joint proposal for filing the pre-trial order and accompanying materials.

The Clerk of Court is directed to terminate the motions at Dkts. 143, 148, 151, and 155.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:      November 8, 2024
            New York, New York